**No. 21-2121**

# In the United States Court of Appeals for the Federal Circuit

MYLAN PHARMACEUTICALS INC.,
*Appellant,*

*v.*

MERCK SHARP & DOHME CORP.,
*Appellee.*

Appeal from the Patent Trial and Appeal Board
No. IPR2020-00040

## OPENING BRIEF OF APPELLANT

Eric T. Werlinger
KATTEN MUCHIN ROSENMAN LLP
2900 K Street, NW – Suite 200
Washington, DC 20007
Tel.: 202-625-3500
eric.werlinger@katten.com

Deepro R. Mukerjee
Lance A. Soderstrom
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022
Tel.: 212-940-6330
deepro.mukerjee@katten.com
lance.soderstrom@katten.com

*Counsel for Appellant Mylan Pharmaceuticals Inc.*
(*Additional counsel on the signature block*)

October 18, 2021

**Patent Claims at Issue: U.S. Patent No. 7,326,708**
**Claims 1-4, 17, 19, 21-23 (Appx00091-00092)**

1. A dihydrogenphosphate salt of 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine of structural formula I:

(I)




or a hydrate thereof.

2. The salt of claim 1 of structural formula II having the (R)-configuration at the chiral center marked with an *

(II)



3. The salt of claim 1 of structural formula III having the (S)-configuration at the chiral center marked with an *

(III)




4. The salt of claim 2 characterized in being a crystalline monohydrate.

17. A pharmaceutical composition comprising a therapeutically effective amount of the salt according to claim 2 in association with one or more pharmaceutically acceptable carriers.

19. A method for the treatment of type 2 diabetes comprising administering to a patient in need of such treatment a therapeutically effective amount of the salt according to claim 2 or a hydrate thereof.

21. A process for preparing the salt of claim 2 comprising the step of contacting one equivalent of (2R)-4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine in an organic solvent or aqueous organic

solvent with about a one equivalent of phosphoric acid at a temperature in the range of about 25-100° C.

22. The process of claim 21 wherein said organic solvent is a $C_1$-$C_5$ linear or branched alkanol.

23. The phosphoric acid salt of (2R)-4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine prepared according to the process of claim 21.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2021-2121

**Short Case Caption** Mylan Pharmaceuticals Inc. v. Merck Sharp & Dohme Corp.

**Filing Party/Entity** Mylan Pharmaceuticals Inc.

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/18/2021

Signature: /s/ Deepro R. Mukerjee

Name: Deepro R. Mukerjee

**FORM 9. Certificate of Interest** **Form 9 (p. 2)**
**July 2020**

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Mylan Pharmaceuticals Inc. | Mylan, Inc.; Viatris Inc. | Mylan, Inc.; Viatris Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Alissa M. Pacchioli | | |
| Christopher W. West, Ph.D. | | |
| Heike S. Radeke, Ph.D. | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Merck Sharp & Dohme Corp. v. Mylan Pharmaceuticals Inc., No. 1-19-cv-00101 (N.D.W. Va.) | | |
| In re Sitagliptin Phosphate (`708 & `921) Patent Litigation, MDL No. 19-2902-RGA | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

PATENT CLAIMS AT ISSUE .......... i

CERTIFICATE OF INTEREST .......... iv

TABLE OF AUTHORITIES .......... ix

STATEMENT OF RELATED CASES .......... xiv

INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 4

STATEMENT OF THE ISSUES .......... 5

STATEMENT OF THE CASE .......... 5

A. Merck Patents Freebase Sitagliptin "and Pharmaceutically Acceptable Salts Thereof": WO ′498 and the ′871 Patent. .......... 5

B. The Prevalence of Crystalline Monohydrates in Pharmaceutical Preparations Was Well Known in the Prior Art. .......... 10

C. Merck Files a Subsequent Patent Claiming the Specific DHP Salt at Issue Here: the ′708 Patent. .......... 13

D. Procedural History .......... 14

SUMMARY OF THE ARGUMENT .......... 18

ARGUMENT .......... 23

I. The Sitagliptin DHP Salt Claimed by the ′708 Patent Is Anticipated by WO ′498 and the ′871 Patent, Which Teach Sitagliptin "and Pharmaceutically Acceptable Salts Thereof." .......... 24

A. The Prior Art Discloses the Combination of Sitagliptin and Phosphoric Acid in a Well-Defined List, and a Skilled Artisan Would Immediately Envisage a 1:1 Stoichiometry. .......... 24

1. WO ’498 and the ’871 Patent teach “pharmaceutically acceptable salts” of sitagliptin using phosphoric acid. ....25

2. A skilled artisan would at once envisage a 1:1 stoichiometry based upon the broader disclosures regarding pharmaceutically acceptable salts of sitagliptin. ....29

B. The Board Erred by Holding that 1:1 Stoichiometry Was Not Anticipated. ....33

II. Claims 1-2, 17, 19, and 21-23 Do Not Antedate WO ’498. ....41

A. Merck’s Antedation Argument Fails Because WO ’498 Discloses Sitagliptin Hydrates and Merck Has Conceded that It Failed to Reduce Them to Practice Before the Publication of That Reference. ....42

B. The Board’s Acceptance of Merck’s Antedation Theory Ignores the Plain Language of WO ’498. ....45

C. The Board’s Antedation Holding Is Wrong Because It Ignored the Presumption of Enablement and Relieved Merck of Its Burden to Overcome That Presumption. ....48

III. Claims 3 and 4 of the ’708 Patent Are Obvious. ....52

A. WO ’498 and Bastin Render Claim 3 Obvious Because They Would Allow a Skilled Artisan to Envisage and Create a 1:1 Sitagliptin DHP With an S-Configuration. ....52

B. Claim 4’s Crystalline Monohydrate Is Obvious in Light of WO ’498, Bastin, and Brittain. ....57

CONCLUSION ....62

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003) ....................48, 49, 50, 51

*Amgen Inc. v. F. Hoffman-La Roche Ltd*,
457 F.3d 1293 (Fed. Cir. 2006) ....................49, 50

*Amgen Inc. v. F. Hoffman-La Roche Ltd*,
580 F.3d 1340 (Fed. Cir. 2009) ....................2

*ArcelorMittal France v. AK Steel Corp.*,
700 F.3d 1314 (Fed. Cir. 2012) ....................34

*Blue Calypso, LLC v. Groupon, Inc.*,
815 F.3d 1331 (Fed. Cir. 2016) ....................18, 27, 28

*Bristol-Myers Squibb Co. v. Ben Venue Lab'ys, Inc.*,
246 F.3d 1368 (Fed. Cir. 2001) ....................24

*Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*,
958 F.3d 1348 (Fed. Cir. 2020) ....................23, 24

*Cohesive Techs., Inc. v. Waters Corp.*,
543 F.3d 1351 (Fed. Cir. 2008) ....................53

*Connell v. Sears, Roebuck & Co.*,
722 F.2d 1542 (Fed. Cir. 1983) ....................53

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
567 F.3d 1314 (Fed. Cir. 2009) ....................51

*Dickinson v. Zurbo*,
527 U.S. 150 (1999) ....................23

*Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*,
471 F.3d 1369 (Fed. Cir. 2006) ....................34, 35

*Enzo Biochem, Inc. v. Calgene, Inc.*,
188 F.3d 1362 (Fed.Cir.1999) .......... 49

*Galderma Lab'ys, L.P. v. Tolmar, Inc.*,
737 F.3d 731 (Fed. Cir. 2013) .......... 61

*Hologic, Inc. v. Smith & Nephew, Inc.*,
884 F.3d 1357 (Fed. Cir. 2018) .......... 24

*Impax Lab'ys, Inc. v. Aventis Pharms. Inc.*,
468 F.3d 1366 (Fed. Cir. 2006) .......... 34, 35

*Impax Lab'ys, Inc. v. Aventis Pharms., Inc.*,
545 F.3d 1312 (Fed. Cir. 2008) .......... 4, 48

*In re Antor Media Corp.*,
689 F.3d 1282 (Fed. Cir. 2012) .......... 48

*In re Clarke*,
356 F.2d 987 (C.C.P.A. 1966) .......... 20, 43, 51

*In re Copaxone Consol. Cases*,
906 F.3d 1013 (Fed. Cir. 2018) .......... 55, 59

*In re Field*,
161 F.2d 372 (C.C.P.A. 1947) .......... 43, 44

*In re Gartside*,
203 F.3d 1305 (2000) .......... 23

*In re Gleave*,
560 F.3d 1331 (Fed. Cir. 2009) .......... 26, 47

*In re Graves*,
69 F.3d 1147 (Fed. Cir. 1995) .......... 25

*In re Kalm*,
378 F.2d 959 (C.C.P.A. 1967) .......... 53

*In re Petering*,
301 F.2d 676 (C.C.P.A. 1962) .......... *passim*

*In re Preda*,
401 F.2d 825 (C.C.P.A. 1968)....................25

*In re Soni*,
54 F.3d 746 (Fed. Cir. 1995)....................60

*In re Steed*,
802 F.3d 1311 (Fed. Cir. 2015)....................43

*In re Von Bramer*,
127 F.2d 149 (C.C.P.A. 1942)....................47

*Intell. Ventures I LLC v. Motorola Mobility LLC*,
870 F.3d 1320 (Fed. Cir. 2017)....................50

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016)....................23, 24

*Iron Grip Barbell Co. v. USA Sports, Inc.*,
392 F.3d 1317, 1322 (Fed. Cir. 2004)....................61, 62

*Kao Corp. v. Unilever U.S., Inc.*,
441 F.3d 963 (Fed. Cir. 2006)....................60

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.*,
780 F.3d 1376 (Fed. Cir. 2015)....................24, 25

*Leo Pharm. Prod., Ltd. v. Rea*,
726 F.3d 1346 (Fed. Cir. 2013)....................60

*Medicines Co. v. Mylan, Inc.*,
853 F.3d 1296 (Fed. Cir. 2017)....................46

*Millennium Pharms., Inc. v. Sandoz Inc.*,
862 F.3d 1356 (Fed. Cir. 2017)....................23, 60, 61

*Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*,
851 F.3d 1270 (Fed. Cir. 2017)....................39, 40

*OSI Pharm., LLC v. Apotex, Inc.*,
939 F.3d 1375 (Fed. Cir. 2019)....................23, 24

*Perricone v. Medicis Pharms. Corp.*,
432 F.3d 1368 (Fed. Cir. 2005) .......... 26

*Pfizer, Inc. v. Apotex Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) .......... 56

*Power Integrations, Inc. v. Lee*,
797 F.3d 1318 (Fed. Cir. 2015) .......... 38, 39

*Realtime Data, LLC v. Iancu*,
912 F.3d 1368 (Fed. Cir. 2019) .......... 53

*Regents of Univ. of Minn. v. AGA Med. Corp.*,
717 F.3d 929 (Fed. Cir. 2013) .......... 47

*Sinclair & Carroll Co. v. Interchemical Corp.*,
325 U.S. 327 (1945) .......... 26

*Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*,
743 F.3d 1359 (Fed. Cir. 2014) .......... 46, 47

*Trustees of Columbia Univ. in N.Y.C. v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016) .......... 45

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*,
683 F.3d 1356 (Fed. Cir. 2012) .......... *passim*

*ZUP, LLC v. Nash Mfg., Inc.*,
896 F.3d 1365 (Fed. Cir. 2018) .......... 61

**Statutes**

28 U.S.C. § 1295(a)(4) .......... 4

35 U.S.C. § 102 (2006) .......... 41, 42, 43, 44, 54

35 U.S.C. § 103 (2006) .......... 41

**Other Authorities**

Compl., *Merck Sharp & Dohme Corp. v. Mylan Pharms. Inc.*,
No. 1:19-cv-00315, ECF No. 1 (D. Del. Feb. 13, 2019)..................................15

## STATEMENT OF RELATED CASES

No other appeal in or from this action was previously before this or any other appellate court. The following cases may be affected by the Court's decision: *Merck Sharp & Dohme Corp. v. Mylan Pharmaceuticals Inc.*, No. 1-19-cv-00101 (N.D.W. Va.); *In re Sitagliptin Phosphate (`708 & `921) Patent Litigation*, MDL No. 19-2902-RGA.

## INTRODUCTION

This appeal arises from an *inter partes* review of U.S. Patent No. 7,326,708 ("the ′708 Patent"). The ′708 Patent generally claims sitagliptin dihydrogen phosphate ("sitagliptin DHP") in a 1:1 stoichiometry and various hydrates thereof. Mylan Pharmaceuticals Inc. petitioned for IPR of the ′708 Patent because patent owner Merck Sharp & Dohme Corp. previously disclosed sitagliptin through at least WO 03/004498 ("WO ′498") and U.S. Patent No. 6,699,871 ("the ′871 Patent"), both of which pre-date the ′708 Patent by several years. The ′708 Patent lists the ′871 Patent as prior art, and its written description repeatedly references the disclosures of WO ′498.

WO ′498 and the ′871 Patent are identical in relevant part. Both claim sitagliptin and its "pharmaceutically acceptable salts." They further teach that such salts can be formed using one of eight "[p]articularly preferred" acids (including phosphoric acid) and may exist in crystalline forms (including hydrates). Appx00376 (9:31-34), Appx00507 (6:44-48). Finally, WO ′498 and the ′871 Patent both exemplify a sitagliptin salt in a 1:1 stoichiometry formed using an acid from the particularly preferred list. Appx00413 (46:1-5), Appx00520 (32:1-13). Based on these disclosures, WO

′498 and the ′871 Patent cover the sitagliptin DHP salt claimed by the ′708 Patent.

These facts set up a classic case of anticipation and obviousness. Merck cannot extend its monopoly over sitagliptin DHP with a serially filed patent that merely provides granular instructions on how to create a salt that it has already disclosed and patented. *See Amgen Inc. v. F. Hoffman-La Roche Ltd,* 580 F.3d 1340, 1370 (Fed. Cir. 2009) (recognizing "long-standing rule that an old product is not patentable even if it is made by a new process"). Yet the Patent Trial and Appeal Board rejected both arguments in an error-riddled final written decision.

The Board first held that WO ′498 and the ′871 Patent did not anticipate certain claims of the ′708 Patent because neither expressly discloses sitagliptin DHP in a 1:1 stoichiometry. Notably, the Board said that a skilled artisan would not envisage the 1:1 stoichiometry because of the supposed "breadth" of other possible salts and stoichiometries that could be formed using different compounds and different acids that were also revealed in the prior art. But in so doing, the Board misapplied the law by improperly broadening the scope of the anticipation analysis. Sitagliptin and its pharmaceutically acceptable salts are expressly claimed by WO ′498 and the

’871 Patent, and the definition of “pharmaceutically acceptable salts” informs skilled artisans that they can and should use phosphoric acid to create such salts.

Because a salt must have a stoichiometry, the only question the Board needed to answer was whether the skilled artisan could then envisage the 1:1 stoichiometry from the disclosure of a sitagliptin and phosphoric acid salt, not whether more distant stoichiometries were also possible. The answer should have been “yes.” The 1:1 stoichiometry is concededly part of a limited class of potential stoichiometries for sitagliptin DHP and that is good enough under Federal Circuit law to prove anticipation. *In re Petering*, 301 F.2d 676, 681 (C.C.P.A. 1962).

This case should have been an easy call on obviousness as well. But the Board summarily dismissed Mylan’s argument on Claims 1-2, 17, 19, and 21-23, holding that WO ’498 was not prior art for these claims because Merck had supposedly reduced the subject matter to practice before the priority date of WO ’498. In doing so, the Board relieved Merck of its burden to prove that it had reduced hydrates of sitagliptin DHP to practice (and it concededly had not) because the Board said WO ’498 does not claim or enable sitagliptin DHP hydrates.

That is false. In defining what a "pharmaceutically acceptable salt" is, WO ′498 says that "[s]alts in the solid form may exist in more than one crystal structure, ***and may also be in the form of hydrates***." Appx00376 (9:32-34) (emphasis added). And because WO ′498 is materially identical to the ′871 Patent, *see* Appx00507 (6:46-48), its disclosures are presumptively enabled. *See Impax Lab'ys, Inc. v. Aventis Pharms., Inc.*, 545 F.3d 1312, 1316 (Fed. Cir. 2008). Merck did not even try to prove otherwise.

Finally, the Board's nonobviousness conclusions on Claim 3 and Claim 4 are flawed because the record shows that WO ′498, alone or in combination with supporting pieces of prior art, would have easily allowed a skilled artisan to arrive at the limitations of those claims. And even though it is dicta, the Board's conclusion that Claim 4 is an unexpected result over the prior art is legally flawed because the Board did not compare the claimed compound to the closest prior art, *i.e.*, the prior art sitagliptin phosphate salt.

For the reasons that follow, the Board's final written decision should be reversed.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(4). The Board entered its final written decisions upholding the

challenged claims of the ′708 Patent on May 7, 2021. Appx00001. Mylan filed a timely notice of appeal on July 8, 2021. Appx09860-09861.

## STATEMENT OF THE ISSUES

1. Is the 1:1 stoichiometry of sitagliptin DHP from Claims 1-3, 17, 19, 21-23 of the ′708 Patent anticipated because the prior art discloses that a 1:1 stoichiometry is one of the limited possible stoichiometries for a sitagliptin DHP salt?

2. Do Claims 1-2, 17, 19, 21-23 antedate WO ′498 despite Merck's concession that it did not reduce hydrate salts of sitagliptin DHP to practice before the priority date of WO ′498?

3. Are Claims 3 and 4 obvious over the prior art?

## STATEMENT OF THE CASE

### A. Merck Patents Freebase Sitagliptin "and Pharmaceutically Acceptable Salts Thereof": WO ′498 and the ′871 Patent.

Sitagliptin has been around for decades.[1] It belongs to a class of compounds called dipeptidyl peptidase-IV ("DP-IV" or "DPP-IV")

[1] Sitagliptin is known as 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro [1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine or 7-[(3R)-3-Amino-4-(2,4,5-trifluorophenyl)butanoyl]-3-(trifluoromethyl)-5,6,7,8- tetrahydro-l,2,4-triazolo[4,3-a]pyrazine .3. Appx00413 (46:1-4).

inhibitors, which are used to treat and manage Type 2 diabetes. Appx00505 (1:49-57). Sitagliptin was publicized in WO ’498 and patented in the United States by the ’871 Patent. Appx00367, Appx00413 (46:1-5), Appx00504, Appx00520 (32:1-16). Both WO ’498 and the ’871 Patent claim priority to U.S. Provisional Application No. 60/303,474, which was filed on July 6, 2001. Appx00367, Appx00504. Relevant here, the claims and written descriptions of WO ’498 and the ’871 Patent are identical.

WO ’498 and the ’871 Patent teach the formulas of various DP-IV inhibitors. Formula I is relevant here:




I

Appx00371 (4:1-5), Appx00521 (3:11-23). WO ’498 and the ’871 Patent expressly claim sitagliptin as one of 33 compounds that can be produced using Formula I:




Appx00422 (bottom compound), Appx00523 (37:35-40). The prior art claims both freebase sitagliptin and "pharmaceutically acceptable salts thereof." Appx00422 (bottom compound), Appx00427 (60:5), Appx00523 (37:35-40), Appx00524 (40:48); *see also* Appx00508 (7:5-7) ("It will be understood that, as used herein, references to the compounds of Formula I are meant to also include the pharmaceutically acceptable salts.").

WO '498 and the '871 Patent instruct that "'pharmaceutically acceptable salts' refers to salts prepared from pharmaceutically acceptable non-toxic bases or acids including inorganic or organic bases and inorganic or organic acids." Appx00376 (9:27-29), Appx00507(6:38-41). Significantly, the prior art identifies eight "[p]articularly preferred" acids for preparing pharmaceutically acceptable salts: "citric, hydrobromic, hydrochloric, maleic, ***phosphoric***, sulfuric, fumaric, and tartaric acids." Appx00377 (10:14-15), Appx00508 (7:2-4) (emphasis added). In the same discussion, WO

’498 and the ’871 Patent state that “[s]alts in the solid form *may exist in more than one crystal structure,* ***and may also be in the form of hydrates***.” Appx00376 (9:33-34), Appx00507 (6:46-48) (emphasis added).

The prior art goes on to exemplify (but not limit) a pharmaceutical preparation of sitagliptin using hydrochloric acid, one of the eight “particularly preferred” acids:

EXAMPLE 7




7-[(3*R*)-3-Amino-4-(2,4,5-trifluorophenyl)butanoyl]-3-(trifluoromethyl)-5,6,7,8-tetrahydro-1,2,4-triazolo[4,3-*a*]pyrazine, hydrochloride

Appx00413 (46:1-4), Appx00520 (32:1-13). Example 7 depicts the hydrochloride salt of sitagliptin in its (R)-configuration.

Importantly, Example 7 exemplifies the sitagliptin salt with only having a 1:1 stoichiometry despite being prepared in a 1000-fold excess of hydrochloric acid—a stronger acid than phosphoric acid.[2] Appx00413 (46:1-4), Appx00520 (32:1-13), Appx02363 (145:22-147:2). As a matter of basic

[2] Stoichiometry is the ratio of acid to base in the salt form. Appx02606 (¶ 33).

chemistry, if one knows that a stronger acid donates only one proton to the sitagliptin molecule (particularly when used in an excess amount), one would expect the same result to be obtained if a sitagliptin salt were prepared using a weaker acid. The stronger an acid is, the more likely it is to donate available protons to a basic compound like sitagliptin. Appx09087-09088 (¶ 8). Subsequent testing validated this expectation: In a series of salt-formation experiments using sitagliptin and phosphoric acid, Dr. Leonard Chyall obtained a 1:1 stoichiometry every time despite his "deliberate attempt to obtain a phosphate salt other than a 1:1 adduct of sitagliptin and phosphoric acid." Appx06869, Appx06878, Appx06879 (¶¶ 22-23, 48, 50).[3]

Finally, both WO '498 and the '871 Patent stress the breadth of their teachings: "While the invention has been described and illustrated with

---

[3] Dr. Chyall's declaration and data come from a patent proceeding in Israel related to the Israeli equivalent of the '708 Patent. Appx02666 (¶ 123). Merck's expert, Dr. Adam Matzger, performed his own experiments for the proceedings below, in which he allegedly obtained non-1:1 stoichiometries. *E.g.*, Appx02667 (¶ 125). But as both Dr. Mukund Chorghade (Mylan's expert) and the Board observed, Dr. Matzger significantly altered the protocol described in the prior art. Appx00038-00039, Appx09114-09118 (¶¶ 45-57). Dr. Chorghade further explained these changes likely explain why Dr. Matzger obtained remote non-1:1 stoichiometries, while Example 7 and Dr. Chyall's experiments resulted in only a 1:1 stoichiometry. Appx09114-09118 (¶¶ 45-57).

reference to certain particular embodiments thereof, those skilled in the art will appreciate that various adaptations, changes, modifications, substitutions, deletions, or additions of procedures and protocols may be made without departing from the spirit and scope of the invention." Appx00416 (49:1-4), Appx00521 (33:29-32). Therefore, "[i]t is intended . . . that the invention be defined by the scope of the claims which follow and that such claims be interpreted as broadly as is reasonable." Appx00416 (49:13-15), Appx00521 (33:29-32).

### B. The Prevalence of Crystalline Monohydrates in Pharmaceutical Preparations Was Well Known in the Prior Art.

WO '498 and the '871 Patent teach pharmaceutically acceptable salts of sitagliptin and explicitly include crystalline hydrates. These publications expanded on industry knowledge about drug formation. For example, it was already known that "[f]or weakly basic drugs substances" like sitagliptin, skilled artisans should consider creating "salts of an inorganic acid," such as "phosphate." Appx00496 (Richard J. Bastin et al., *Salt Selection and Optimisation Procedures for Pharmaceutical New Chemical Entities*, 4 ORGANIC

PROCESS RESEARCH AND DEVELOPMENT 427, 428 (2000) ("Bastin")).[4] Moreover, a skilled artisan would have known that hydrochloric acid poses "potential disadvantages" in salt formation, including "unacceptably high acidity in formulations (e.g., parenteral products), the risk of corrosion, less than optimal solubility . . . and the potential for poor stability." Appx00496.

Further, monohydrates are the most prevalent form of crystalline hydrate. This would have been basic knowledge to a skilled artisan. *See generally* Appx00436-00494 (BRITTAIN, POLYMORPHISM IN PHARMACEUTICAL SOLIDS (1999) ("Brittain")). Brittain discusses the prevalence of crystal hydrates of pharmaceutical substances. Appx00439-00442. As Brittain teaches:

> Focusing on active drug substances, it is estimated that approximately one-third of the pharmaceutical actives are capable of forming crystalline hydrates [3]. A search of the Cambridge Structural Database

[4] The Board defined the skilled artisan as having: (i) a Ph.D. in chemistry, biochemistry, medical chemistry, pharmacy, pharmaceutics, or a related field, and at least two years of relevant experience in drug development including an understanding of salt selection in drug development; (ii) a master's degree in the same fields and at least five years of the same relevant experience; or (iii) a bachelor's degree in the same fields and at least seven years of the same relevant experience. *See* Appx00012-00013.

> (CSD) shows that approximately 11% of all the reported crystal structures contain molecular water [4]. This represents over 16,000 compounds. If organometallic compounds are excluded, this number drops to approximately 6,000 (3.8%), and the breakdown of these according to hydration number is shown in Fig. 1. **This shows the expected trend in which monohydrates are most frequently encountered**, and where the frequency decreases almost exponentially as the hydration number increases.

Appx00441 (emphasis added). Figure 1 of Brittain showing the prevalence of crystalline monohydrates over other crystalline hydrates is below:




**Fig. 1** Occurrence of various crystalline hydrate stoichiometries.

Appx00441.

### C. Merck Files a Subsequent Patent Claiming the Specific DHP Salt at Issue Here: the ’708 Patent.

Against this backdrop, Merck obtained the ’708 Patent, which issued on February 5, 2008, and claims priority from U.S. Provisional Application No. 60/482,161 (June 24, 2003). Appx00078. The ’708 Patent issued with 24 claims. Only Claims 1-4, 17, 19, and 21-23 are challenged here.

The ’708 Patent claims a dihydrogen phosphate salt of sitagliptin in a 1:1 stoichiometry, as well as various compositions and methods of using sitagliptin DHP to treat Type 2 diabetes. Appx00078 (Abstract). The written description acknowledges that WO ’498 “describes” sitagliptin as a potent DP-IV inhibitor that is “useful for the treatment of Type 2 diabetes” and admits that “[p]harmaceutically acceptable salts of this compound are generically encompassed within the scope” of the application. Appx00084 (1:49-52, 1:55-57). It also recognizes the “previously disclosed hydrochloride salt” of sitagliptin taught by WO ’498. Appx00085 (4:21-22). But the written description goes on to say that “there is no specific disclosure in the above reference of the newly discovered monobasic dihydrogenphosphate salt.” Appx00084 (1:58-62). Though the ’708 Patent claims this salt is “new,” Appx00084 (1:59, 1:66), the only thing that the ’708 Patent adds over WO ’498

and the ′871 Patent is granular instructions on how to prepare the specific sitagliptin DHP crystalline monohydrate salt.

Claims 1-3 broadly claim a sitagliptin phosphate salt or a hydrate thereof in the (R) or (S) configuration. Appx00091 (15:64-16:46). Conversely, Claim 4 is specifically directed to "a crystalline monohydrate" of the (R)-sitagliptin phosphate salt of Claim 2. Appx00091 (16:47-48). Claim 17 is directed to a pharmaceutical composition containing a therapeutically effective amount of (R)-sitagliptin phosphate salt. Appx00092 (17:21-24). Claim 19 is directed to a method for the treatment of type 2 diabetes using a therapeutically effective amount of (R)-sitagliptin phosphate salt or its hydrate. Appx00092 (17:29-32). Claims 21 and 22 are process claims for preparing (R)-sitagliptin phosphate salt, and Claim 23 is a product-by-process claim for Claim 21. Appx00092 (17:37-18:12). Each claim requires the claimed sitagliptin phosphate salt to have a 1:1 stoichiometry. Appx00027.

### D. Procedural History

Sitagliptin DHP is an active pharmaceutical ingredient in two FDA approved drugs marketed by Merck: Januvia® and Janumet®. The Orange Book entry for both drugs lists the ′871 Patent and the ′708 Patent. Appx00528, Appx00530. Mylan filed abbreviated new drug applications for

generic versions of Januvia® and Janumet®, which included Paragraph IV certifications to the ′708 Patent. Appx01623. Merck first sued Mylan for patent infringement in February 2019. *See* Compl., *Merck Sharp & Dohme Corp. v. Mylan Pharms. Inc.*, No. 1:19-cv-00315, ECF No. 1 (D. Del. Feb. 13, 2019). Mylan thereafter filed for *inter partes* review in October 2019, asserting that Claims 1-3, 17, 19, 21-23 were anticipated by WO ′498 and the ′871 Patent and, in any event, Claims 1-4, 17, 19, 21-23 were obvious over the prior art. Appx00177-00258. Over Merck's objection, the Board instituted review. Appx01738-01801.

Mylan's case before the Board was straightforward. It argued that the challenged claims were anticipated by WO ′498 and the ′871 Patent because both publications claim and disclose sitagliptin DHP in two narrow, well-defined lists. Appx00019-00021. The 1:1 stoichiometry was anticipated too. It was either inherent to sitagliptin salts (based upon Example 7 and Dr. Chyall's data), Appx00021, Appx07833, or it would be the first of a limited set of stoichiometries that a skilled artisan would envisage (based upon competing data offered by Merck), Appx00025, Appx00030. Mylan's obviousness argument built upon the disclosures of WO ′498 with other prior art demonstrating that a skilled artisan would be highly motivated to

create a sitagliptin salt with phosphoric acid and would be highly likely to create a crystalline monohydrate, given the prevalence of monohydrates in pharmaceutical production. Appx00235-00255.

Merck's response to Mylan's position was essentially threefold. *First*, it argued that the challenged claims were not anticipated because neither WO '498 and the '871 Patent disclosed a sitagliptin phosphoric acid salt in a 1:1 stoichiometry. Appx00021. Notably, Merck claimed the stoichiometry was not inherent because its expert, Dr. Adam Matzger, identified up to three other potential stoichiometries for a sitagliptin phosphoric acid salt by deviating from various conditions described in the prior art. Appx00033. *Second*, Merck claimed that WO '498 did not qualify as prior art for Claims 1-2, 17, 19, and 21-23 because it is the assignee of WO '498 and, prior to WO '498's publication, had reduced to practice as much of those challenged claims as is revealed by WO '498. Appx00043-00045. *Third*, Merck asserted that Claims 3 and 4 were not obvious over WO '498 and the other prior art because those references did not disclose the (S)-enantiomer or crystalline monohydrate form of sitagliptin DHP. Appx00054-00066. It also argued that Claim 4 was non-obvious because of the supposed unexpected properties of the crystalline monohydrate form of sitagliptin DHP. Appx00067-00069.

The Board held an oral hearing in February 2021, Appx09773, and issued its decision denying Mylan's petition on May 7, 2021, Appx00001. The Board first ruled that Claims 1-3, 17, 19, 21-23 were not anticipated by WO '498 and the '871 Patent because the 1:1 stoichiometry of the claimed sitagliptin DHP salt was not expressly taught by the prior art, the skilled artisan could not envisage the claimed stoichiometry, and the stoichiometry was not inherent to sitagliptin salts. Appx00027-42.

On obviousness, the Board agreed with Merck that Claims 1-2, 17, 19, and 21-23 antedate WO '498. Appx00052. It acknowledged that Merck had not reduced hydrates of the claimed 1:1 sitagliptin DHP to practice before WO '498 was published. Appx00046. And the Board recognized that WO '498 claimed pharmaceutically acceptable salts and instructed that such salts may exist as hydrates. Appx00048. Nonetheless, it ruled that WO '498 does not disclose or enable hydrates of sitagliptin salts, based on the supposed "highly unpredictable" process for forming such salts. Appx00048-00052. As a result, the Board concluded that Merck did not need to reduce them to practice before WO '498's publication. Appx00052.

The Board determined that the antedation of WO '498 was dispositive of Mylan's obviousness arguments on Claims 1-2, 17, 19, and 21-23, leaving

only Claims 3 and 4. Appx00052. On Claim 3, the Board determined that the combination of Bastin and WO ʼ498 would not have produced the claimed 1:1 stoichiometry or motivated a skilled artisan to produce an S-enantiomer of a 1:1 sitagliptin phosphate salt. Appx00054-00058. On Claim 4, the Board held that the teachings of Brittain, Bastin, and WO ʼ498 would not have motivated a skilled artisan to create a crystalline monohydrate of a 1:1 sitagliptin phosphate salt and that a skilled artisan would not have had a reasonable expectation of success in making this crystalline monohydrate. Appx00058-00069.

## SUMMARY OF THE ARGUMENT

**I.** By determining that WO ʼ498 and the ʼ871 Patent do not anticipate Claims 1-3, 17, 19, and 21-23, which claim a 1:1 sitagliptin phosphate salt, the Board misapplied this Court's precedent on anticipation through lists and envisagement.

A prior-art reference anticipates a claimed combination of elements when the reference lists those compounds and suggests combining them. *See Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1342-44 (Fed. Cir. 2016); *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1360-62 (Fed. Cir. 2012). Here, WO ʼ498 and the ʼ871 Patent explicitly claim sitagliptin and its

pharmaceutically acceptable salts, and list phosphoric acid as one of eight particularly preferred acids with which to form these salts. Based on this Court's precedent and the prior art, the Board should have concluded that WO '498 and the '871 Patent both disclose the '708 Patent's claimed sitagliptin phosphate salt.

Further, a prior-art reference anticipates a limitation when that limitation is a member of a "limited class" and, by reading the reference, a skilled artisan could "at once envisage each member of" that class. *In re Petering*, 301 F.2d 676, 681 (C.C.P.A. 1962). This theory of anticipation does not constitute impermissible "gap-filling" of a limitation; as long as the reference discloses the class to which the limitation belongs and allows the skilled artisan to envisage the limitation, the reference anticipates the limitation. WO '498 and the '871 Patent disclose a sitagliptin hydrochloride salt with a 1:1 stoichiometry, and they disclose both sitagliptin and phosphoric acid. A skilled artisan would understand that every salt must have a stoichiometry. And, as Merck concedes, there are only a limited number of sites on the sitagliptin molecule that could accept protons and a limited number of protons that can be donated by phosphoric acid. Given this, a skilled artisan would be able to envisage the set of possible

stoichiometries of a sitagliptin phosphate salt. At that point, whether or not WO ′498 also allowed a skilled artisan to envisage the other possible stoichiometries, the Board should have concluded that the claimed 1:1 stoichiometry was anticipated.

**II.** The Board also committed legal error by concluding that the ′708 Patent's Claims 1-2, 17, 19, and 21-23 antedate WO ′498. To prove antedation, Merck was required to show that it reduced to practice as much as WO ′498 revealed of these "claimed invention[s]" prior to WO ′498's publication date. *In re Clarke*, 356 F.2d 987, 991 (C.C.P.A. 1966). The challenged claims encompass hydrate forms of sitagliptin phosphate, and it is undisputed that Merck did not reduce hydrates to practice before WO ′498 was published. But the Board concluded that WO ′498 does not disclose hydrates of sitagliptin phosphate and, therefore, Merck did not have to reduce them to practice before WO ′498's publication. This conclusion was wrong. WO ′498 discloses that its pharmaceutically acceptable salts—which, as discussed above, include sitagliptin phosphate salt—"may also be in the form of hydrates." The Board thus should have concluded that the challenged claims do not antedate WO ′498.

The Board's alternate ruling that WO '498 does not enable hydrates was equally unsound. WO '498 is identical to the issued '871 Patent, which explicitly claims "pharmaceutically acceptable salts" of sitagliptin and defines "pharmaceutically acceptable salts" to include salts "in the form of hydrates" in its specification. Because hydrates are encompassed by WO '498 and its companion U.S. patent, the Board should have treated them as presumptively enabled and required Merck to offer persuasive evidence of non-enablement. Merck offered none. The Board failed to follow this burden-shifting framework and, furthermore, failed to identify any persuasive evidence itself of non-enablement. Because of this error, the Board should be required to consider the obviousness of these claims.

**III.** Finally, the Board incorrectly deemed Claims 3 and 4 nonobvious under the combination of one or more references with WO '498, which Merck concedes is not antedated by these two claims.

Bastin and WO '498 render Claim 3's limitations obvious. The Board mainly rested its nonobviousness conclusion on the claimed (S)-configuration of sitagliptin phosphate. But by reading WO '498, a skilled artisan would know that a molecule like sitagliptin phosphate can exist only as one of two optical isomers—one with an (R)-configuration and one with

an (S)-configuration. Because a skilled artisan could envisage these configurations, WO ’498 anticipates the claimed (S)-configuration and therefore renders it obvious.

Claim 4’s limitations are likewise obvious. The Board found this claim nonobvious because it recites a crystalline monohydrate form of sitagliptin phosphate. The Board held that a skilled artisan would not have reasonably expected to succeed at creating this form, would not have been motivated to make it, and would not have expected the properties that the form showed. These conclusions ignore the teachings of the prior art. WO ’498 explicitly tells skilled artisans that the described salts can exist in a crystal structure and as hydrates. Brittain teaches that one-third of pharmaceuticals can form crystalline hydrates and that monohydrates are the most common hydrate. Based upon these teachings, a skilled artisan would have had a reasonable expectation of success. In addition, a skilled artisan would have had sufficient motivation because, as Brittain emphasizes, hydrate forms impact the development process and dosage form of pharmaceuticals. Finally, the Board’s analysis on unexpected results of Claim 4 defied this Court’s precedent because it failed to compare the claimed sitagliptin phosphate crystalline monohydrate with the “closest prior art compound”—a

sitagliptin phosphate salt in a different form. *Millennium Pharms., Inc. v. Sandoz Inc.*, 862 F.3d 1356, 1368 (Fed. Cir. 2017). Thus, at minimum, the Board should be required to reassess the obviousness of this claim.

## ARGUMENT

This Court reviews the Board's conclusions of law de novo and its findings of fact for substantial evidence. *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1366 (Fed. Cir. 2016). Although deferential, substantial-evidence review is more than "simply rubber-stamping agency factfinding." *OSI Pharm., LLC v. Apotex, Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019) (quoting *Dickinson v. Zurbo*, 527 U.S. 150, 162 (1999)). It asks "whether a reasonable fact finder could have arrived at the agency's decision" and involves "examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *Intelligent Bio-Sys., Inc.*, 821 F.3d at 1366 (quoting *In re Gartside*, 203 F.3d 1305, 1312 (2000)). Evidence is "substantial" only if it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *OSI Pharm., LLC*, 939 F.3d at 1381 (internal quotation marks omitted).

Anticipation is generally a question of fact, but legal misapplication of the doctrine is reviewed de novo. *See Cochlear Bone Anchored Sols. AB v.*

*Oticon Med. AB*, 958 F.3d 1348, 1354 (Fed. Cir. 2020) (holding that Federal Circuit "review[s] the Board's compliance with legal standards de novo"). Obviousness is a "mixed question of law and fact," and the Court reviews "the Board's ultimate obviousness determination de novo and underlying fact-findings for substantial evidence." *Hologic, Inc. v. Smith & Nephew, Inc.*, 884 F.3d 1357, 1361 (Fed. Cir. 2018).

## I. THE SITAGLIPTIN DHP SALT CLAIMED BY THE '708 PATENT IS ANTICIPATED BY WO '498 AND THE '871 PATENT, WHICH TEACH SITAGLIPTIN "AND PHARMACEUTICALLY ACCEPTABLE SALTS THEREOF."

### A. The Prior Art Discloses the Combination of Sitagliptin and Phosphoric Acid in a Well-Defined List, and a Skilled Artisan Would Immediately Envisage a 1:1 Stoichiometry.

To anticipate a patent claim, a prior art reference must disclose each element of the claim, explicitly or inherently, and enable one of ordinary skill in the art to practice the invention without undue experimentation. *See generally Bristol-Myers Squibb Co. v. Ben Venue Lab'ys, Inc.*, 246 F.3d 1368 (Fed. Cir. 2001). Importantly here, a "reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would 'at once envisage' the claimed arrangement or combination." *Kennametal, Inc. v.*

*Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015) (quoting *Petering*, 301 F.2d at 681).

Indeed, "[a] reference anticipates a claim if it discloses the claimed invention 'such that a skilled artisan could take its teachings in combination with his own knowledge of the particular art and be in possession of the invention.'" *In re Graves*, 69 F.3d 1147, 1152 (Fed. Cir. 1995) (internal citation and emphasis omitted). "[I]t is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom." *In re Preda*, 401 F.2d 825, 826 (C.C.P.A. 1968).

WO '498 and the '871 Patent tell skilled artisans everything they need to know in order to arrive at the claimed 1:1 sitagliptin DHP compound.

**1. WO '498 and the '871 Patent teach "pharmaceutically acceptable salts" of sitagliptin using phosphoric acid.**

WO '498 and the '871 Patent expressly disclose freebase sitagliptin as one of 33 example compounds that can be created as part of Formula I. Appx00422 (bottom compound), Appx00523 (37:35-40). Both further claim "pharmaceutically acceptable salts" of sitagliptin. Significantly, in defining what a "pharmaceutically acceptable salt" is, WO '498 and the '871 Patent

identify phosphoric acid as a "[p]articularly preferred" acid with which to form a sitagliptin salt. Appx00377 (10:14-15), Appx00508 (7:2-4). That is more than enough to disclose the sitagliptin DHP phosphate salt generally. *Perricone v. Medicis Pharms. Corp.*, 432 F.3d 1368, 1376 (Fed. Cir. 2005) ("This court rejects the notion that one of these ingredients cannot anticipate because it appears without special emphasis in a longer list."). In fact, the '708 Patent itself says that sitagliptin is "[s]pecifically disclosed" in the prior art and that "[p]harmaceutically acceptable salts of this compound"—*i.e.*, sitagliptin—"are generically encompassed within the scope" of the prior art. Appx00084 (1:49-57).

The fact that sitagliptin and phosphoric acid are not explicitly illustrated in combination is of no legal significance. Both are disclosed in two limited, well-defined lists, and WO '498 and the '871 Patent instruct the skilled artisan to combine those lists to create the "pharmaceutically acceptable salts" claimed by the prior art. Together, they form a single comprehensive list of compounds, including (R)- and (S)-sitagliptin phosphate. *Sinclair & Carroll Co. v. Interchemical Corp.*, 325 U.S. 327, 335 (1945); *In re Gleave*, 560 F.3d 1331, 1337 (Fed. Cir. 2009) ("For the purposes of whether they are anticipatory, lists and genera are often treated differently

under our case law.”). This Court routinely finds similar disclosures sufficient for anticipation.

Take for example *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC,* 683 F.3d 1356 (Fed. Cir. 2012). The Court found anticipation of a claimed chewing gum’s combination of menthol and a chemical coolant called WS-23, based on their disclosure in lists in an existing patent. *Id.* at 1362. The patent broadly disclosed chemical combinations in many potential oral compositions, like chewing gum, lozenges, toothpaste, and mouth rinses. *Id.* at 1360. In one list of 23 flavoring agents, the patent’s written description listed menthol. *Id.* In a separate list, the patent disclosed WS-23 as a “preferred cooling agent” but deemed such agents “non-essential” in the listed oral compositions. *Id.*

Likewise, in *Blue Calypso, LLC v. Groupon, Inc.*, the Court affirmed the Board’s invalidation of a patent claim for a peer-to-peer advertising system that employed a targeted-campaign tool and a refer-a-friend tool. 815 F.3d 1331, 1336-37, 1342 (Fed. Cir. 2016). The prior art disclosed both of these functionalities in a list of “a limited number of tools” that could be used in a similar e-mail advertising system. *Id.* at 1344. The patent owner argued that the Board’s anticipation finding “erroneously combined these distinct tools

when such a combination [was] not explicitly found" in the prior art. *Id.* at 1342. This Court rejected that argument because the prior art "explicitly contemplate[d] the combination of the disclosed functionalities." *Id.* at 1343. Thus, the Court recognized that "a reference may still anticipate if that reference teaches that the disclosed components or functionalities may be combined and one of skill in the art would be able to implement the combination." *Id.* at 1344.

Just as the *Wrigley* and *Blue Calypso* patents contemplated combining components, WO '498 and the '871 Patent contemplate combining the listed DP-IV inhibitor compounds with a "[p]articularly preferred" acid to create a "pharmaceutically acceptable salt." Indeed, this case presents a stronger case than both *Wrigley* and *Blue Calypso*. Here, the prior art focuses heavily on the creation of salts that *require* the combination of a narrow class of 33 compounds and a base or acid. In contrast, the prior art in *Wrigley*, 683 F.3d at 1362, deemed cooling agents "non-essential" in the claimed compositions, and the prior art in *Blue Calypso* merely encouraged the combination of various tools, 815 F.3d at 1343. Under well-settled law, the teachings of WO '498 and the '871 Patent are more than enough to disclose sitagliptin DHP.

### 2. A skilled artisan would at once envisage a 1:1 stoichiometry based upon the broader disclosures regarding pharmaceutically acceptable salts of sitagliptin.

Every salt must have a stoichiometry. So once the skilled artisan combines sitagliptin and phosphoric acid to make a salt, she would immediately inquire about the salt's stoichiometry. Based upon the teachings of the prior art, the skilled artisan would immediately envisage a 1:1 stoichiometry.

For starters, WO '498 and the '871 Patent exemplify a sitagliptin salt using hydrochloric acid (one of the other "[p]articularly preferred" acids) that has a 1:1 stoichiometry. Appx00413 (46:1-4), Appx00520 (32:1-13). This embodiment is revealing for two reasons. *First*, it demonstrates that a sitagliptin salt generally can exist in a 1:1 stoichiometry. Though Example 7 involved a different "[p]articularly preferred acid," there is no scientific reason to doubt that phosphoric acid would likewise exist in a 1:1 stoichiometry. Merck does not dispute this point.[5] Given this, the skilled artisan could easily envisage a 1:1 sitagliptin DHP preparation.

---

[5] Merck's expert, Dr. Adam Matzger, opined that Example 7 does not preclude the possible existence of *other* stoichiometries beyond 1:1. Appx02658 (¶ 113). He likewise questioned whether a skilled artisan could

*Second* and relatedly, Example 7 shows a 1:1 salt in the presence of a substantial excess of hydrochloric acid, which is a stronger acid than phosphoric acid. *See* Appx09087-09088 (¶ 8). So if sitagliptin forms only a 1:1 salt with the stronger hydrochloric acid (when HCl is used in a 1000-fold excess), it is highly likely that the same result would be obtained with phosphoric acid under similar conditions. Appx09087-09088 (¶ 8). Indeed, it would be the first thing a skilled artisan would envision given the express stoichiometry shown in the prior art with the HCl salt.

Experimental data from Dr. Chyall also shows that a 1:1 sitagliptin DHP preparation is the *only* stoichiometry that forms under conditions similar to those described in WO ′498 and the ′871 Patent. Appx06869, Appx06878, Appx06879 (¶¶ 22-23, 48, 50). But even if other stoichiometries

---

substitute phosphoric acid for hydrochloric acid while strictly following the procedures laid out in Example 7. Appx02723-02726 (¶ 189-195). But Dr. Matzger does not (and cannot) dispute that a skilled artisan would imagine that sitagliptin DHP will exist in a 1:1 stoichiometry based upon Example 7. Appx08476-08477 (133:18-134:9) ("1:1 salts fall under the claims of the ′498 patent[.]"), Appx08489-08490 (146:13-147:5) ("[Y]ou can imagine that the [1:1 phosphoric acid salt] would exist[.]").

were possible,[6] the 1:1 stoichiometry is *still* anticipated because it is among the limited class of stoichiometries that the skilled artisan would envisage.

The universe of possible alternative stoichiometries is limited by the number of sites on the sitagliptin molecule that can accept protons and the number of protons that phosphoric acid can donate. Even Merck concedes there are at most two sites at which freebase sitagliptin can accept a proton. Both Mylan and Merck agree that the primary amine ($NH_2$) can accept a proton. Merck further argues it is theoretically possible for the nitrogen on the triazole ring to accept a second proton (though it never explained why the prior art did not show a second protonation on the nitrogen on the triazole ring on sitagliptin even when exposed to a 1000-fold excess of HCl). Appx00303-00304 (¶ 76), Appx02649-02650 (¶ 104).




Appx02649 (¶ 104).

[6] As previously noted, Dr. Chyall's experiments resulted in a 1:1 stoichiometry for sitagliptin DHP salt across 12 experiments. Appx06869, Appx06878, Appx06879 (¶¶ 22-23, 48, 50).

Merck further claims that phosphoric acid is polyprotic, meaning it can theoretically donate multiple (up to three) protons. Appx02606-02607 (¶ 34). *But see* Appx08492-08493 (149:11-150:11) (Dr. Matzger conceding that "just because something is a polyprotic acid, it doesn't necessarily follow that it will donate all of its protons."). So even under Merck's theory of this case, it has identified only three other possible stoichiometries beyond 1:1—1:2, 2:1, and 3:2. *See* Appx02645-02646 (¶ 97) (identifying only four potential stoichiometries for sitagliptin DHP).[7]

Under these circumstances, a skilled artisan would envisage the 1:1 stoichiometry first, which is sufficient to demonstrate anticipation. Take *In re Petering*. There, a reference disclosed a "generic" chemical formula that encompassed "a vast number and perhaps even an infinite number of compounds." 301 F.2d 676, 681 (C.C.P.A. 1962). Though this generic formula did "not . . . by itself describe[ ] [the claimed] invention," a set of "specific preferences" for using the formula did. *Id.* These "specific preferences in

[7] In practice, phosphoric acid is only likely to donate one proton because it is a comparatively weak acid. Even under Merck's results-oriented testing, it could only get phosphoric acid to donate two protons at most. As a matter of basic chemistry, the first proton that an acid donates will be the most acidic, with each successive proton becoming more neutral—and therefore more difficult to pull off. Appx08296 (82:19-24), Appx08298 (84:2-14).

connection with [the] generic formula constitute[d] a description of a definite and limited class of compounds" that allowed a skilled artisan to "at once envisage each member of" the formula's "limited class" of compounds. *Id.* Based upon this, the Court held that the reference anticipated a patent claiming a compound that was part of this "limited class." *Id.* Importantly, the Court reached this conclusion despite the fact that the prior art "did not expressly spell out the limited class" and "even though this skilled person might not at once define in his mind the formal boundaries of the class." *Id.* So too here.

In sum, WO ′498 and the ′871 Patent teach everything a skilled artisan would need to envisage the claimed sitagliptin DHP salt in a 1:1 stoichiometry. It is therefore anticipated.

**B. The Board Erred by Holding that 1:1 Stoichiometry Was Not Anticipated.**

The Board held that "[Mylan's] 'list(s)' and 'envisage' theories do not make up for the absence of express disclosure of the 1:1 sitagliptin DHP salt" because WO ′498 and the ′871 Patent do not "identif[y] *expressly* all the phosphate salts in any, much less all, the potential stoichiometric ratios." Appx00029. But as a matter of law, express identification of a limitation is

not required for anticipation. *Petering* says as much. 301 F.2d at 681. Tellingly, the Board did not cite (much less distinguish) *Petering* in its decision.[8]

This is not a case in which the skilled artisan would have to envisage a limitation from a broad or undefined class. Even under Merck's theory, the 1:1 stoichiometry is one of only four possible stoichiometries for sitagliptin and phosphoric acid. That fact distinguishes this case from cases like *Impax Laboratories, Inc. v. Aventis Pharmaceuticals Inc.*, 468 F.3d 1366 (Fed. Cir. 2006), and *Eli Lilly & Co. v. Zenith Goldline Pharmaceuticals, Inc.*, 471 F.3d 1369 (Fed. Cir. 2006). In *Impax*, this Court affirmed a district court's finding that a prior-art chemical formula did not anticipate a patent claim for riluzole, even though the formula encompassed riluzole. *Id.* at 1383. The Court reasoned that because the formula covered a "large number of compounds" with "no specific identification of riluzole," the prior art did not anticipate that compound. *Id.* And in *Eli Lilly*, this Court agreed that a prior-art reference

[8] Notwithstanding its vintage, *Petering* is good law. *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1323 (Fed. Cir. 2012) ("*Petering* establishes that when a prior art reference discloses a 'definite and limited class' of suitable members within a general formula, it may be read to disclose each member of that class.").

did not anticipate a claimed compound called olanzapine. 471 F.3d at 1377. The reference in *Eli Lilly* encompassed "millions" of compounds, and it neither contained any "generic disclosure encompassing olanzapine" nor disclosed anything "close to the claimed invention" among the preferred compounds it described. *Id.* at 1376-77. In fact, the Court found, "[n]o possible combination of th[e] preferred substituents" in that reference's "general structural formula" would have led "to the components that make up olanzapine." *Id.* at 1377.

In contrast, WO '498 explicitly discloses sitagliptin and lists phosphoric acid among eight preferred acids. Further, WO '498 invites the skilled artisan to combine them to create a pharmaceutically acceptable salt that can have one of only a limited number of stoichiometries. WO '498's disclosure is not so broad that a skilled artisan would not be able to envision each member, in contrast to the class in *Impax*, which contained "hundreds of compounds." 468 F.3d at 1383. Nor does WO '498 resemble the prior art in *Eli Lilly*, which did not explicitly disclose the compound in question or provide a general structural formula that could have encompassed the compound. 471 F.3d at 1376-77.

The Board did not address this critical distinction. It instead accepted Merck's invitation to improperly broaden the scope of its envisaging analysis by focusing on the number of possible stoichiometries that might exist if one were to create *all* of the salts that might result by combining the 33 identified salts in Claim 15 with the eight "[p]articularly preferred" acids described in the definition of "pharmaceutically acceptable salt." Appx00029. But the skilled artisan does not need to see through all of those stoichiometries in order to envisage the 1:1 stoichiometry of sitagliptin DHP. Pharmaceutically acceptable salts of sitagliptin are explicitly taught by WO '498 and the '871 Patent. Pharmaceutically acceptable salts are defined to include salts formed using phosphoric acid. So the only thing the skilled artisan needs to envisage from these disclosures is the 1:1 stoichiometry, which she can easily do based upon Example 7. [9]

*Wm. Wrigley* demonstrates the Board's error in broadening the scope of its envisaging analysis. The district court in *Wm. Wrigley* made two findings to support its conclusion of anticipation: (1) the prior-art patent

[9] For the same reason, the Board's concern about the "breadth of compounds and hypothetical salts encompassed by WO '498," Appx00029, is beside the point.

disclosed menthol and WS-23 as compounds that could be combined in an oral composition, like chewing gum; and (2) the prior-art patent incorporated another patent that disclosed a range for the amount of WS-23 that fell within the range recited by the anticipated claim. 683 F.3d at 1360. This Court affirmed that analysis. It distinguished a prior case by noting that the prior-art reference in *Wm. Wrigley* disclosed the "component amounts within the ranges" recited by the anticipated claim. *Id.* at 1362. Just as the lists reciting menthol and WS-23 in *Wm. Wrigley* allowed the court to analyze the range limitation separately, the lists reciting sitagliptin and phosphoric acid allow this Court to separately analyze the 1:1 stoichiometry limitation.

The Board went on to dismiss Example 7, saying that it agreed with Merck's witness (Dr. Matzger) that a skilled artisan "would not simply conclude that whatever applies for hydrochloric acid and sitagliptin also applies to the many different acids that are disclosed—and phosphoric acid, in particular." Appx00028. But the Board's holding is directed toward a straw man; Mylan never made such a sweeping argument. Rather, it simply argued that Example 7 would help a skilled artisan envision a 1:1 sitagliptin phosphate salt. The reason why is simple. Example 7 demonstrates that an excess of hydrochloric acid, which is a strong acid, yielded only a 1:1

sitagliptin HCl salt. Given its strength and saturated use, a skilled artisan would expect hydrochloric acid to donate as many protons as possible and protonate sitagliptin at all available sites. Appx09087-09088 (¶ 8). Yet Example 7 yielded only a 1:1 stoichiometry. Appx09087-09088 (¶ 8). A skilled artisan would expect the same behavior out of phosphoric acid, which is much weaker than hydrochloric acid.[10] Appx09087-09088 (¶ 8), Appx09123 (¶ 67).

As such, the Board's reliance on the differences between hydrochloric acid and phosphoric acid is off the mark. Example 7 is instructive for the skilled artisan notwithstanding the differences between a sitagliptin HCl salt and other sitagliptin salts formed using the particularly preferred acids. It informs the skilled artisan that, under the conditions described in Example 7 and in the presence of a large excess of a strong acid, sitagliptin accepts one proton. The Board's fundamental misapprehension of Mylan's position is reversible error. *See Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1323-25 (Fed.

---

[10] The fact that hydrochloric acid is monoprotic is beside the point. Appx00028. If sitagliptin could be pronated at multiple sites as Merck argued, the skilled artisan would expect a 1:2 sitagliptin HCl salt. Indeed, as the Board and Dr. Matzger both pointed out, Examples 1-5 of WO ′498 were protonated by two HCl ions. Appx00028, Appx 02650 (¶ 105).

Cir. 2015) (reversing Board decision that "misconstrued" party's "principal claim construction argument" and instead focused on "red herring" argument that the party "never made").

Similarly flawed is the Board's conclusion that Mylan's envisaging argument amounted to impermissible gap-filling of limitations absent in the prior art. Appx00030. This is not a case in which the prior art fails to disclose a claim limitation or the class to which the limitation belongs. In *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, this Court rejected the Board's holding that "anticipation can be found even when a prior art reference fails to disclose a claim element so long as a skilled artisan reading the reference would 'at once envisage 'the claimed arrangement.''" 851 F.3d 1270, 1274 (Fed. Cir. 2017). There, a patent claimed a system for controlling the torque of an electromagnetic motor. *Id.* at 1271. Part of the system outputted a value calculated based on a "rotating frame of reference"—in other words, relative to the position of a rotor. *Id.* at 1271-72. Prior art disclosed a system in which the analogous output was based on a "stationary frame of reference"—that is, relative to the position of a part called the stator. *Id.* at 1271. Although the Board held that the prior art anticipated the patent claim, the Federal Circuit found that the disclosure of an output in a stationary frame of reference was

not equivalent to the output in a rotating frame of reference—even if a skilled artisan could speculate about a rotating frame of reference based on the prior art. *Id.* at 1274-75.

The explicit disclosure of the 1:1 stoichiometry distinguishes this case from *Nidec* and similar cases. Once again, a salt must have a stoichiometry. Even if other more remote stoichiometries were possible, a skilled artisan would still start by envisioning the 1:1 stoichiometry. And the skilled artisan would be able to envision each possible stoichiometry because the possible stoichiometries are limited by the number of basic sites on the sitagliptin molecule (2) and the number of protons that phosphoric acid has to donate (3). In *Nidec*, however, the disclosure of values in a stationary frame of reference did not allow a skilled artisan to envision a separate class of values—those based on a rotating frame of reference. 851 F.3d 1274-75.

* * *

Claims 1-3, 17, 19, and 21-23 are anticipated by WO ′498 and the ′871 Patent. Both teach "pharmaceutically acceptable salts" of sitagliptin using phosphoric acid. A skilled artisan would have immediately envisaged the 1:1 stoichiometry of a sitagliptin DHP salt based upon Example 7, which exemplifies a 1:1 sitagliptin salt using another "particularly preferred" acid

that is stronger than phosphoric acid. The Board's reasoning for rejecting this common-sense conclusion is wrong as a matter of law and should be reversed.

## II. CLAIMS 1-2, 17, 19, AND 21-23 DO NOT ANTEDATE WO '498.

Separately, all of the challenged claims are invalid because WO '498, alone or in combination with other references, renders them obvious. There is no dispute that WO '498 is prior art for Claims 3 and 4. But the Board held that Claims 1-2, 17, 19, and 21-23 antedate WO '498 because Merck had reduced to practice as much as the "reference shows of the claimed invention." Appx00047. So the Board concluded it could not consider this reference as § 102(a) prior art in an obviousness analysis,[11] and thus it never analyzed whether WO '498 rendered these claims obvious.

---

[11] The parties agree that if the '708 Patent antedates WO '498, the latter cannot be considered in an obviousness analysis because WO '498 would qualify as prior art only under pre-AIA § 102(e), not pre-AIA § 102(a). Pre-AIA § 103(c)(1) states that prior art under § 102(e) cannot be used to prove obviousness if the prior art's "subject matter and the claimed invention were, at the time the claimed invention was made, owned by the same person or subject to an obligation of assignment to the same person." The parties agree that the '708 Patent and WO '498 were commonly owned by Merck, and thus WO '498 cannot be considered in an obviousness analysis if Merck reduced the subject matter of the '708 Patent to practice before WO '498 was published. However, as explained in this section, because Merck did not reduce the hydrates claimed by the '708 Patent to

This was legal error. The challenged claims of the ’708 Patent purport to cover hydrates. By its plain text, so does WO ’498. Importantly, Merck concedes it did not reduce to practice sitagliptin DHP hydrates before WO ’498 was published. That should have been dispositive of Merck’s antedation argument. The Board came out the wrong way on this issue because of its improperly narrow interpretation of WO ’498 and its failure to apply well-settled precedent on the presumption of enablement.

### A. Merck’s Antedation Argument Fails Because WO ’498 Discloses Sitagliptin Hydrates and Merck Has Conceded that It Failed to Reduce Them to Practice Before the Publication of That Reference.

Under pre-AIA § 102, an applicant was not entitled to a patent if their “invention was . . . patented or described in a printed publication in this or a foreign country before the invention thereof by the applicant for patent.” 35 U.S.C. § 102(a) (2006). Thus, to overcome a § 102(a) challenge based on a patent or printed publication, applicants could prove that their invention “antedated” the patent or printed publication—that is, that they invented the relevant subject matter before issuance of that patent or publication.

---

practice before WO ’498’s publication, WO ’498 counts as § 102(a) prior art and can be considered in assessing the challenged claims’ obviousness.

A party can antedate a reference "by showing that the invention was conceived before the effective date of the reference, with diligence to actual or constructive reduction to practice." *In re Steed*, 802 F.3d 1311, 1320 (Fed. Cir. 2015). In proving antedation, a patent owner must show that it reduced to practice at least as much as "the reference shows of the claimed invention" before the reference's publication date. *In re Clarke*, 356 F.2d at 961. If a patent's inventor fails to make this showing, the invention does not antedate the prior art, and the prior art can be used to invalidate the patent under § 102(a).

Thus, an antedation analysis requires courts to consider both the scope of the invention disclosed in the prior art and the scope of the invention in the patent at issue. *See* 35 U.S.C. § 102. If the prior art discloses the invention a patent owner is attempting to claim, and the patent owner failed to reduce that invention to practice before the prior art was published, then the patent owner's claim is anticipated.

Here, WO '498 explicitly claims sitagliptin and its "pharmaceutically acceptable salts," identifies phosphoric acid as a "[p]articularly preferred" acid for making such salts, and plainly defines "pharmaceutically acceptable salts" to include crystalline hydrates. Appx00376 (9:27-34); *see In re Field,* 161

F.2d 372, 374 (C.C.P.A. 1947) ("The subject matter defined by the claims of a patent cited as a reference is part of the disclosure of that reference and may properly be considered in determining the question of anticipation.").

Because WO ′498 discloses sitagliptin DHP hydrates, Merck must show that it conceived and began diligently reducing these hydrates to practice before WO ′498's priority date. But as the Board found below, "Merck had made no hydrates of 1:1 sitagliptin DHP as of the January 16, 2003, publication date of WO ′498." Appx00046. To the contrary, the record shows only that Merck reduced a single species of a monohydrate to practice on March 26, 2003—months after the publication of WO ′498. Appx00046. Indeed, a named inventor submitted a declaration to the Board confirming the date of the reduction to practice. Appx03404-03407 (¶¶ 9-14).

The inclusion of hydrate forms of sitagliptin DHP in WO ′498 and Merck's failure to reduce these hydrates to practice before its publication means that the ′708 Patent does not antedate WO ′498. Therefore, WO ′498 can and should be considered in assessing the obviousness of all challenged claims.

### B. The Board's Acceptance of Merck's Antedation Theory Ignores the Plain Language of WO '498.

Despite the clear language in WO '498, the Board was skeptical that this reference discloses hydrates of 1:1 sitagliptin phosphate or, if it does, that it enables hydrate forms. The Board's skepticisms are unwarranted.

*First*, as explained above, WO '498 discloses 1:1 sitagliptin phosphate in hydrate form. Although the Board objected that "none of the salts described in WO '498—for sitagliptin or otherwise—are hydrates," Appx00048, the specification makes clear that the described salts could exist in hydrate form. Neither the Board nor Merck pointed to precedent that requires a further disclosure.

*Second*, the Board incorrectly believed that the references did not disclose a hydrate form specific to a sitagliptin salt. Appx00048. But a skilled artisan would read the reference to disclose hydrates—especially because WO '498 claims the relevant compound's "pharmaceutically acceptable salts," which its specification defines to include hydrates. *See Trustees of Columbia Univ. in N.Y.C. v. Symantec Corp.*, 811 F.3d 1359, 1362 (Fed. Cir. 2016) ("The specification is the 'single best guide to the meaning of a disputed term,' and 'is, thus, the primary basis for construing the claims.'"

(citation omitted)). Specifically, in describing "pharmaceutically acceptable salts," the specification states that "[s]alts in the solid form may exist in more than one crystal structure, and may also be in the form of hydrates." Appx00376 (9:33-34). That definition would tell a skilled artisan that a sitagliptin phosphate salt could exist as a hydrate.

*Third*, the Board incorrectly concluded that the references were unclear on whether hydrates existed for the relevant salts. In reaching this conclusion, it relied on the use of the word "may" in the prior art: "[T]he sentence states that crystalline forms (e.g., hydrates) 'may' exist. WO '498 does not show that any such hydrates do exist for any disclosed or hypothetical salt (much less a 1:1 sitagliptin DHP) . . . ." Appx00049 (citation omitted). But the word "may" in the first sentence is not used to express uncertainty as to whether hydrate forms exist but rather to define the term "pharmaceutically acceptable salts" to *include* hydrates. Federal Circuit case law is replete with examples of patentees using the word "may" to define a claim term. *E.g.*, *Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296, 1300 (Fed. Cir. 2017) (adopting definition of "batches" based on disclosure that "'[b]atches' may also include all batches prepared by a same compounding process."); *Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*, 743 F.3d 1359, 1364 (Fed. Cir.

2014) (adopting definition of "practically," which the specification states means that "the particles may include a small quantity (about 5 weight % or less) of particles whose particle diameter is out of above described range"); *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013) (noting that "the specification discloses that 'the conjoint disk may include another piece of material'").

The Board's two other concerns—that there is not "any guidance in WO '498 on making" sitagliptin salt hydrates and that "forming as a hydrate is highly unpredictable," Appx00049—go to the question of enablement, not disclosure. For purposes of disclosure, "[i]t is not necessary that a reference patent for a device or chemical compound disclose an operative process for producing the article or product." *In re Von Bramer,* 127 F.2d 149, 152 (C.C.P.A. 1942); *see In re Gleave*, 560 F.3d at 1337 (distinguishing the two steps required for anticipation of a compound: the "naming" of the compound and "a person of ordinary skill in the art's ability to make the claimed compound"). And as explained below, the Board's handling of enablement contravenes well-settled precedent and is reversible error.

### C. The Board's Antedation Holding Is Wrong Because It Ignored the Presumption of Enablement and Relieved Merck of Its Burden to Overcome That Presumption.

In a conclusory finding, the Board held that WO '498 does not enable hydrates and, therefore, Merck was not required to reduce hydrates to practice. But the Board failed to recognize that a prior-art patent is presumptively enabling. *Impax Lab'ys, Inc. v. Aventis Pharms., Inc.*, 545 F.3d 1312, 1316 (Fed. Cir. 2008). By ignoring this presumption of enablement, the Board inappropriately relieved Merck of its duty of providing persuasive evidence of non-enablement.

"[B]oth claimed and unclaimed materials disclosed in a patent are presumptively enabling." *In re Antor Media Corp.*, 689 F.3d 1282, 1287 (Fed. Cir. 2012). To overcome this presumption, a patent owner must provide "persuasive evidence showing that the prior art patent does not enable the claimed invention." *Impax*, 545 F.3d at 1316. This Court has repeatedly recognized this burden-shifting framework. *E.g.*, *Antor*, 689 F.3d at 1288; *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003). In assessing whether a patent owner has overcome a presumption, a court should keep in mind that "a prior art reference is enabled even if some 'routine experimentation is required in order to practice a claimed

invention," though "such experimentation must not be 'undue.'" *Amgen v. Hoechst Marion Roussel, Inc.*, 457 F.3d 1293, 1306 (Fed. Cir. 2006) (quoting *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1371 (Fed. Cir. 1999)).

Here, WO '498 claims "pharmaceutically acceptable salts" of sitagliptin. The definition of "pharmaceutically acceptable salts" includes hydrates. WO '498's claims are presumptively enabled because, as discussed above, WO '498 shares the same specification as the '871 Patent. Further, the '871 Patent is listed in the Orange Book as having claims that cover a product containing 1:1 sitagliptin DHP monohydrate. Appx00528-00530. Given that the '871 Patent is presumptively enabling for hydrates, so too is WO '498.

Accordingly, Merck could succeed on its antedation argument only if it overcame this presumption. But Merck did not even try to do so, and the Board failed to hold Merck to its burden. This failure constitutes legal error. *Amgen*, 314 F.3d at 1356 (finding district court's placing burden of disproving enablement on patent challenger to be legal error).

Beyond failing to require Merck to prove non-enablement, the Board also made only a half-hearted effort itself to recognize and engage with the presumption. The Board stated only that "[e]ven if that presumption were appropriate here"—which, as explained above, it indisputably and legally

is—it would have been "overcome based on a complete absence of examples or guidance in WO '498 about making such hydrates, and the substantial unpredictability concerning whether a hydrate of any specific salt will even form." Appx00049. Even if the Board were permitted to do Merck's job for it, the Board failed to point to persuasive evidence that the invention was not enabled. Even if WO '498 does not discuss how to make any hydrate at length, the Board failed to show that a skilled artisan would not be able to produce hydrates with "routine experimentation," and it failed to point to any evidence that such experimentation would be "undue." *Amgen*, 457 F.3d at 1306.

Because the Board did not follow the correct burden-shifting framework, it committed reversible legal error, and this Court need look no further. But even if the Board's finding were owed deference, it failed to point to persuasive evidence of non-enablement, and the complete absence of evidence necessarily fails the substantial-evidence test. *See Intell. Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1329 (Fed. Cir. 2017) (finding no substantial evidence that "Motorola's customers obtained a 'benefit' from the generation of delivery reports" and therefore infringed a patent because

"there [was] no evidence that the customers ever 'generate[d] a delivery report.'").

Finally, the Board's concerns about the supposed "unpredictability" of salt and hydrate formation has no bearing on antedation. Appx00049. Whether a result is predictable over a prior-art disclosure is a question of obviousness. *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir. 2009) ("[P]redictability is a touchstone of obviousness."); Appx01921 (Merck admitting the same). But for antedation, the inquiry narrowly focuses on what the prior art actually discloses. *See In re Clarke*, 365 F.2d at 961. As discussed above, hydrates are disclosed by WO '498 and are presumptively enabled—a presumption that Merck did not rebut.

* * *

The Board erred in its antedation ruling because it misread WO '498 to not disclose hydrates, and it failed to correctly apply the presumption of enablement to WO '498. Because this antedation ruling prevented the Board from analyzing the obviousness of Claims 1-2, 17, 19, and 21-23 based on this reference, this Court cannot review the Board's conclusion for harmless error. *See Amgen Inc.*, 314 F.3d at 1356 (applying harmless-error analysis only where lower court had conducted anticipation analysis with prior art that

was erroneously found non-enabled despite presumption of enablement). This Court should reverse and remand for consideration of the obviousness of these claims.

## III. CLAIMS 3 AND 4 OF THE ’708 PATENT ARE OBVIOUS.

Merck does not dispute that WO ’498 is prior art for Claim 3 and Claim 4. Together with Bastin, WO ’498 renders Claim 3 obvious. And together with Bastin and Brittain, WO ’498 renders Claim 4 obvious.

### A. WO ’498 and Bastin Render Claim 3 Obvious Because They Would Allow a Skilled Artisan to Envisage and Create a 1:1 Sitagliptin DHP With an S-Configuration.

Bastin makes doubly clear what WO ’498 already reveals: phosphoric acid is a prime candidate to combine with compounds like sitagliptin. Sitagliptin is a weakly basic drug substance. Appx09088 (¶ 9), Appx08483-08484 (140:9-141:15), Appx08114 (128:7-9). Bastin teaches that "[f]or weakly basic drugs substances," skilled artisans should consider creating "salts of an inorganic acid," such as a "phosphate." Appx00496. Further, Bastin would encourage a skilled artisan to depart from WO ’498's use of hydrochloric acid with sitagliptin in Example 7. Bastin teaches that, while hydrochloride salts "have often been the first choice for weakly basic drugs," they pose "potential disadvantages" like "unacceptably high acidity in

formulations (e.g., parenteral products), the risk of corrosion, less than optimal solubility . . . and the potential for poor stability." Appx00496. Thus, based on Bastin, a skilled artisan would be incentivized to try other recommended salts, particularly phosphoric acid.

WO '498 renders the claimed 1:1 stoichiometry and the (S)-configuration obvious because it teaches those limitations. As this Court has often said, "anticipation is the 'epitome of obviousness,'" *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1363 (Fed. Cir. 2008) (quoting *In re Kalm,* 378 F.2d 959, 962 (C.C.P.A. 1967)). Thus, it is well settled that, generally, "a disclosure that anticipates under § 102 also renders the claim invalid under § 103.'" *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1373 (Fed. Cir. 2019) (quoting *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983)).

As explained in Part I, a skilled artisan reading WO '498 would envisage the limited set of possible stoichiometries for a sitagliptin phosphate salt. So too with the claimed (S)-configuration. WO '498 explicitly teaches that "[t]he compounds of the instant invention have one asymmetric center at the beta carbon atom" and "[e]ach such asymmetric center will independently produce two optical isomers and it is intended that all of the possible optical isomers . . . are included within the ambit of this invention."

Appx00375 (8:21-22, 24-27). Sitagliptin only has a single asymmetric center. Appx00314 (¶ 112). Thus, a skilled artisan would understand that the sitagliptin phosphate salt encompassed by WO ’498 could exist as only one of two optical isomers (also known as enantiomers): one with an (R)-configuration, where the molecules in the compound are arranged clockwise by priority order; or one with an (S)-configuration, where the molecules are arranged counter-clockwise by priority order. Because anyone who applied a basic knowledge of organic chemistry to WO ’498 could envision this limited set of configurations, the (S)-configuration in Claim 3 is anticipated and therefore obvious.

The Board’s two reasons for finding nonobviousness are unpersuasive. It rejected Mylan’s obviousness argument on the ground that a skilled artisan who ran WO ’498’s Example 7 process using phosphoric acid “would, at best, make a 1:1 (R)-sitagliptin DHP,” while Claim 3 claims the “(S)-enantiomer of 1:1: sitagliptin DHP.” Appx00057. Further, the Board reasoned that Mylan had provided “no expected or even theoretical benefit to making an (S)-enantiomer of 1:1 sitagliptin DHP” and that WO ’498 did not provide a motivation to make it with a reasonable expectation of success. Appx00058. Under a theory of anticipation, neither of these considerations

is pertinent. Even though Example 7 teaches the creation of (R)-sitagliptin DHP, a skilled artisan reading this example along with the rest of WO ’498 would be able to envision the *only* other possible enantiomer, (S)-sitagliptin DHP. That is enough to render the limitation obvious—regardless of whether WO ’498 directly discloses this configuration and regardless of whether a skilled artisan would be motivated to make, see a benefit in making, or reasonably expect to succeed in making (S)-sitagliptin DHP.

But for good measure, WO ’498 *does* provide a motivation, benefit, and reasonable expectation of success. As discussed above, the publication says that its disclosed compounds can exist in either the (R) or (S) configuration. Because WO ’498 is presumptively enabled, a skilled artisan would expect success in producing both configurations. And WO ’498’s disclosure of these two forms would suggest to a skilled artisan that these configurations could have different benefits. Appx00375 (8:21-22, 24-27). Thus, a skilled artisan would be motivated to make both configurations. *See In re Copaxone Consol. Case*s, 906 F.3d 1013, 1025 (Fed. Cir. 2018) (affirming obviousness finding where prior art provided motivation to explore a subject matter and there were only a “limited number” of possibilities to explore).

Finally, the supposed unpredictability of salt formation is factually and legally inadequate to show that Claim 3 is nonobvious. The evidence shows that the 1:1 sitagliptin DHP salt was first allegedly made doing nothing more than a simple, automated salt screen by a person with a skill level below that of the skilled artisan. Appx08908-08912 (27:20-31:22), Appx08920-08921 (39:13-40:22), Appx08923-08925 (42:18-44:15), Appx08928-08939 (47:46:2-58:12); *see also* Appx01072-01073 (¶¶16–19). In fact, the Board concluded that Dr. Matzger allegedly made non-1:1 sitagliptin DHP salt using "conventional techniques." Appx00033. These facts dovetail into the legal problem: "equating unpredictability to patentability, applied in this case, would mean that any new salt . . . would be separately patentable, simply because the formation and properties of each salt must be verified through testing." *Pfizer, Inc. v. Apotex Inc.*, 480 F.3d 1348, 1364, 1366 (Fed. Cir. 2007). This reasoning proves too much and should be rejected as a matter of law.

Because WO '498 anticipates Claim 3's limitations and provides guidance that undermines the Board's concerns, Claim 3 should be deemed obvious.

### B. Claim 4's Crystalline Monohydrate Is Obvious in Light of WO '498, Bastin, and Brittain.

Like Claim 3, Claim 4 indisputably does not antedate WO '498. That publication, together with Brittain and Bastin, renders Claim 4 obvious.

As an initial matter, most of Claim 4's limitations are plainly obvious. Claim 4 depends on Claim 2, which claims the (R)-configuration of sitagliptin phosphate salt. As discussed above, WO '498 discloses the (R)-configuration of a sitagliptin salt in Example 7, Appx00413 (46:1-4), and it makes clear that the compounds encompassed by the publication can exist in the (R) or (S)-configuration, Appx00375 (8:21-22, 24-27). In addition, a skilled artisan would have combined sitagliptin with phosphoric acid to create a sitagliptin phosphate salt. WO '498 expressly tells a skilled artisan that its listed compounds and acids can be combined. Appx00376 (9:27-34). And Bastin would give a skilled artisan a reason to depart from Example 7's use of hydrochloric acid—which poses disadvantages like high acidity, corrosion, suboptimal solubility, and poor stability—and try another acid, like phosphoric acid. Appx00496. Finally, as explained above, the 1:1 stoichiometry would have been obvious given the limited set of possible stoichiometries.

Because of this strong case of obviousness for these limitations, the Board did not find them nonobvious. Instead, the Board ruled that Claim 4's limitation that the salt exist as a "crystalline monohydrate" was nonobvious because a skilled artisan would not have been motivated to make it or reasonably expected to succeed in making it. The Board also believed that the properties of the crystalline monohydrate form of sitagliptin phosphate were an unexpected result. The prior art undermines these rationales.

*First*, a skilled artisan would have expected to succeed in creating a crystalline monohydrate. WO '498 states that the salts that it describes—which include sitagliptin phosphate salt—can exist "in more than one crystal structure" and in the "form of hydrates." Appx00376 (9:33-34). And Brittain teaches that "approximately one-third of the pharmaceutical actives are capable of forming crystalline hydrates" and that "[t]his shows the expected trend in which monohydrates are most frequently encountered." Appx00441. Because WO '498 is presumptively enabled, a skilled artisan would expect to succeed in creating a crystalline hydrate. And based on Brittain, a skilled artisan would expect that the compound could form as a crystalline monohydrate, since one-third of pharmaceutical compounds can

form crystalline hydrates and monohydrates are the most frequently encountered form of a crystalline hydrate.

*Second*, a skilled artisan would have been motivated to explore hydrate forms, including crystalline monohydrate forms. As Brittain explains, "the behavior of pharmaceutical hydrates" became "the object of increasing attention" nearly thirty years ago, "primarily due (directly or indirectly) to the potential impact of hydrates on the development process and dosage form performance." Appx00439. Knowing this, a skilled artisan would have been motivated to explore various hydrate forms, and a crystalline monohydrate structure is one of the limited hydrate forms of sitagliptin phosphate. Appx00334-00335 (¶ 170), Appx00441; *see In re Copaxone Consol. Cases*, 906 F.3d at 1025.

*Third* and finally, the Board's consideration of unexpected results was an afterthought that was not critical to its ruling. Appx00067 ("Finally, although we need not reach the alleged unexpected properties of the claimed crystalline monohydrate, such unexpected results are further evidence undermining Petitioner's challenge to claim 4."). But in conducting this non-essential analysis, the Board committed a critical legal error by failing to

compare the claimed compound—a sitagliptin phosphate crystalline monohydrate—with the closest prior art compound—sitagliptin phosphate.

Unexpected results can indicate nonobviousness by showing "improved properties provided by the claimed compositions are much greater than would have been predicted." *Leo Pharm. Prod., Ltd. v. Rea*, 726 F.3d 1346, 1358 (Fed. Cir. 2013) (quoting *In re Soni*, 54 F.3d 746, 751 (Fed. Cir. 1995)). But "[w]hen unexpected results are used as evidence of nonobviousness, the results must be shown to be unexpected compared with the closest prior art." *Millennium Pharms., Inc. v. Sandoz Inc.*, 862 F.3d 1356, 1368 (Fed. Cir. 2017) (quoting *Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 970 (Fed. Cir. 2006)). In the context of chemical compounds, courts must compare the claimed compound with "the closest prior art compound." *Millennium*, 862 F.3d at 1368.

Here, the Board failed to follow this rule. It compared the properties of a sitagliptin phosphate crystalline monohydrate with a compound disclosed in the prior art—sitagliptin HCl. But the closest prior art compound was not sitagliptin HCl but rather sitagliptin phosphate. As discussed above, sitagliptin phosphate salt was disclosed by WO '498, which names sitagliptin in a list of only 33 compounds and phosphoric acid in a list

of eight preferred compounds. Furthermore, Bastin encourages the use of phosphoric acid for weakly basic compounds, like sitagliptin.

The Board seemingly compared the claimed monohydrate to sitagliptin HCl based on the false premise that WO ʼ498 does not disclose sitagliptin phosphate salt. But as explained in Part I, the disclosure of sitagliptin and phosphoric acid on lists and the teaching that they can be combined is sufficient to disclose the sitagliptin phosphate salt. *See Wrigley*, 683 F.3d at 1360. Thus, the Board should have compared the properties of a sitagliptin phosphate in Claim 4 of the '708 Patent to a sitagliptin phosphate salt in the prior art.

This error is reversible. *Millennium*, 862 F.3d at 1368. But even if this Court explored the merits of this argument, it would not find unexpected results on this record. As the patent owner, Merck had "the burden of production with respect to evidence of secondary considerations of nonobviousness," such as unexpected results. *ZUP, LLC v. Nash Mfg., Inc.*, 896 F.3d 1365, 1373 (Fed. Cir. 2018). This burden required proof of "[u]nexpected results . . . that are 'different in kind and not merely in degree from the results of the prior art.'" *Galderma Lab'ys, L.P. v. Tolmar, Inc.*, 737 F.3d 731, 739 (Fed. Cir. 2013) (quoting *Iron Grip Barbell Co. v. USA Sports, Inc.*,

392 F.3d 1317, 1322 (Fed. Cir. 2004)). Here, Merck did not produce any evidence that the properties of any claimed sitagliptin phosphate of the ’708 Patent would be different in kind from another form of sitagliptin phosphate salt in the prior art. In sum, this record offers no basis for affirming that Claim 4 is nonobvious.

## CONCLUSION

The Board’s final written decision should be reversed.

Date: October 18, 2021

Respectfully submitted,

/s/ Deepro R. Mukerjee

Eric T. Werlinger
KATTEN MUCHIN ROSENMAN LLP
2900 K Street, NW – Suite 200
Washington, DC 20007
Tel.: 202-625-3500
eric.werlinger@katten.com

Deepro R. Mukerjee
Lance A. Soderstrom
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022
Tel.: 212-940-6330
deepro.mukerjee@katten.com
lance.soderstrom@katten.com

Jitendra Malik
KATTEN MUCHIN ROSENMAN LLP
550 S. Tryon Street – Suite 2900
Charlotte, NC 28202
Tel.: 704-444-2000
jitty.malik@katten.com

*Counsel for Appellant Mylan Pharmaceuticals Inc.*

# ADDENDUM

Trials@uspto.gov
571-272-7822

Paper 91
Entered: May 7, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MYLAN PHARMACEUTICALS INC.,
Petitioner,

v.

MERCK SHARP & DOHME CORP.,
Patent Owner.

---

IPR2020-00040[1]
Patent 7,326,708 B2

---

Before SHERIDAN K. SNEDDEN, ROBERT A. POLLOCK, and TIMOTHY G. MAJORS, *Administrative Patent Judges*.

MAJORS, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Denying Patent Owner's Motion to Exclude
*37 C.F.R. § 42.64*

---

[1] Dr. Reddy's Laboratories, Inc. and Dr. Reddy's Laboratories, Ltd. were joined as parties to this proceeding via Motion for Joinder in IPR2020-01060; and Sun Pharmaceuticals Industries Ltd. was joined as a party to this proceeding via Motion for Joinder in IPR2020-01072.

## I. INTRODUCTION

Mylan Pharmaceuticals Inc. ("Petitioner" or "Mylan"),[2] on October 30, 2019, filed a Petition to institute *inter partes* review of claims 1–4, 17, 19, and 21–23 of U.S. Patent No. 7,326,708 B2 (Ex. 1001, "the '708 patent"). Paper 1 ("Pet." or "Petition"). On May 12, 2020, based on the preliminary record, we instituted *inter partes* review of the challenged claims on all asserted grounds. Paper 21 ("Inst. Dec.").

After institution, Patent Owner Merck Sharp & Dohme Corp. ("Patent Owner" or "Merck") filed a Response. Paper 41 ("PO Resp."). Petitioner filed a Reply. Paper 65 ("Reply"). Patent Owner filed a Sur-reply. Paper 74 ("Sur-reply"). Also before us is Patent Owner's Motion to Exclude (*see* Papers 81, 85). We held an oral hearing on February 11, 2021, and the transcript is on file. Paper 90 ("Tr.").

As a brief overview, the claims here relate to a compound called "sitagliptin" and, specifically, to particular dihydrogenphosphate ("DHP") salt forms of it that have a 1-to-1 ratio, or stoichiometry, between the relevant phosphate anion and the corresponding sitagliptin cation. Pet. 1–2; PO Resp. 1 (discussing "1:1 sitagliptin DHP"); Ex. 1001, 2:44–65, 15:64–16:15 (claim 1). Sitagliptin is among a class of compounds known as dipeptidyl peptidase-IV inhibitors, which can inhibit an enzyme implicated in the etiology of non-insulin dependent diabetes mellitus (i.e., Type 2 diabetes). *Id.* at 1:3–36. Indeed, Merck developed and sells its drug

---

[2] Petitioner identifies itself, Mylan Inc., and Mylan N.V. as the real parties-in-interest. Pet. 6.

product, Januvia, which is indicated for treatment of Type 2 diabetes and includes a 1:1 sitagliptin DHP salt. PO Resp. 1, 25–26; Ex. 2003 ¶ 2.[3]

The dispute in this case focuses, in large part, on whether an earlier-filed international patent application, which Merck also owns, expressly or inherently discloses the 1:1 sitagliptin DHP salt claimed in the '708 patent.[4] At institution, and despite our determination that this prior art included no explicit disclosure of a phosphate salt of sitagliptin having the 1:1 stoichiometry, we nevertheless instituted trial based, *inter alia*, on testimony from Petitioner's expert that sitagliptin can only be mono-protonated and reacting sitagliptin with phosphoric acid forms the 1:1 DHP salt "every time" and is, thus, inherent. Inst. Dec. 52–53 (noting preliminary record "suggest[s] the 1:1 salt is the necessary byproduct of contacting phosphoric acid and sitagliptin"). Because it is undisputed that the prior art does not expressly disclose the specific 1:1 DHP salt of sitagliptin,[5] and the evidence through trial now shows that sitagliptin can form phosphate salts in <u>non</u>-1:1 ratios without necessarily forming the 1:1 salt (i.e., no inherency), Merck argues that Petitioner's anticipation challenge fails. PO Resp. 6–19.

---

[3] Merck has indicated that "the crystalline monohydrate form of the DHP salt . . . is the solid form of sitagliptin used today in Merck's products." Paper 10, 4–5.

[4] The published international patent application (WO 03/004498) and a U.S. counterpart patent (US 6,699,871; also asserted here as anticipating art) contain materially "identical" disclosures. *See* Pet. 33; Tr. 7:8–13.

[5] *See* Tr. 15:7–19 (Petitioner's counsel agreeing that "there's no express disclosure of a 1:1 DHP salt of sitagliptin in the WO ['498] reference or the '871 reference"); Ex. 2103 ¶ 67.

If anticipation fails, Petitioner is left with obviousness. But, in Merck's telling, the obviousness challenge fares no better because Merck's inventors reduced to practice the subject matter of almost all the challenged claims before the key prior art published, thus disqualifying that art as a § 102(a) reference; and, even if that art still qualifies under § 102(e), Merck's common ownership of the art eliminates it from the obviousness analysis under § 103(c)(1).[6] PO Resp. 22–28. For the two dependent claims for which Merck does not argue an earlier reduction to practice, Merck contends those claims are not obvious because, among other things, that claimed subject matter was highly unpredictable and Petitioner failed to show a reason why it would have been made by an ordinarily skilled person with a reasonable expectation of success. *Id.* at 38–59.

We address in detail the parties' arguments on anticipation and obviousness in the sections below. On this trial record, however, we find Petitioner has failed to show by a preponderance of the evidence that claims 1–4, 17, 19, and 21–21 are unpatentable. Petitioner has, thus, not met its burden and proved unpatentability of the challenged claims. 35 U.S.C. § 316(e). Our reasoning is detailed in Section II below.

We also deny Patent Owner's Motion to Exclude. *Infra* Section III.

---

[6] Under the pre-AIA § 103(c)(1) exception, subject matter developed by "another person" that qualifies as prior art under § 102(e) can be eliminated from use in an obviousness analysis if that subject matter and the claimed invention are commonly owned or under obligation of assignment to the same person or entity at the time of the invention. 35 U.S.C. § 103(c)(1).

### *A. Related Patents and Proceedings*

"[T]here are no related United States patents or pending applications" and "this is the first IPR directed to the '708 patent." Pet. 7, 67.

Petitioner identifies several related cases before the courts including, without limitation: *Merck Sharp & Dohme Corp. v. Mylan Pharm. Inc. et al.*, 1:19:-cv-00101 (N.D. W. Va.); *Merck Sharp & Dohme Corp. v. Mylan Pharm. Inc. et al.*, 1:19-cv-01489 (D. Del.); and *Merck Sharp & Dohme Corp. v. Sandoz, Inc.*, 1:19-cv-00312 (D. Del.). Pet. 6–7 (listing cases). Patent Owner states that it "filed Hatch-Waxman suits alleging infringement of the '708 patent, among others, against fourteen generic drug companies including Mylan, Teva, Apotex, Par, Sun, and Sandoz." Paper 10, 10. The litigation against the generic drug companies "has been consolidated for pretrial proceedings in a multidistrict litigation ('MDL')" before the district court in Delaware. *Id.* (identifying *In re Sitagliptin Phosphate ('708 & '921) Patent Litig.*, C.A. No. 19-md-2902-RGA (D. Del.)).

There are also related matters filed with the Board. After institution, other petitioners filed substantially identical petitions challenging claims of the '708 patent and requested joinder with Mylan in this proceeding. *See* IPR2020-01045 ("Teva" matter); IPR2020-01060 ("Dr. Reddy's" matter); IPR2020-01072 ("Sun" matter). We instituted trial in those other matters and joined the petitioners as parties here. IPR2020-00040, Papers 44–46. The Dr. Reddy's and Sun parties remain joined. The Teva parties (Teva Pharmaceuticals USA, Inc. and Watson Laboratories, Inc.) have settled with Merck and IPR2020-01045 is terminated. IPR2020-01045, Paper 25. The Teva parties are no longer joined. IPR2020-00040, Paper 73, 2–3.

### *B. Asserted Grounds of Unpatentability*

Petitioner asserts six grounds of unpatentability (Pet. 12) as set forth in the table below:

| Claim(s) Challenged | 35 U.S.C. § | Basis |
|---|---|---|
| 1–3, 17, 19, 21–23 | 102(a), 102(e)(2)[7] | WO ’498[8] |
| 1–3, 17, 19, 21–23 | 102(e)(2) | ’871 patent[9] |
| 3, 17, 19, 21–23 | 103 | WO ’498 |
| 1–3, 17, 19, 21–23 | 103 | WO ’498, Bastin[10] |
| 4 | 103 | WO ’498, Bastin, Brittain[11] |
| 4 | 103 | WO ’498, Brittain |

---

[7] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) (“AIA”), amended 35 U.S.C. §§ 102 and 103. The ’708 patent’s claims have an effective filing date before the effective date of those amendments so we refer to the pre-AIA versions of §§ 102 and 103 here.

[8] Edmondson et al., WO 03/004498 A1, published Jan. 16, 2003 (Ex. 1004, “WO ’498”). WO ’498 published from Application No. PCT/US02/21349, filed July 5, 2002, which claims priority to US Provisional Application No. 60/303,474, filed July 6, 2001 (Ex. 1012).

[9] Edmondson et al., US 6,699,871 B2, issued Mar. 2, 2004 (Ex. 1007, “the ’871 patent”). The ’871 patent issued from an application filed July 5, 2002, and claims priority to US Provisional Application No. 60/303,474, filed July 6, 2001 (Ex. 1012).

[10] Richard J. Bastin et al., *Salt Selection and Optimisation Procedures for Pharmaceutical New Chemical Entities*, 4 ORGANIC PROCESS RESEARCH & DEVELOPMENT 427–435, 2000 (Ex. 1006, “Bastin”).

[11] Polymorphism in Pharmaceutical Solids, Harry G. Brittain ed., 1999 (Ex. 1005, “Brittain”).

Petitioner relies on the Declaration of Mukund Chorghade, Ph.D. (Ex. 1002) and Dr. Chorghade's Reply Declaration (Ex. 1035), among other evidence.

Patent Owner relies on the Declaration of Allan S. Myerson, Ph.D. (Ex. 2101), the Declaration of Adam J. Matzger, Ph.D. (Ex. 2103), and testimony from several current or former Merck employees (including many of the '708 patent's eight named inventors), among other evidence. *See, e.g.*, Exs. 2002 (Vydra Decl.), 2003 (Wenslow Decl.), 2004 (Ferlita Decl.), 2005 (Diddle Decl.), 2109 (Herman Decl.), 2124 (Cypes Decl.), 2127 (Hansen Decl.), and 2140 (Shultz Decl.).

### *C. The '708 Patent*

The '708 patent is titled "PHOSPHORIC ACID SALT OF A DIPEPTIDYL PEPTIDASE-IV INHIBITOR." Ex. 1001, code (54). The '708 patent claims priority to non-provisional and provisional patent applications filed, respectively, on June 23, 2004, and June 24, 2003. *Id.* at codes (21), (22), (60). The patent issued February 5, 2008. *Id.* at code (45).

According to the '708 patent, "[t]he present invention relates to a particular salt of a dipeptidyl peptidase-IV inhibitor," and specifically, the dihydrogenphosphate ("DHP") salt of 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine. *Id.* at 1:13–17. The chemical,4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine, is also known as "sitagliptin." *See*

Ex. 2003 ¶ 2; Pet. 1 n.1.[12] The structural formula for the DHP salt of sitagliptin is shown below as formula (I):

(I)




Ex. 1001, 2:44–63. This formula reflects a salt with one phosphate anion associated with one sitagliptin amine cation (with a stereogenic carbon at *). *Id.* at 3:46–52 ("[T]he dihydrogenphosphate salt of the present invention is comprised of one molar equivalent of mono-protonated [sitagliptin] . . . and one molar equivalent of the dihydrogenphosphate (biphosphate) anion.").

The '708 patent states that this salt is "useful for the treatment and prevention of diseases and conditions for which an inhibitor of dipeptidyl peptidase-IV is indicated, in particular Type 2 diabetes." *Id.* at 1:19–22.

In a section related to background of the invention, the '708 patent identifies WO 03/004498 (i.e., WO '498), which is "assigned to Merck &

---

[12] Petitioner notes, without dispute, that sitagliptin is also the compound with the chemical name: 7-[(3R)-3-Amino-4-(2,4,5-trifluorophenyl)butanoyl]-3-(trifluoromethyl)-5,6,7,8-tetrahydro-1,2,4-triazolo[4,3-α]pyrazine. Pet. 1 n.1; Ex. 1004, 47 (Example 7). In citing asserted references and technical publications in this Decision, we generally use the page numbers added to the exhibit not the original pagination, except that, for US patents, we use the column and line number format or other indicia.

Co." *Id.* at 1:49–50. The '708 patent states that WO '498 "describes a class of beta-amino tetrahydrotriazolo[4,3-a]pyrazines, which are potent inhibitors of DP-IV and therefore useful for the treatment of Type 2 diabetes." *Id.* at 1:50–52. According to the '708 patent, WO '498 "[s]pecifically disclose[s]" the 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazine-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine. *Id.* at 1:53–55. The patent states that "[p]harmaceutically acceptable salts of this compound are generically encompassed within the scope of WO 03/004498." *Id.* at 1:53–57. "However," the '708 patent states, "there is no specific disclosure in the above reference [(WO '498)] of the newly discovered monobasic dihydrogenphosphate salt . . . of structural formula I." *Id.* at 1:58–62.

The '708 patent further notes the following about WO '498:

> The crystalline dihydrogenphosphate salt of the present invention exhibits pharmaceutic advantages over the free base and the previously disclosed hydrochloride salt (WO 03/004498) in the preparation of a pharmaceutical drug product containing the pharmaceutically active ingredient. In particular, the enhanced chemical and physical stability of the crystalline dihydrogenphosphate salt monohydrate constitute advantageous properties in the preparation of solid pharmaceutical dosage forms containing the pharmacologically active ingredient.

*Id.* at 4:19–28.

### *D. Challenged Claims*

The '708 patent includes twenty-four claims. Petitioner challenges claims 1–4, 17, 19, and 21–23. Claims 1, 2, and 4 are illustrative and read as follows:

1. A dihydrogenphosphate salt of 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazine-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine of structural formula I:

(I)




or a hydrate thereof.

2. The salt of claim 1 of structural formula II having the (R)-configuration at the chiral center marked with an *

(II)




4. The salt of claim 2 characterized as being a crystalline monohydrate.

Ex. 1001, 15:64–16:30, 16:48–49. Each of the other challenged claims depends (directly or indirectly) on claims 1 or 2. *See, e.g.*, *id.* at 17:29–32 (claim 19: method of treating type 2 diabetes with the salt of claim 2), 17:37–18:5 (claim 21: process for preparing the salt of claim 2).

## II. ANALYSIS

### *A. Principles of Law*

"In an IPR, the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid. Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3)).

To show anticipation under 35 U.S.C. § 102, each and every claim element, arranged as in the claim, must be found in a single prior art reference. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359 (Fed. Cir. 2008). The prior art need not, however, use the same words as the claims. *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009). The anticipation inquiry takes into account the literal teachings of the prior art reference, and inferences the ordinarily skilled person would draw from it. *Eli Lilly and Co. v. Los Angeles Biomedical Res. Inst. at Harbor-UCLA Med. Ctr.*, 849 F.3d 1073, 1074–75 (Fed. Cir. 2017). Indeed, "a reference can anticipate a claim even if it does not expressly spell out all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would at once envisage the claimed arrangement or combination." *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015) (internal quotation marks omitted).

As to obviousness, a claim is unpatentable under 35 U.S.C. § 103 if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question

of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness when presented. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). A party who petitions the Board for a determination of unpatentability based on obviousness must show that "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) (quotations and citations omitted).

### *B. Person of Ordinary Skill in the Art*

In determining the level of skill in the art, we consider the problems encountered in the art, the art's solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of active workers in the field. *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986).

Petitioner contends a person of ordinary skill in the art (or "POSA") at the time of the invention would have had:

> (i) a Ph.D. in chemistry, biochemistry, medical chemistry, pharmacy, pharmaceutics, or a related field, and at least two years of relevant experience in drug development including an understanding of salt selection in drug development; (ii) a master's degree in the same fields and at least five years of the same relevant experience; or (iii) a bachelor's degree in the same fields and at least seven years of the same relevant experience.

Pet. 11; Ex. 1002 ¶¶ 45–46. Patent Owner does not oppose this definition.[13]

We find Petitioner's proposed definition is consistent generally with the cited prior art, and we apply it for the purposes of this Decision. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (explaining that specific findings regarding ordinary skill level are not required "where the prior art itself reflects an appropriate level and a need for testimony is not shown") (quoting *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed. Cir. 1985)).

### *C. Claim Construction*

We interpret a claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2019). Under this standard, we construe the claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.* "[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*

[13] Merck's experts, Drs. Myerson and Matzger, phrase the definition differently—limiting the fields of study to "chemistry, chemical engineering or a related field," and requiring two or more years (depending degree attained) "working with pharmaceutical solids, including polymorphic forms." Ex. 2101 ¶ 39; Ex. 2103 ¶ 40. Neither party contends, however, that any disputed matter turns on acceptance of one definition or the other. Merck's experts state that their opinions do not change under either definition. Ex. 2101 ¶ 40; Ex. 2103 ¶ 41.

*Ltd.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (quoting *Vivid Tech., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

At institution, neither party requested any express claim construction. Pet. 10 ("Petitioner submits that no further construction [beyond the claims as written] is necessary"); Ex. 1002 ¶¶ 57–59.

Claim 21 is a dependent claim and recites a process for preparing the 1:1 (R)-sitagliptin DHP of claim 2. Ex. 1001, 17:37–18:5. Petitioner, in its Reply, argues that claim 21's "contacting" limitation "means an actual physical interaction between molecules." Reply at 11–12. Petitioner's position is that the claim phrase "contacting one equivalent of [sitagliptin] in an organic solvent or aqueous organic solvent with about one equivalent of phosphoric acid at a temperature in the range of about 25–100°C" does not limit the molar amounts of the acidic and basic reagents provided in the solvent, but rather how discrete molecules actually interact to form the final salt. *Id.*; Ex. 1001, 17:38–18:5; Tr. 23:23–25:9. In Petitioner's view, "the sitagliptin base molecule is *only able* to interact once with a phosphoric acid molecule." Reply 12. And because a 1:1 salt allegedly always forms when an acid (e.g., hydrochloric or phosphoric) is reacted with sitagliptin, the "contacting" step would be met even if the reaction conditions were to include using a large excess (i.e., a substantially non-equivalent molar amount) of acid molecules relative to the base, such as the excess hydrochloric acid in WO '498's Example 7.[14] Reply 12–13.

---

[14] Put differently, Petitioner's position is that it does not matter what molar amounts of the acid and base are used (e.g., 100 moles of acid vs. 1 mole of

Patent Owner responds that Petitioner is abrogating claim 21's limitations. According to Patent Owner, Petitioner's interpretation and application of the art to claim 21 renders irrelevant: (i) the starting materials (insofar as the cited art starts with BOC-protected sitagliptin, not sitagliptin free base); and (ii) the claim's "one equivalent" language (insofar as the cited example in the art uses a substantial molar excess of the acid), so long as a salt with 1:1 stoichiometry might somewhere form in a downstream process. Sur-reply 13–14; *see also* Ex. 2103 ¶ 232 (describing WO '498's Example 7 as "using ~1000 fold excess of hydrochloric acid").

Given the present record, we are unpersuaded that a further construction of claim 21 is required. Even if we agreed with Petitioner's interpretation, Petitioner has not proved that the cited art expressly or inherently discloses preparing the 1:1 DHP salt of sitagliptin (discussed *infra* for anticipation challenges). Alternatively, if claim 21 required use of one molar equivalent of sitagliptin and about (i.e., "approximately") one molar

---

base would still be encompassed); key to Petitioner's argument is the final result of a 1:1 salt, thus allegedly proving the reagents will only interact in a 1:1 ratio. We explained at the oral hearing that we found Petitioner's interpretation problematic because it cited no intrinsic evidence in support and also appeared to read the term "about" out of the claim. Tr. 25:2–27:6 (asking how it's possible to have interaction at a molecular level as suggested by Petitioner (seemingly requiring whole numbers ratios, like 1:1 or 1:2, in which the molecules might interact and bond) between one equivalent of a molecule and *about* one equivalent of another). Petitioner had no satisfactory response to those concerns. *Id.*; *see also id.* at 75:14–21 (Petitioner's counsel later suggested that even if the "contacting" step required use of equal molar amounts, using such amounts would be an obvious change "that you would indeed use").

equivalent of acid in the solvent (*see* Ex. 1001, 6:29–55 (disclosing a process for preparing the claimed 1:1 sitagliptin DHP)), Petitioner has not shown that WO ’498 describes that reaction. Again, it is undisputed that the cited example (Example 7 of WO ’498) uses a substantial molar excess of the acid (HCl) to the base. On obviousness and as explained below (*see* Section II(F)), we conclude that Patent Owner’s reduction-to-practice evidence is dispositive for several claims, including claim 21, and that issue does not turn on whether we accept or reject Petitioner’s interpretation (which encompasses, but is not limited to, using equimolar amounts). PO Resp. 25 (explaining, citing undisputed evidence, how the inventors made 1:1 sitagliptin DHP with “equimolar” amounts of sitagliptin and phosphoric acid under conditions encompassed by claim 21).

### *D. Anticipation by WO ’498*

Petitioner asserts that claims 1–3, 17, 19, and 21–23 are unpatentable as anticipated by WO ’498. Pet. 12–31. We provide an overview of WO ’498, and then turn to analysis of the alleged anticipation.

#### 1. Overview of WO ’498 (Exhibit 1004)

WO ’498 “is directed to compounds which are inhibitors of the dipeptidyl peptidase-IV enzyme (‘DP-IV inhibitors’) and which are useful in the treatment or prevention of diseases in which the dipeptidyl peptidase-IV enzyme is involved, such as diabetes and particularly type 2 diabetes.” Ex. 1004, 1. WO ’498 is further “directed to pharmaceutical compositions comprising these compounds and the use of these compounds and compositions” for treatment or prevention of the above-noted diseases. *Id.*

WO ’498 discloses several examples of the compounds of its invention. *Id.* at 38–47 (describing Examples 1–7); *see also id.* at 48–49 (identifying other example compounds, numbered examples 8–33). The salt of Example 7 is shown in the chemical structure below.

EXAMPLE 7




7-[(3*R*)-3-Amino-4-(2,4,5-trifluorophenyl)butanoyl]-3-(trifluoromethyl)-5,6,7,8-tetrahydro-1,2,4-triazolo[4,3-*a*]pyrazine, hydrochloride

*Id.* at 47:1–5; *see also id.* at 47:6–26 (describing steps for preparing the compound and salt of Example 7). The structure in Example 7 of WO ’498 “depicts the hydrochloride salt of sitagliptin in its (R)-configuration.” Ex. 1002 ¶ 67.

WO ’498 does not describe or exemplify any specific phosphate salt of sitagliptin (or any phosphate of the other compounds). More generically, however, WO ’498 claims (R)-sitagliptin and several other compounds, and pharmaceutically acceptable salts thereof. WO ’498 claims:

15. A compound which is selected from the group consisting of:

***




***

and pharmaceutically acceptable salts thereof.

Ex. 1004, 55:16–61:5 (claim 15 depicts thirty-three DP-IV inhibitor compounds, one of which is (R)-sitagliptin (shown in the excerpt above), and, after depicting all those compounds, recites "and pharmaceutically acceptable salts thereof").

WO '498 elsewhere describes "'pharmaceutically acceptable salts' [as] refer[ring] to salts prepared from pharmaceutically acceptable non-toxic bases or acids including inorganic or organic bases and inorganic or organic acids." *Id.* at 10:27–29. "When the compound of the present invention is basic," WO '498 indicates the "salts may be prepared from pharmaceutically acceptable non-toxic acids, including inorganic and organic acids," and WO '498 identifies twenty-six illustrative acids. *Id.* at 11:8–14 ("Such acids include acetic, benzenesulfonic, benzoic, . . . hydrochloric, . . . phosphoric, succinic, sulfuric, tartaric, p-toluenesulfonic acid, and the like."). Among the twenty-six acids named, WO '498 discloses that "[p]articularly preferred are citric, hydrobromic, hydrochloric, maleic, phosphoric, sulfuric, fumaric,

and tartaric acids." *Id.* at 11:14–15; *see also id.* at 11:16–17 ("It will be understood, as used herein, references to the compounds of Formula I are meant to also include the pharmaceutically acceptable salts.").

2. Analysis of Alleged Anticipation

*a) The Parties' Arguments*

Petitioner contends that WO '498 discloses (R)-sitagliptin and its pharmaceutically acceptable salts. Pet. 16–17 (citing Ex. 1004, 55–60 ("Claim 15 (7th compound)"). Petitioner further argues that WO '498's disclosure of acceptable salts would include at least the eight "[p]articularly preferred" acids, one of which is phosphoric acid, as a non-toxic acid for use in forming salts with compounds like sitagliptin. *Id.* at 16–18; *see* Ex. 1004, 10:8–15. Thus, Petitioner argues, "WO '498 teaches the phosphoric acid salt of sitagliptin" and a specific example is not needed. *Id.* at 16–18.

According to Petitioner, this case involves anticipation by disclosure of "lists," not necessarily anticipation where the art discloses a genus and a species within that genus are claimed. Pet. 20–22 (citing, *e.g.*, *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1361 (Fed. Cir. 2012)); *see also id.* at 23–24 (citing *In re Gleave*, 560 F.3d 1331, 1331 (Fed. Cir. 2009) ("For purposes of whether they are anticipatory, lists and genera are often treated differently under our case law.")).[15] More specifically,

[15] Whether a disclosed genus anticipates a species ordinarily turns on whether the prior art "expressly spelled out a definite and limited class of compounds that enabled a person of ordinary skill in the art to at once envisage each member of this limited class." *Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, 471 F.3d 1369, 1376 (Fed. Cir. 2006); *Atofina v.*

Petitioner contends "WO '498 provides two closed lists," where "[t]he primary list (i.e., Claim 15) provides 33 compounds" and the "secondary" list "identifies by name the eight" preferred acids. *Id.* at 22. Because the first list includes (R)-sitagliptin and the second list includes phosphoric acid, Petitioner contends "neither list leaves anything to the imagination" and WO '498 anticipates claims 1 and 2. *Id.* at 22–24. Petitioner asserts that WO '498's disclosures even arguably "collapse to form a single comprehensive list" of all the compounds and salts. *Id.* at 23–24; Ex. 1002 ¶ 80. And, because lists are involved, Petitioner argues "the number of [listed items] is irrelevant." *Id.* at 24 (citing *In re Gleave*, 560 F.3d at 1333, 1338 (explaining that the art "expressly lists every possible fifteen-base-long oligodeoxynucleotide sequence in IGFBP-2," and that the "list include[d] more than 1400 sequences")).

Petitioner does not, in the Petition, address the 1:1 stoichiometry limitation of the claimed salt head-on. To the extent addressed at all, Petitioner's discussion appears in parts of a footnote spanning several pages. Pet. 18–20 n.8. There, Petitioner states that claim 1's "dihydrogenphosphate salt" of sitagliptin, "is nothing more than another name for the (monobasic) phosphoric acid salt of sitagliptin." *Id.* Petitioner cites the '708 patent's disclosure on reacting one equivalent of sitagliptin with approximately one

---

*Great Lakes Chem. Corp.*, 441 F.3d 991, 999 (Fed. Cir. 2006) ("It is well established that the disclosure of a genus in the prior art is not necessarily a disclosure of every species that is a member of that genus. . . . There may be many species encompassed within a genus that are not disclosed by a mere disclosure of the genus. On the other hand, a very small genus can be a disclosure of each species within the genus.").

equivalent of phosphoric acid. *Id.* (citing Ex. 1001, 6:29–55). And Petitioner cites Dr. Chorghade's testimony that sitagliptin can only be mono-protonated at sitagliptin's primary amine so that the DHP salt forms "every time." *Id.* (citing Ex. 1002 ¶ 76); *see also* Ex. 1002 ¶ 77 (noting, with no further analysis, that Example 7 of WO '498 is a 1:1 hydrochloride salt). At institution, we observed that Petitioner's position was "light" on analysis for the claimed stoichiometry. Inst. Dec. 53. But we instituted trial, as there was some preliminary support for the position that a 1:1 stoichiometry was inherent, and because, at that time, Patent Owner offered in rebuttal only attorney argument about different protonation states and stoichiometric ratios. *Id.* at 53–54.

In its Response at trial, Patent Owner contends that Petitioner "cannot and does not assert that these references [(WO '498 or the related '871 patent)] expressly disclose" 1:1 sitagliptin DHP. PO Resp. 6–7. And, Patent Owner argues, Petitioner's critical assumptions necessary to prevail on anticipation have now been proved incorrect. *Id.* Thus, whether Petitioner's theory is based on lists or "envisaging" the claimed subject matter, or on "inherency," Patent Owner contends the challenge fails. *Id.* at 7–19.

According to Patent Owner, the unrebutted evidence shows that the salt formation here is unpredictable, it involves "trial and error" processes, and that, absent sufficient detail, a POSA has no way of knowing whether any particular salt within a genus of potential salts will form at all. *Id.* at 8–10 (citing, *e.g.*, Ex. 2103 ¶¶ 163–71, 86–92; Ex. 2127 ¶ 15; Ex. 2042, 5 ("No predictive procedure to determine whether a particular acidic or basic drug would form a salt with a particular counter-ion has been reported in the

literature"); Ex. 2051, 116:22–117:3 (Dr. Chorghade admitting salt formation lacks predictability and is a "trial and error process")). Patent Owner points out that WO '498 does not expressly describe any phosphate salts of any compound, much less any phosphate salt of sitagliptin—only a hydrochloride salt is shown. *Id.* at 7 (citing Ex. 2103 ¶¶ 72–74; Ex. 1004, 46:1–26 (Example 7)). Also, Patent Owner contends, Petitioner has improperly narrowed the combinations in WO '498 when, in fact, there are millions of compounds and hypothetical salts encompassed by WO '498 broad teachings (e.g., compounds based on Formula I), none of which were reviewed by Dr. Chorghade beyond the "33 compounds" in claim 15 and the preferred "8 counterions." *Id.* at 12–13 (citing Ex. 2103 ¶¶ 77–85).

On this record, Patent Owner argues that the "envisaging" doctrine does not help Petitioner. PO Resp. 8. According to Patent Owner, envisaging the claimed subject matter might apply "[i]f the genus resulting from combining the two lists is 'of such a defined and limited class that one of ordinary skill in the art could at once envisage each member of the genus.'" *Id.* (quoting *Wrigley*, 683 F.3d at 1361) (internal quotation marks and citation omitted). But that is not so here, Patent Owner argues, because the genus is not limited as Petitioner says and "[t]he POSA reading WO '498 cannot envisage—because she does not know—the genus of salts that will form." *Id.* at 8–9; Ex. 2051 (Chorghade dep.) 63:22–64:3 ("Q: You wouldn't know without performing research whether a phosphate salt of sitagliptin would form without doing that work. Right? A. That is correct").

Patent Owner emphasizes another allegedly important distinction. To the extent Petitioner's anticipation theory requires combining reagents to

perform an unpredictable *chemical reaction*, Patent Owner contends there is no similarity to other cases like *Wrigley*, where a "simple combination . . . [of] two chewing gum components" was at issue. PO Resp. 11. According to Patent Owner, the district court in *Shire* recognized such a distinction in rejecting the argument that a POSA would at once envisage the claimed compound from combining and chemically reacting two reagents (L-lysine and d-amphetamine) allegedly among lists in a prior art reference. *Id.* (citing *Shire LLC v. Amneal Pharm., LLC*, 2014 WL 2861430 * 15 (D.N.J. June 23, 2014), *aff'd in part*, *rev'd in part and remanded*, 802 F.3d 1301 (Fed. Cir. 2015)).[16]

Patent Owner further argues that Petitioner is foreclosed from using the "at once envisage" doctrine to fill in limitations missing in WO '498. PO Resp. 18. As noted by Patent Owner, "[t]he 'at once envisage' test 'does not stand for the proposition that a reference missing a limitation can anticipate a claim if a skilled artisan viewing the reference would at once envisage the missing limitation.'" *Id.* (quoting *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 851 F.3d 1270, 1274–75 (Fed. Cir. 2017) (internal quotation marks omitted)). Because "1:1 sitagliptin DHP" is not described and that salt's "1:1 stoichiometry limitation" is "indisputably

---

[16] The district court in *Shire*, in granting summary judgment of no anticipation, distinguished *Wrigley*, finding that the claimed compound "does not appear to be something that you get just by mixing a little L-lysine and a little d-amphetamine together" and "[t]here is no dispute that some chemical reactions have to take place." *Shire*, 2014 WL 2861430 at * 15. The Federal Circuit later reversed and remanded on the issue of induced infringement. *Shire*, 802 F.3d at 1310–11.

missing from WO ’498,” Patent Owner contends “the Board cannot ‘fill in missing limitations simply because a skilled artisan would immediately envision them.’” *Id.* at 18–19 (quoting *Nidec*, 851 F.3d at 1274–75); *see also* Sur-reply 1–4 (addressing further the “envisage” theory).

On inherency, Patent Owner argues that undisputed evidence shows sitagliptin and phosphoric acid also react to form non-1:1 phosphate salts. *Id.* at 14–19. So, Patent Owner contends, Petitioner’s and Dr. Chorghade’s assertions that a 1:1 DHP sitagliptin salt forms “every time” are demonstrably “wrong.” *Id.* at 15 (citing Ex. 2013 ¶¶ 99–102, 113–118); Ex. 1002 ¶ 76. In support, Patent Owner identifies non-1:1 phosphate salts of sitagliptin reported in the literature—salts Dr. Chorghade did not consider. PO Resp. 15 (citing Ex. 2220). And Patent Owner’s expert “Dr. Matzger has *actually made* other non-1:1 salts.” *Id.* (citing Ex. 2103 ¶¶ 123–176). As Dr. Matzger explains, sitagliptin includes multiple sites that can accept protons, and phosphoric acid is “triprotic”—meaning it can donate up to three protons in an acid-base reaction. *Id.* at 16 (citing Ex. 2103 ¶¶ 103–112). Indeed, as Patent Owner contends, Dr. Matzger formed a 3:2 sitagliptin phosphate salt, as well as a 2:1 salt. *Id.* at 17 (citing Ex. 2103 ¶¶ 123–38, 148–176).[17] According to Patent Owner, other

---

[17] Dr. Matzger testifies, *inter alia*, that “my experiments have definitively shown that non-1:1 salts can indeed form in chemical reactions between sitagliptin and phosphoric acid. . . . [I]t is my opinion that a 1:1 DHP salt of sitagliptin is not the inevitable result of a chemical reaction between those species.” Ex. 2103 ¶ 118. As also explained by Dr. Matzger, Exhibit 2220 (WO 2012/166420 (“WO ’420”)) depicts, among other things, a salt with

chemistry professors, including Drs. Jerry Atwood and Leonard Chyall, respectively from University of Missouri and Purdue University, also formed non-1:1 salts of sitagliptin and phosphoric acid using conventional salt-screening protocols. *Id.* ("Dr. Matzger reproduced one of the non-1:1 sitagliptin phosphate salts of WO '420 [Ex. 2220] (a salt Dr. Chyall had also produced), and determined—via multiple techniques—it was a 3:2 salt.") (citing, *e.g.*, Exs. 2224, 2225, 2227, 2192; Ex. 2103 ¶¶ 123–135, 148–160). Patent Owner contends the existence of these non-1:1 salts "precludes a finding that the 1:1 salt is inherently anticipated." PO Resp. 17–18; *see also* Sur-reply 5–12 (addressing Petitioner's "inherency" theory).

In Reply, Petitioner restates its view that the claimed salt is found in a combination of two lists in WO '498—sitagliptin "among a narrow list of 33 exemplified compounds" and phosphoric acid in a list of eight preferred acids. Reply 2–5. Petitioner contends that there is no dispute that 1:1 salts would be encompassed by the claims of WO '498. *Id.* at 3. And, in furtherance of its envisaging theory, Petitioner contends that Patent Owner's expert, Dr. Matzger, testified that "you can imagine that the [1:1 phosphoric acid salt] would exist." *Id.* (quoting, in part, Ex. 1025, 146:13–147:5) (brackets added by Petitioner)). According to Petitioner, Patent Owner's emphasis on unpredictability is flawed because the issue is anticipation, not obviousness, and also the claimed 1:1 sitagliptin DHP was "made easily" in

---

two molecules of sitagliptin to one molecule of the phosphate anion (a 2:1 salt), as well as a 1:2 salt, with one sitagliptin molecule associated with two phosphate anions. Ex. 2103 ¶¶ 121–122 (citing Ex. 2220, 8 (Compound 3), 16 (Compound 7)).

a salt-screen by one of the inventors who had little work experience at that time. *Id.* at 5.

Petitioner's Reply raises two primary points on inherency. First, that, in methanol-based experiments run years ago by Dr. Chyall, the reaction of phosphoric acid and sitagliptin produced 1:1 sitagliptin DHP—results that Merck allegedly does not dispute. Reply 5–7 (citing Ex. 2225[18]). Petitioner contends that because those experiments used "methanol/ambient conditions" they are consistent with the process in WO '498's Example 7. *Id.* at 6–8 (citing Ex. 2225 ¶¶ 22–52, 72; Ex. 1035 ¶¶ 22–26, 63–67). Second, Petitioner argues that Merck's testing evidence misses the mark because it does not resemble WO '498's Example 7. *Id.* at 9 (citing testimony that Dr. Matzger was "not trying to reproduce anything in the '498" (Ex. 1025, 87:21–88:17)). Insofar as Dr. Matzger's testing used an isopropanol/water solvent, not methanol, Petitioner contends that the test results are less relevant (or irrelevant) to whether the claimed 1:1 sitagliptin DHP is inherent based on WO '498. *Id.* at 8–10; *see also id.* at 3 (arguing "Merck turns to non-prior art evidence (WO420) using different conditions than WO498, to contend that other possible stoichiometries may exist").

---

[18] Exhibit 2225 is Dr. Leonard J. Chyall's Declaration (dated Aug. 3, 2010) apparently prepared for an opposition proceeding in Israel, concerning a foreign counterpart to the '708 patent. *See* Reply 6; Ex. 2225 ¶ 1. Merck submitted Exhibit 2225, along with other exhibits containing Dr. Chyall's prior testimony, when it filed its Patent Owner Response. *See* PO Resp. 17 (citing Exhibits 2225, 2192, 2224, and 2227). Petitioner and Dr. Chorghade relied, in the Reply, on some of Dr. Chyall's experiments, particularly those in Exhibit 2225 using methanol. Patent Owner moves to exclude in part Exhibit 2225, which we address in Section III.

*b) Whether WO ’498 Discloses 1:1 Sitagliptin DHP*

*(i) Petitioner’s Lists & “Envisage” Theories*

All the challenged claims require a 1:1 sitagliptin DHP salt, as recited in claims 1 or 2. Ex. 1001, 15:64–16:30 (claim 2 is the (R)-enantiomer of 1:1 sitagliptin DHP). We focus on those claims because whether WO ’498 discloses, expressly or inherently, that phosphate salt of sitagliptin with its 1:1 stoichiometry is decisive. *Vergegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987) (“A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference.”).

It is undisputed that a 1:1 sitagliptin DHP salt is not *expressly* disclosed in WO ’498. *See* Tr. 15:7–19; Ex. 2103 ¶ 67. No phosphate salts of sitagliptin, or any of the other thirty-two exemplary DP-IV compounds, are shown in WO ’498, nor are there details given about making them. Ex. 2103 ¶¶ 74, 81. Petitioner’s declarant, Dr. Chorghade conceded these points on cross-examination. Dr. Chorghade agreed, for example, that he was “not aware of any prior process where sitagliptin and phosphoric acid are being reacted to form a phosphate salt” and that “WO’498 does not disclose a process in which sitagliptin and phosphoric acid have been reactive.” Ex. 2283, 50:18–51:6; *see also id.* at 15:2–12.

What WO ’498 does describe in some detail are *hydrochloride* salts, made by reacting a different acid (hydrochloric acid) with several of the example DP-IV inhibitor compounds. *See, e.g.*, Ex. 1004, 38–47 (Examples 1–7). One of those compounds is sitagliptin. *Id.* at 47; *see also id.* at 56 (bottom-depicted compound).

It is true that, in Example 7, WO ’498 describes a process for making a hydrochloride salt of sitagliptin, which appears to form in a 1-to-1 ratio. *Id.* at 47. On this record, however, we credit Dr. Matzger’s testimony that a POSA would not simply conclude that whatever applies for hydrochloric acid and sitagliptin also applies to the many different acids that are disclosed—and phosphoric acid, in particular. *See, e.g.*, Ex. 2103 ¶¶ 103–113. First, hydrochloric acid and phosphoric acid are different for at least the reason that hydrochloric acid has only one proton to donate, whereas phosphoric acid has three. *Id.* ¶¶ 33–34 (citing references), 113 n. 39 (“Since HCl is monoprotic, the 1:1 stoichiometry of Example 7 is irrelevant to the question whether a polyprotic acid could form non-1:1 salts with multiple sitagliptin molecules.”). Second, persuasive evidence shows that sitagliptin (and structurally-similar analogues) can, indeed, accept multiple protons. Ex. 2103 ¶ 122 (showing a 1:2 sitagliptin phosphate); *id.* ¶¶ 103–105 (discussing Examples 1–5 of WO ’498, in which one molecule of the analogue is protonated by two HCl ions), 108 (testifying on other potential ratios with polyprotic acids); Ex. 1004, 38 (Example 1); Ex. 2051 (Chorghade dep.), 152:21–153:10 (agreeing other example compounds are sitagliptin analogues but declining to concede that they have a non-1:1 stoichiometry). This is consistent with Patent Owner’s position and Dr. Matzger’s testimony that sitagliptin and analogous compounds have, not just one, but multiple sites that are capable of accepting protons when forming salts. Ex. 2103 ¶¶ 103–104 (showing proton-accepting sites at the primary amine and triazole ring).

Petitioner's "list(s)" and "envisage" theories do not make up for the absence of express disclosure of the claimed 1:1 sitagliptin DHP salt on this record. Even accepting that WO '498 includes a "list" of 33 example active compounds and also a "list" of eight preferred acids as possible counterions to form potential salts with such compounds, there is no "list" that identifies *expressly* all the phosphate salts in any, much less all, the potential stoichiometric ratios. Petitioner does not persuasively argue otherwise. And that fact distinguishes this case from others, where the relevant subject matter was listed expressly. *In re Gleave*, 560 F.3d at 1333, 1338 (holding that the reference "expressly lists" every possible one of the relevant sequences).

Petitioner did not attempt to quantify the breadth of compounds and hypothetical salts encompassed by WO '498's disclosures. Nor does Petitioner rebut Patent Owner's evidence that does. *See, e.g.*, Ex. 2103 ¶¶ 73, 97; Ex. 2051 (Chorghade dep.), 57:2–12 (testifying that he did not attempt to quantify the compounds), 69:11–16 (agreeing, however, that sitagliptin is one of "at least 1,000 compounds" in WO '498). Dr. Matzger testifies persuasively that, even if it were appropriate to limit the genus to the 33 example compounds (not the thousands or millions within Formula I), the potential combinations with the 8 preferred acids (rather than the open-ended list of twenty-six acids), and then accounting for varied stoichiometry, "there would theoretically be approximately 957 salts" that might exist. Ex. 2103 ¶ 97 (describing this as a "conservative[] estimate"). Again, this evidence is uncontested. Whether the disclosure cited by Petitioner is characterized as one list or two, we find that there is no express listing of all

these 950-plus hypothetical salts, much less the specific 1:1 sitagliptin DHP as claimed, sufficient to anticipate claims 1 and 2.

With no express disclosure of all limitations of the 1:1 sitagliptin DHP salt in WO ’498, Petitioner cannot fill gaps by arguing a POSA would “envisage” what is missing.[19] *See Nidec*, 851 F.3d 1270, 1274–75; *accord Galderma Labs, L.P. v. Teva Pharm. USA, Inc.*, 799 F. App’x 838, 845 (Fed. Cir. 2020) (holding “the district court was not permitted to ‘fill in missing limitations simply because a skilled artisan would immediately envision them.’”). On that point, at the oral hearing, Petitioner sought to pivot the inquiry from envisaging to enablement—whether a 1:1 sitagliptin DHP salt is enabled by WO ’498. Tr. 13:24–15:3. But, as we pointed out then, Petitioner’s argument conflates anticipation and enablement. *Id.* at Tr. 15:7–16:9. “Whether a prior art reference is enabled is a separate question from whether it discloses, expressly or inherently, the claimed limitations at issue.” *See Galderma*, 799 F. App’x at 844 (explaining that “Teva makes the impermissible leap from enablement to disclosure” and “[w]hat a POSA ‘envisages,’ . . . is undoubtedly a question of disclosure, not enablement”).[20]

---

[19] This gap-filling is precisely what Petitioner attempts to do. *See, e.g.*, Tr. 12:9–11 (Petitioner, after discussing the two alleged lists, arguing “[s]o the only thing we have to show is whether or not a POSA would envision the 1:1 stoichiometry of the 1:1 DHP stoichiometry and whether it would be able to make it.”).

[20] Although Petitioner spent little effort developing argument around Merck’s listing of the ’871 patent in the Orange Book for Januvia in its papers, Petitioner brought up the Orange Book over ten times at oral hearing. *See, e.g.*, Tr. 14:1–14; *see* Pet. 5, 18 n.8, 66 (Orange Book

Separately, even if the law did not foreclose Petitioner's "envisaging" theory, Petitioner's evidence on it is weak. Dr. Chorghade does not opine that a POSA would "at once envisage" the 1:1 sitagliptin DHP salt. *See generally* Ex. 1002. His initial testimony was, instead, that a 1:1 ratio results "every time" sitagliptin and phosphoric acid are reacted (i.e., inherency). Ex. 1002 ¶ 76; Pet. 18 n.8. Now, Dr. Chorghade states simply that he "agree[s] with Dr. Matzger that looking at Example 7, when replacing phosphoric acid for HCL, a POSA 'can imagine that the [1:1 phosphoric acid salt] would exist.'" Ex. 1035 ¶ 9 (quoting Ex. 1025 (Matzger dep.), 147:3–4) (brackets added by Dr. Chorghade); Reply 3 (same). But, a closer look at Dr. Matzger's testimony, in its more complete context, tells a

---

(Ex. 1009) mentioned once in an "Overview" section, once in a footnote, and one other time in an effort to preempt a possible nexus showing because the Orange Book lists multiple patents); Reply (no mentions). We warned the parties that oral hearing is not the place for new argument. Paper 80, 3 (citing *Dell Inc. v. Acceleron, LLC*, 884 F.3d 1364, 1369 (Fed. Cir. 2018)). Nevertheless, as best understood, Petitioner sees the listing of the '871 patent in the Orange Book as evidence of or a concession by Merck that the '871 patent (and equally WO '498) claims, describes, and enables the 1:1 sitagliptin DHP salt. There appears to be no dispute by these parties that the salt would be encompassed by broad claims of those references. And while there is some tension between Merck's Orange Book listing and certain arguments made by Merck here (*see* Tr. 48:9–50:9), for reasons explained in this Decision, we find on this record that there is no express or inherent anticipating disclosure of the 1:1 sitagliptin DHP salt in WO '498 (or the '871 patent). Whether Merck's listing of the '871 patent in the Orange Book was appropriate, and whether claims in the reference are so broad that they fail the written description or enablement requirements of § 112, are not issues for us to resolve in this proceeding.

different story—one that does not persuade us a POSA would have at once envisaged the claimed salt:

> [Q] [W]hen you read the phrase or interpret the phrase 'at once envisage,' how did you interpret that in connection with your analysis?
>
> A. That you can clearly see all the possibilities based on the disclosure.
>
> Q. So, in example 7, where it disclosed a 1:1 HCl salt, can you not clearly see the 1:1 phosphoric acid also being there as a result of the HCl salt?
>
> A. So by looking at that, you can imagine that it would exist but that's different than believing it would exist and that it could be produced. So an organic chemist looking at that could exchange the counterion in their mind, but that's different than understanding what could be produced, what would be possible to make.
>
> Q. So you don't dispute that it actually comes to your mind, the 1:1 phosphoric acid salt based on example 7.
>
> A. Looking at the general disclosure, no. It does not come to your mind.

Ex. 1025, 146:13–147:17 (objections and counsel names omitted). The testimony is, thus, more nuanced than Petitioner's and Dr. Chorghade's limited quotation would suggest. Dr. Matzger does not testify that a POSA would immediately envisage all the possibilities. *Id.* Dr. Matzger further clarified that the claimed 1:1 sitagliptin DHP "does not" come to mind based on WO '498. *Id.* And he distinguished a POSA hypothetically imagining something versus understanding from the disclosure that a particular salt would exist or could be made. *Id.* Paired with Dr. Matzger's unequivocal and repeated testimony elsewhere (*see, e.g.*, Ex. 2013 ¶¶ 91–98) that a POSA would not and could not at once envisage all the possible salts, nor

the claimed 1:1 sitagliptin DHP salt, the isolated "imagine" testimony does not carry the weight Petitioner places on it.

Petitioner's envisaging theory fails for yet another reason. Petitioner does not show that a POSA would "at once envisage each member of th[e] limited class" of phosphate salts allegedly disclosed in WO '498. *See Eli Lilly*, 471 F.3d at 1376. Petitioner's expert did not even "at once envisage" each member of the sub-class of different sitagliptin phosphate salts that can be formed (accepting, for sake of argument, the position that combining the identified non-toxic acids with sitagliptin in WO '498 would constitute a disclosure of all pharmaceutically acceptable salts of sitagliptin). Quite the opposite, Dr. Chorghade testified that sitagliptin forms the 1:1 salt with phosphoric acid "every time." Ex. 1002 ¶ 76. The evidence, however, shows that non-1:1 phosphate salts of sitagliptin, such as 1:2, 2:1, and 3:2 salts, do exist and can be made by conventional techniques—with none of those techniques exempted from WO '498's broad disclosure. *See, e.g.*, Ex. 2103 ¶¶ 122–135, 148–160. In short, the envisaging theory is also undermined by Petitioner's own (initial) position, and its own expert's testimony, that the 1:1 salt is the *only* possible sitagliptin phosphate salt.

In reaching our decision, we need not embrace the distinction about chemical reactions that Patent Owner asks us to draw from the district court's decision *Shire*. PO Resp. 10–11. From a lay- or less-technical perspective, combining ingredients in chewing gum (as in *Wrigley*) may be easier to envisage compared to envisaging compounds that may (or may not) form through chemical reactions. Yet the envisaging inquiry and what would be understood and inferred from the prior art do not turn on a lay-

perspective; they are from the POSA's vantage point. *Acoustic Tech., Inc. v. Itron Networked Solutions, Inc.*, 949 F.3d 1366, 1373 (Fed. Cir. 2020) (explaining that "[e]xpert testimony may shed light on what a skilled artisan would reasonably understand or infer from a prior art reference").

Where the level of technical skill is reasonably high, as here, a POSA might well "envisage" a complex product notwithstanding that chemical reactions are required to make it. To the extent Patent Owner suggests "envisaging" is inapplicable if chemical reactions are involved, we decline to adopt such a rule. On the other hand, the art's predictability, at least in some way, colors the lens through which the POSA reads and understands the art.[21] And here, the evidence is undisputed that making salts like those disclosed in the '708 patent and prior art is an unpredictable endeavor. *See, e.g.*, Ex. 2103 ¶¶ 163–71; Ex. 2042, 5 (describing, as of 2002 in the "Handbook of Pharmaceutical Salts," that "[n]o predictive procedure . . . has been reported in the literature"); Ex. 2051, 116:22–117:3. As best we can, in discerning whether WO '498 discloses the claimed 1:1 sitagliptin DHP salt, this Decision considers the art through the ordinarily skilled person's eyes based on the relevant evidence without either improperly inflating or diminishing their abilities.[22]

---

[21] *Cf. In re Baxter Travenol Labs.*, 952 F.2d 388, 390 (Fed. Cir. 1991) (holding "extrinsic evidence may be . . . used to explain, but not expand, the meaning of a reference").

[22] That one of the inventors allegedly "made easily" the claimed salt, as asserted by Petitioner (Reply 5), does not mean that the reaction product was known or predictable. Whether a certain salt-screening protocol might be

For the above reasons, we find that there is no express disclosure of the claimed 1:1 sitagliptin DHP salt in WO ’498 sufficient to anticipate claims 1 or 2. The other challenged claims (claims 3, 17, 19, and 21–23) depend from claims 1 or 2, so our finding applies to those claims as well.

*(ii) Inherency*

“An element may be inherently disclosed only if it is necessarily present, not merely probably or possibly present, in the prior art.” *Guangdong Alison Hi-Tech Co. v. Int’l. Trade Comm’n.*, 936 F.3d 1353, 1364 (Fed. Cir. 2019). “[A] limitation or the entire invention is inherent and in the public domain if it is the natural result flowing from the explicit disclosure of the prior art.’” *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1379 (Fed. Cir. 2003) (internal quotation and citation omitted).

Petitioner did not, in the Petition, provide any experimental results or data to show that sitagliptin can only be mono-protonated and will form the 1:1 DHP salt every time when reacted with phosphoric acid. *See* Ex. 2051 (Chorghade dep.) 168:11–169:14 (agreeing the declaration (Ex. 1002) provides no literature or data supporting his opinion that sitagliptin can only be mono-protonated). Neither did Petitioner’s expert, even throughout trial, conduct testing to confirm that his earlier opinion is correct.

What Petitioner and Dr. Chorghade do rely on now, however, is testing performed by Dr. Chyall many years ago. Reply 1, 5–8. According to Petitioner, Dr. Chyall’s testing (described in Ex. 2225) involved “12

---

easy to run is different from predictability of the salts that may (or may not) form upon running it; and, as discussed, the preponderance of the evidence is that screening for actual salts is an unpredictable, trial-and-error process.

methanol-based experiments adhering to the WO498's Example 7" and "each experiment resulted in the 1:1 sitagliptin DHP salt." Reply 1 (citing Ex. 2225 ¶¶ 24, 48, 52). Petitioner highlights, in particular, one experiment in which Dr. Chyall reacted sitagliptin and phosphoric acid (in a 1-to-5.01 molar ratio) in methanol at ambient temperature, and made 1:1 sitagliptin DHP. *Id.* (citing Ex. 2225 ¶¶ 24, 27) (quoting portion of a table related to Sample ID "234584" and "Notebook No. 4063-19-01").[23]

Patent Owner, as an initial matter, contends that this is an untimely new anticipation argument from Petitioner, which the Board should not consider. Sur-reply 6 (citing 37 C.F.R. § 42.23(b)). That is, the notion that a POSA would have adhered to WO '498's Example 7 to make a phosphate salt is not in the Petition and, thus, is a new inherency theory. *Id.* In any event, Patent Owner contends the theory is wrong as Dr. Chyall was not trying to reproduce WO '498 or any example from it, nor did he adhere to Example 7 because there are at least eight changes between Dr. Chyall's testing and Example 7—not the least of which is that Example 7 uses hydrochloric acid, not phosphoric acid. *Id.* at 6–8 (listing eight differences) ("WO498 does not disclose any of these modifications to Example 7, so it cannot support inherency as a matter of law").

[23] Exhibit 2225 includes a table (Table 1) listing twelve salt formation experiments, and indicates three variables were modified between experiments: API (i.e., sitagliptin)/$H_3PO_4$ molar ratios for the starting materials (e.g., 3:1, 1:5.01, etc.); Reaction solvent (methanol or methanol/water); and Temperature (ambient, 0°C, 65°C). Ex. 2225 ¶ 24.

As discussed below, whether Petitioner's reliance on Dr. Chyall's testing and a modified Example 7 is new or not, on the merits, Petitioner has not proved inherency by a preponderance of the evidence on this record.

Example 7 of WO '498 is *explicitly* a process for preparing a hydrochloride salt. Ex. 1004, 47. One could run that process 10,000 times and it would never produce any phosphate salt of sitagliptin. Ex. 2283 (Chorghade dep.), 52:17–22 (following Example 7 without modification will only produce the hydrochloride salt). Dr. Chyall did not, thus, "adher[e]" to Example 7 because that example must necessarily be changed to produce any phosphate salt. Reply 1. And, there is no process explicitly described in WO '498 for making *phosphate* salts of sitagliptin (or any compound). Ex. 2283, 50:18–51:6; *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 970 (Fed. Cir. 2001) (explaining that inherency must "flow[] from the reference's explicitly explicated limitations"); *Schering*, 339 F.3d at 1379 (same). Nor are we directed to any explicit disclosure in WO '498 that instructs the POSA to apply the process used with hydrochloric acid (e.g., as in Example 7) with the numerous other preferred or non-preferred acids identified. It may be a possible or even likely option that a POSA could change Example 7 to accommodate a use of phosphoric acid, but inherency does not turn on probabilities. "The inherent result must inevitably result from the disclosed steps; '[i]nherency . . . may not be established by probabilities or possibilities.'" *In re Montgomery*, 677 F.3d 1375, 1379–80 (Fed. Cir. 2012) (citations omitted, alterations in original).

Petitioner also admits that Dr. Chyall's testing involved more than merely swapping hydrochloric acid for phosphoric acid in the Example 7

process[24] (even assuming Dr. Chyall was trying to follow Example 7 of WO '498, and there is no evidence that he was). Patent Owner shows that there were at least half-a-dozen other changes from Example 7, including using "dropwise" acid addition, different reactant concentrations, different reaction times, and a "slurry crystallization." Sur-reply 8 (citing e.g., Ex. 2283, 43:12–45:10, 48:15–49:7). That Dr. Chorghade offers possible explanations for the changes or opines that they should make little difference in the end result (Ex. 1035 ¶¶ 26–42) does not alter the fact that what Dr. Chyall did was not the same process described in Example 7 (even beyond the change from one acid to another).

We agree that Dr. Chyall's testing is, in some respects, closer to WO '498's Example 7 than some of the testing conditions presented by Patent Owner. Similar to Example 7, Dr. Chyall used methanol as the solvent and ambient temperature in some of the cited experiments. *Compare* Ex. 1004, 47, *with* Ex. 2225 ¶ 24. In contrast, Dr. Matzger used, for example, an isopropanol solvent system and heat (70°C). Ex. 1025, 80:1–9, 92:2–6. But, when anticipation is the issue, close is not enough. *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983) (explaining that "[a] prior art disclosure that 'almost'" discloses all the elements arranged exactly as in the claim, "may render the claim invalid under § 103, [but] it does not 'anticipate'") (internal citation omitted). Anticipation is still a doctrine based on "strict identity." *Trintec Indus., Inc. v. Top-U.S.A.*

[24] *See* Tr. 19:6–20 (Q: "It wasn't just swapping out HCL for phosphoric acid, there were changes in the protocol [of Dr. Chyall] even from what's explicitly described in Example 7." Petitioner's Counsel: "Of course.").

*Corp.*, 295 F.3d 1292, 1296 (Fed. Cir. 2002). We conclude Petitioner's theory, inasmuch as it relies on a protocol with several admitted changes from what is actually described in an effort to show inherent anticipation, even if such protocol resembles WO '498's Example 7 in some ways, strays into the realm of obviousness.

For the above reasons, we agree with Patent Owner that Dr. Chyall's experiments are no more the actual, asserted "prior art" than Dr. Matzger's. Sur-reply 6. So, while Dr. Chyall's approach in Exhibit 2225 might be one option a POSA might take if screening for potential phosphate salts of sitagliptin, there are other undisputedly reasonable and conventional approaches a POSA could pursue—including the experimental protocols run by Dr. Matzger. *See, e.g.*, Ex. 2103 ¶¶ 123–176. Such protocols include screening salts in an isopropanol/water solvent, and Dr. Matzger's results show production of 2:1 and 3:2 phosphate salts of sitagliptin in that solvent system. *See, e.g.*, *id.* ¶¶ 123–135 and 148–160 (discussing results on 3:2 salt), 136–138 and 161–178 (discussing results on 2:1 salt). Petitioner does not challenge that Dr. Matzger made these non-1:1 salts. Dr. Matzger also explains persuasively that although his experiments show the creation of several non-1:1 salts, "there is no evidence of any 1:1 salt" in the reaction product he created as evidenced by the absence of certain peaks in X-ray powder diffraction measurements he observed. Ex. 2103 ¶ 167.

Petitioner counters that the non-1:1 sitagliptin phosphate salts cited (and made) by Patent Owner are reported in non-prior art evidence. Reply 3 (citing "WO420" (i.e., Ex. 2220)). That argument is, however, misplaced. Non-prior art evidence can be used to show that certain subject matter is or

is not inherent. *Hospira, Inc. v. Fresenius Kabi USA, LLC*, 946 F.3d 1322, 1329–30 (Fed. Cir. 2020) (agreeing a court can use extrinsic, non-prior art evidence in the inherency analysis); *see Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*, 878 F.3d 1336, 1345 (Fed. Cir. 2018) (explaining that evidence on inherency "need not antedate the critical date of the patent").

As for Petitioner's contention (Reply 3) that Dr. Matzger used different conditions than WO '498's Example 7, so did Dr. Chyall in the testing that Petitioner relies upon, as explained above. And Petitioner does not seriously contest that Dr. Matzger's salt-screening conditions were anything but conventional. Tr. 74:6–19 (Petitioner's counsel agreeing that an isopropanol/water salt screen like Dr. Matzger used was a conventional process). Indeed, the preponderance of the evidence shows just that. *See, e.g.*, Ex. 2103 ¶¶ 125, 128 (testifying that Drs. Atwood, Chyall, and Matzger all made non-1:1 phosphate salts of sitagliptin "using conventional methods"); Ex. 1025 (Matzger dep.), 219:1–7 (testifying a POSA would run a salt screen, varying solvents, stoichiometry of the reagents, and temperature); Ex. 2283 (Chorghade dep.), 30:12–31:5 (testifying a POSA would have run a salt screen and known that they could have used isopropanol, ethanol, or methanol as solvents). Even for the methanol solvent that Petitioner treats as sacrosanct and not to be changed, Patent Owner cites evidence that non-1:1 sitagliptin salts also form in methanol. Sur-reply 10 (citing Ex. 2220, 32 (Example 2, showing a 2:1 sitagliptin phosphate salt in a methanol system)); Ex. 2283 (Chorghade dep), 87:8–22 (testifying he has "no opinions" on Exhibit 2220 (WO '420)); Ex. 1025,

221:21–228:5 (testifying about Exhibits 2273 and 2274 and non-1:1 sitagliptin sulfates forming in methanol).

In sum, the evidence—confirmed experimentally and reported in the technical literature—undeniably shows that non-1:1 sitagliptin phosphate salts do exist and that the claimed 1:1 sitagliptin DHP does not form "every time" sitagliptin and phosphoric acid are reacted. Petitioner's criticisms that such evidence applies conditions that do not follow Example 7 of WO '498 as closely as the conditions of Petitioner's relied-upon testing are misplaced because that testing too is changed from what WO '498 explicitly describes. We also find that the experimental results cited by Patent Owner are not mere aberrations based on irrelevant conditions. To the contrary, the evidence shows that the conditions under which non-1:1 salts form are conventional salt-screening techniques that a POSA, acting reasonably, could have pursued. We, therefore, find Petitioner's inherent anticipation theory unpersuasive.

Petitioner has not proved that WO '498 expressly or inherently discloses the subject matter of claims 1 and 2. Thus, we find on this record that claims 1 and 2 are not anticipated by WO '498. The other challenged claims (claims 3, 17, 19, and 21–23) depend from claims 1 or 2, so our finding applies to those claims as well.

### *E. Anticipation by the '871 patent*

Petitioner contends that claims 1–3, 17, 19, and 21–23 are anticipated by the '871 patent. Pet. 31–38. According to Petitioner, the '871 patent is prior art under 35 U.S.C. § 102(e)(2). *Id.* at 31–32.

Petitioner states that "[t]he specifications of the '871 patent and WO '498 are identical in all relevant material respects."[25] *Id.* at 33. Indeed, Petitioner's challenge based on the '871 patent parallels the anticipation challenge based on WO '498. *Id.* at 33–38. Petitioner agreed that, like the parties, the Board should treat WO '498 and the '871 patent "for all intents and purposes as having the same disclosures." Tr. 7:8–13; Reply 1 n.2 (noting that Petitioner's "Reply discusses WO498 and the '871 patent together as WO498").

Petitioner's anticipation challenge based on the '871 patent fails for the same reasons as addressed above for WO '498. *See supra* Section II(D). We, thus, similarly find that Petitioner has not proved by a preponderance of the evidence that the '871 patent anticipates claims 1–3, 17, 19, and 21–23.

### *F. Obviousness*

Petitioner asserts that claims 1–3, 17, 19, and 21–23 would have been obvious over WO '498, or WO '498 in combination with Bastin. Pet. 39–46 (Ground 3),[26] 46–59 (Ground 4). Petitioner asserts that claim 4 would have

---

[25] WO '498 and the '871 patent each include an identical claim 15 (depicting 33 compounds); the '871 patent also includes one claim that depicts only sitagliptin and further recites "or a pharmaceutically acceptable salt thereof." Ex. 1007, 36:50–40:48 (claim 15), 41:1–14 (claim 17).

[26] The Petition does not identify claims 1 and 2 as being allegedly obvious over WO '498 alone. *See* Pet. 38–39 (starting obviousness analysis with claim 3). That allegation is implicit in Petitioner's allegation that claims depending from claims 1 and 2 would have been obvious. To satisfy limitations of claims 1 and 2 appearing in the dependent claims, however, Petitioner's WO '498 obviousness challenge relies on Petitioner's

been obvious over the combination of WO ’498, Bastin, and Brittain (*id.* at 59–62 (Ground 5)), or just WO ’498 and Brittain (*id.* at 62–63 (Ground 6)).

1. Antedation and Application of § 103(c)(1) Exception

All of Petitioner’s obviousness grounds rely on WO ’498. *See generally* Pet. 38–62. Before reaching the merits of Petitioner’s challenge, we address a threshold issue. Patent Owner argues that it reduced to practice the subject matter of claims 1, 2, 17, 19, and 21–23 before WO ’498 published. PO Resp. 22–28; Sur-reply 21–22. If Patent Owner prevails on that issue, WO ’498 is not § 102(a) prior art, and it is merely a § 102(e) reference. Because it is, however, undisputed that the inventions claimed in the ’708 patent and the subject matter of WO ’498 were commonly owned by Merck, or under obligation of assignment to Merck, at the time of invention, the exception under pre-AIA § 103(c)(1) would apply. 35 U.S.C. § 103(c)(1). Therefore, if we agree with Patent Owner on the antedation issue, WO ’498 cannot be used to show that claims 1, 2, 17, 19, and 21–23 would have been obvious. That would then leave only claims 3 and 4 subject to Petitioner’s obviousness challenge.

In an *inter partes* review, the burden of persuasion is on petitioner to prove unpatentability by a preponderance of the evidence, and that burden never shifts to patent owner. *Dynamic Drinkware, LLC v. Nat’l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). The petitioner has the initial burden of production to show that an asserted reference qualifies as prior art

“predicate” anticipation arguments. Pet. 39–40 (incorporating by reference the reasons advanced for Ground 1 (anticipation by WO ’498)).

under 35 U.S.C. § 102. *Id.* at 1378–79. Once a petitioner meets the initial burden, a burden of production shifts to the patent owner to argue or produce evidence that the asserted reference does not render the claims unpatentable, or that the reference is not prior art (e.g., because patent owner actually reduced to practice the invention before the applicable date of the asserted art). *Id.* at 1379–80 (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327 (Fed. Cir. 2008)).

Patent Owner argues that it actually reduced to practice the subject matter of claims 1, 2, 17, 19, and 21–23 before WO ’498’s January 16, 2003, publication date. PO Resp. 22–23; *In re Steed*, 802 F.3d 1311, 1318 (Fed. Cir. 2018) (explaining that actual reduction to practice requires an inventor have "constructed an embodiment or performed a process that met all the limitations" of the invention, and "determined that the invention would work for its intended purpose"). According to Patent Owner, the testimony of inventors Vicky Vydra and Dr. Karl Hansen, and from witness Dr. Rebecca Leigh Schultz, which is further corroborated by documentary evidence, shows the creation of a 1:1 sitagliptin DHP salt in December 2001, with experimental confirmation of the salt's form and stoichiometry documented in early 2002. *Id.* at 23–25 (citing, for example, Ex. 2002 ¶¶ 9–20; Ex. 2103 ¶¶ 46–53; Ex. 2127 ¶¶ 11–14, 16–22 (testifying, *inter alia*, on the confirmed stoichiometry using HPLC); Ex. 2140 ¶¶ 30–31; Ex. 2135 (delivery sheet for 1:1 sitagliptin DHP, indicating a testing date of Mar. 25, 2002, and sent date of Apr. 22, 2002)). This evidence, Patent Owner contends, shows successful reduction to practice of the subject matter of claims 1 and 2. *Id.*; *see also id.* at 25–26 (citing additional and persuasive testimony and documentary

evidence (unrebutted by Petitioner) supporting reduction to practice of the subject matter of claims 17, 19, and 21–23).

This proof of reduction to practice, Patent Owner argues, "means that WO '498 qualifies as prior art only under §102(e)." *Id.* at 27. And, citing the exception under pre-AIA § 103(c)(1) and documents showing Patent Owner's common ownership of the claimed subject matter and WO '498, Patent Owner argues WO '498 is eliminated as a § 102(e) reference from the obviousness inquiry for claims 1, 2, 17, 19, and 21–23. *Id.* at 27–28 (citing agreements requiring assignment from the inventors to Merck, such as in Ex. 2005 (Diddle Decl.), 7–8 (Edmondson agreement), 28–29 (Cypes agreement), 44–45 (Vydra agreement)).[27]

Petitioner does not dispute that Merck reduced 1:1 sitagliptin DHP salts to practice before WO '498 published, nor that Merck commonly owned the relevant subject matter. Petitioner, instead, raises a relatively discrete counterargument. Reply 15–18.[28] According to Petitioner, absent Merck proving an earlier reduction to practice of *hydrates* of the 1:1

---

[27] Patent Owner argues these employment "agreements required the inventors to assign the claimed inventions to Merck, which they in fact did." PO Resp. 27 (citing supporting evidence including Exs. 2009 and 2010 (certified assignments)).

[28] Before institution, Petitioner argued that the '708 patent "plainly admits" that WO '498 is prior art by listing it in the "Background of the Invention." Pet. 2. We explained previously why we rejected that position and noted, in any event, that it was not controlling on whether the § 103(c)(1) exception applies. Inst. Dec. 41. Petitioner did not contest our explanation or raise that issue again during trial and, thus, Petitioner appears to have abandoned argument based on the alleged "admitted" prior art status of WO '498. To the extent not abandoned, we adopt and incorporate our prior analysis. *Id.*

sitagliptin DHP salt, Merck's antedation argument fails. *Id.* at 17–18. Petitioner alleges the following: (i) the '708 patent's claims do not exclude hydrates, (ii) WO '498 discloses, as a general comment, that "[s]alts in the solid form may exist in more than one crystal structure, and may also be in the form of hydrates," and (iii) although Merck previously made multiple anhydrous forms of 1:1 sitagliptin DHP, it did not make the crystalline monohydrate of 1:1 sitagliptin DHP until March 26, 2003—about two months after WO '498's publication. *Id.* at 16–18 (citing Ex. 1004, 10:32–34; Ex. 2124 ¶¶ 9 (testifying that, as of January 2003, "no hydrates of the 1:1 DHP salt" had been identified), 14 (describing crystalline monohydrate isolation on March 26, 2003)).

In more plain terms, Petitioner argues that WO '498 shows more of the claimed invention than Merck had actually reduced to practice at the relevant time. Reply 15–18. Hence, Petitioner argues, we should reject Merck's antedation argument because Merck has not proved "priority with respect to so much of the claimed invention as the [prior art] happens to show." *Id.* at 15–16 (quoting *In re Clarke*, 356 F.2d 987, 991 (CCPA 1966) (brackets added by Petitioner)).[29]

It is true, on this record, that Merck had made no hydrates of 1:1 sitagliptin DHP as of the January 16, 2003, publication date of WO '498.

---

[29] *See also In re Mantell*, 454 F.2d 1398, 1401 (CCPA 1972) (affirming the Board's decision that antedation evidence was insufficient for certain generic claims where "affidavit evidence shows reduction to practice of much less than the reference shows").

Ex. 2124 ¶ 9. We also agree with Petitioner's position that the challenged claims do not exclude hydrates. In fact, claim 1 includes the clause "or a hydrate thereof."[30] Ex. 1001, 16:14–15. But, in resolving the antedation issue here, we are guided by *Clarke*, which explains that "it is not the entire scope of the claims which is determinative . . . . Rather, *it is how much the reference shows of the claimed invention that is crucial* to the requirement." *In re Clarke*, 365 F.2d at 991 (emphasis added). The dispositive question is, thus, whether the evidence shows Merck's reduction to practice of as much of the claimed invention as is shown in WO '498. *Id.*

As discussed above, WO '498 does not expressly show any phosphate salts of any disclosed compound, much less a phosphate salt of any of the thirty-three example compounds, a phosphate salt of sitagliptin, or the particular 1:1 sitagliptin DHP of the challenged claims. *Supra* Section II(D). WO '498 discloses sitagliptin among many compounds, and salts thereof. Ex. 1004, 55–60. WO '498 actually describes a 1:1 hydrochloride salt of sitagliptin—notably, this salt is *not a hydrate*. *Id.* at 47. And, elsewhere, WO '498 lists several potential salt-forming acids, one of which is phosphoric acid among a sub-list of eight preferred acids. *Id.* at 11:8–15. We find that Merck's undisputed, detailed, and repeated actual reduction to practice of the claimed 1:1 (R)-sitagliptin DHP salts shows more, not less,

---

[30] Claim 2, which is directed to the (R)-configuration of 1:1 sitagliptin DHP does not include the clause "or a hydrate thereof." Ex. 1001, 16:16–30. Claim 4, however, depends from claim 2 and expressly recites "a crystalline monohydrate" of the 1:1 (R)-sitagliptin DHP—claim 2 must, therefore, also encompass hydrates. *Id.* at 16:47–49.

than what is shown in WO ’498 for the claimed subject matter. PO Resp. 23–26; Ex. 2103 ¶¶ 46–62; Ex. 2002 ¶¶ 9–20; Ex. 2103 ¶¶ 46–53; Ex. 2127 ¶¶ 11–14, 16–22; Ex. 2140 ¶¶ 30–31.

Even assuming WO ’498’s disclosure were sufficient to show the claimed 1:1 sitagliptin DHP, there is no *hydrate* of that salt shown anywhere in the reference. Indeed, as Petitioner’s declarant concedes, WO ’498 provides no polymorphic data for sitagliptin and none of the WO ’498 compounds are disclosed as being synthesized as hydrates. Ex. 2051, 197:22–198:9. Unless WO ’498 shows a 1:1 sitagliptin DHP *hydrate*, Merck need not have reduced such a hydrate to practice to antedate WO ’498’s publication date. *In re Clarke*, 365 F.2d at 991.

Petitioner emphasizes the sole mention of “hydrates” in WO ’498, which reads, in full, “[s]alts in the solid form may exist in more than one crystal structure, and may also be in the form of hydrates.” Ex. 1004, 10:32–34; Reply 16–17. From this, Dr. Chorghade opines that the POSA “would have expected that (R)-sitagliptin phosphate of Claim 2 exists as a crystalline hydrate.” Ex. 1002 ¶ 169. That conclusory opinion, however, does not hold up to scrutiny.

First, *none* of the salts described in WO ’498—for sitagliptin or otherwise—are hydrates, as Dr. Chorghade admits. Ex. 2051, 197:22–198:9. Second, there are at least thousands, likely millions, of salts embraced by hypothetical combinations of DP-IV compounds and potential counterions in WO ’498. Ex. 2103 ¶¶ 73, 77. The solitary “hydrates” sentence is not specific to sitagliptin (or any particular compound), and we credit Dr. Myerson’s testimony that a POSA would not have understood the

sentence as applying to sitagliptin phosphate salts in particular. Ex. 2101 ¶¶ 102, 136. Third, the sentence states that crystalline forms (e.g., hydrates) "may" exist. Ex. 1004, 10:32–34. WO '498 does not show that any such hydrates *do* exist for any disclosed or hypothetical salt (much less a 1:1 sitagliptin DHP), nor is there any guidance in WO '498 on making them. Ex. 2101 ¶¶ 93, 124, 150 (expert opinion supporting this interpretation); Sur-reply 17. And fourth, as discussed in more detail below, the substantial weight of evidence shows that whether any particular salt is even capable of forming as a hydrate is highly unpredictable. Indeed, Dr. Chorghade, when asked if he could "predict with reasonable certainty" whether a hydrate might exist, answered that he "couldn't predict with *any degree* of certainty." Ex. 2051, 257:18–258:11 (emphasis added). We, thus, find more credible the testimony of Merck's expert, Dr. Myerson, that "the POSA would not have understood that [one] statement [in WO '498] as disclosing that every compound, or every one of the disclosed or exemplified compounds of WO '498, can exist as a hydrate." Ex. 2101 ¶ 150.

Petitioner suggests, in a footnote, that WO '498 is presumptively enabling for the hydrated forms of the various salts. Reply 18 n.9. Even if that presumption were appropriate here, we would find it overcome based on a complete absence of examples or guidance in WO '498 about making such hydrates, and the substantial unpredictability concerning whether a hydrate of any specific salt will even form, as discussed below.

Patent Owner and Dr. Myerson explain persuasively that a POSA would not have known or predicted whether particular salts, especially the 1:1 sitagliptin DHP, could crystallize at all, form a hydrate, or form a

monohydrate. Ex. 2101 ¶¶ 58–63 ("The unpredictability of crystalline forms applies equally in the context of solvates and hydrates.") (citing supporting evidence), 146–150, 163–164; *see* PO Resp. 46–47, 50–53. The literature of record firmly supports them. For example, in one of Teva's patents, it notes that "[t]he existence and physical properties of polymorphs, hydrates and solvates is unpredictable." Ex. 2048, 3:3–5. In a publication from 2007 (naming Dr. Chorghade as editor), the authors note that "it is still fair to presume that no method exists to predict polymorphs with a considerable degree of certainty," and that discovery and prediction of such forms is filled with "trial and error, and serendipities." Ex. 2045, 215; *see also* 2047, 10 (observing that it is "not yet possible to predict when materials will crystallize" and that polymorphs "are all too frequently discovered by serendipity"); Ex. 2046, 18 ("Predicting the formation of solvates or hydrates . . . is complex and difficult.").[31] And, on cross examination, Dr. Chorghade agreed that the art was unpredictable on precisely this point: "Q. Do you agree that it is unpredictable which set of experimental conditions will yield a particular crystal form? . . . [A] It is not predictable

---

[31] We agree with Patent Owner that the unpredictability of forming crystalline polymorphs, including hydrates, has been repeatedly recognized in other matters by the Board and the courts. *See, e.g., Lupin Ltd. v. Janssen Sciences Ireland UC*, IPR2015-01030, Paper 17 at 20 (PTAB Oct. 16, 2015) (finding "it would have been known that preparing hydrates generally was unpredictable"); PO Resp. 41–42 (citing cases); *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1089 (Fed. Cir. 2018) ("The experts of both parties agreed that whether a pharmaceutically suitable crystalline salt will form from a particular acid-base combination is unpredictable."). Our Decision here is, however, based on the evidentiary record in this case.

with any degree of certainty." Ex. 2051, 269:11–20; *see also id.* at 245:21–246:8 (admitting "[i]t was presumably true in 2003 and earlier" that it "wasn't possible to predict when materials will crystallize").

Consistent with this evidence, Merck also provides additional testimony and documentation showing that its actual discovery of a hydrate of 1:1 sitagliptin DHP—a crystalline monohydrate—was unforeseen and arose only after substantial work with other salt forms. For example, one of the inventors, Dr. Wenslow, testifies that even after "over a year of development on the 1:1 DHP salt had taken place, including extensive experiments with the 1:1 DHP salt in both water and aqueous solvent mixtures, . . . the DPP-IV project team had not observed a monohydrate until its surprising and unexpected creation very late in the development cycle." Ex. 2116 ¶ 36 (citing Ex. 2119 (project team memorandum), 1–5, 10–11). Another inventor, Stephen Cypes, testifies on the "unexpected" discovery of the hydrated form while trying to find more efficient synthetic routes to directly crystallize a pure *anhydrous* form, and using an isoamyl alcohol/water solvent. Ex. 2124 (Cypes Decl.) ¶¶ 9–15; PO Resp. 5–6; *see also* Ex. 2101 ¶ 94 (opinion of Dr. Myerson that isoamyl alcohol/water is an unusual solvent system, that he is not aware of its use being reported in the art, and that a "POSA would not have arrived at the particular experimental conditions necessary . . . absent undue experimentation").[32]

---

[32] Petitioner comments that, irrespective to any non-enablement of a *monohydrate*, claim 1 of the '708 patent and WO '498 encompasses hydrates, not just monohydrates. Reply 18 n.9. But the evidence on

Altogether, we find the preponderance of the evidence shows that Merck reduced to practice at least as much (indeed, more) of the claimed subject matter versus what is shown in WO ’498. We disagree that, to antedate WO ’498’s publication, Merck needed to prove a prior reduction to practice of the 1:1 sitagliptin DHP *hydrate*. Accordingly, WO ’498 is only a § 102(e) reference. Based on Merck’s undisputed ownership (or ownership right by assignment obligation) at all relevant times of the claimed subject matter and WO ’498, that reference is excluded from consideration for obviousness purposes under pre-AIA § 103(c)(1) for claims 1, 2, 17, 19, and 21–23. Without WO ’498, Petitioner’s § 103 challenge to those claims fails. That leaves claims 3 and 4, for which Patent Owner does not assert a prior reduction to practice, subject to the obviousness challenge.

---

unpredictability cited above is not limited to monohydrates; it extends to crystalline forms and hydrates generally. Also, as to other hypothetical hydrates of 1:1 sitagliptin DHP, it is not apparent on this record that any exist. Merck cites evidence that, despite years of research, the ’708 patent’s monohydrate is the only such form known. Ex. 2101 ¶ 205 (citing support); Ex. 2122, 34 (describing “Single crystal form”); Ex. 2124 ¶¶ 9, 15; Sur-reply 25. As to the alleged enablement through use of isopropanol as a solvent (Reply 24–25), although some evidence indicates a 1:1 sitagliptin DHP monohydrate can form in isopropanol/water (Ex. 2101 ¶ 33 (citing Ex. 1001, 12:61–13:21)) there is also experimental evidence to the contrary, which underscores the unpredictable nature of salt formation. *See, e.g.*, Ex. 2103 ¶¶ 123–78 (Matzger testing creating 3:2 and 2:1 sitagliptin phosphate salts in isopropanol/water); Sur-reply 21 (“[I]n isopropanol/water, Dr. Matzger obtained two crystalline salts outside the scope of any claims.”).

2. Claim 3

Claim 3 recites "[t]he salt of claim 1 of structural formula III having the (S)-configuration at the chiral center marked with an *" and further depicts the chemical structure of that (S)-form of the 1:1 DHP salt. Ex. 1001, 16:31–45. Patent Owner does not argue that it reduced to practice the subject matter of claim 3 before WO '498 published. WO '498 is, therefore, available as a § 102(a) reference for purposes of analyzing the alleged obviousness of claim 3.

Petitioner argues claim 3 would have been obvious over WO '498 alone (Pet. 38–41), or over a combination of WO '498 and Bastin (Pet. 56). We gave an overview of WO '498 above (*see* Section II(D)(1)). We provide an overview of Bastin below, then turn to the obviousness analysis.

*a) Overview of Bastin (Exhibit 1006)*

Bastin is a publication from 2000 related to "[s]election of an appropriate salt form for a new chemical entity," giving a chemist "the opportunity to modify the characteristics of the potential drug substance and to permit the development of dosage forms with good bioavailability, stability, manufacturability, and patient compliance." Ex. 1006, 1 (Abstr.). According to Bastin, "[w]here possible, a range of salts should be prepared for each new substance and their properties compared during a suitable preformulation program." *Id.*

Bastin teaches that "the choice of salt is governed largely by the acidity or basicity of the ionisable group," but that "safety" and "drug indications" should also be considered. *Id.* at 2. According to Bastin, "[t]he vast majority of salts are developed to enhance aqueous solubility of drug

substances," and "[f]or weakly basic drugs substances, salts of an inorganic acid (e.g., hydrochloride, sulphate, or phosphate) . . . could be considered." *Id.* (Table 1 (listing "common pharmaceutical salts" including, among others, hydrochloride, hydrobromide, sulfate, nitrate, and phosphate)). Bastin teaches that "[h]ydrochloride salts have often been the first choice for weakly basic drugs . . . [but] the potential disadvantages of hydrochloride salts may include unacceptably high acidity in formulations (e.g., parenteral products), the risk of corrosion, less than optimal solubility . . . and the potential for poor stability." *Id.*

*b) Analysis of Alleged Obviousness*

The challenge to claim 3 as obvious over WO '498 alone fails because it is based on Petitioner's "predicate" anticipation challenge to claim 1. Pet. 40–41. For the reasons above (*supra* Section II(D)(2)), we reject Petitioner's challenge to claim 1. Petitioner has, thus, failed to succeed on its "predicate" showing. Pet. 40–41.

We turn next to the challenge to claim 3 as obvious over WO '498 and Bastin. Pet. 56; *see also id.* at 46–56 (claim 1 discussion); Reply 21–23.

Petitioner contends that, "[s]ince WO '498 discloses (R)-sitagliptin and its 'pharmaceutically acceptable salts,' the skilled artisan would have been motivated to optimize the salt." Pet. 51. Petitioner contends a POSA would, in making such salts, have used non-toxic acids because sitagliptin is basic. *Id.* at 51–52; Ex. 1002 ¶ 147. According to Petitioner, because WO '498 and Bastin identify phosphoric acid for use as a possible salt-forming acid with basic drugs, and considering Bastin's salt selection and optimization procedures, the POSA would have formed claim 1's 1:1

sitagliptin DHP. Pet. 53–54. Also, Petitioner argues, “Bastin would have given the POSA motivation to make alternatives to the hydrochloride salt due to its potential problems” and “the combined teachings . . . would motivate the POSA to use the following list of three salts as alternatives to the hydrochloride salt exemplified in WO ’498: hydrobromide, sulfate, and phosphate.” *Id.* at 53; Ex. 1002 ¶¶ 148–152 (testifying about overlapping acids). At a minimum, Petitioner contends “it would be obvious to try” alternatives, and “making the phosphoric acid salt . . . would have been a matter of routine experimentation.” Pet. 55–56.

For the (S)-enantiomer limitation, Petitioner contends that WO ’498 describes (R)-sitagliptin, but “WO ’498 taught that there are only two configurations ((R) and (S)) and how to synthesize each.” Pet. 56 (citing Ex. 1004, 10:3–26, 12:11–14); Ex. 1002 ¶¶ 155–156.

On this record, we find Petitioner’s challenge to claim 3 unpersuasive. The Petition does not identify where the recited 1:1 ratio is necessarily satisfied upon the combination of WO ’498 and Bastin. Petitioner’s reliance on Bastin goes, not to any stoichiometry, but to its disclosure of phosphoric acid, some desired attributes of pharmaceutical salts like better stability, and potential disadvantages to using hydrochloric acid. Pet. 53–56; Ex. 1006. Petitioner, however, cites no specific screening or optimization protocol in Bastin that, combined with WO ’498, would have led to a 1:1 sitagliptin DHP, or the 1:1 (S)-sitagliptin DHP of claim 3. Again, the Petition relied on the opinion of Dr. Chorghade that the only possible salt arising from the combination of phosphoric acid and (R)-sitagliptin in WO ’498 is one with

the recited 1:1 stoichiometry. Pet. 18 n.8; Ex. 1002 ¶ 76. That is incorrect as discussed above. *Supra* Section II(D)(2).

We are also unpersuaded a POSA would have been motivated to make the 1:1 phosphate salt of (S)-sitagliptin, in particular, and that a POSA would have reasonably believed that salt form would have solved any problem with WO '498's hydrochloride salt of (R)-sitagliptin. To the contrary, we agree with Patent Owner that there were numerous reasons why a POSA would not have made all the choices that would been needed to arrive at the claimed subject matter. Ex. 2103 (Matzger Decl.) ¶¶ 31–34 (testifying persuasively on the differences between hydrochloric acid and phosphoric acid and why they are not interchangeable), ¶¶ 214–218 (no shortcomings with the hydrochloride salt of sitagliptin described), ¶¶ 227–229 (testifying, citing supporting literature, that phosphates were known to reduce solubility and stability versus hydrochloride salts); Ex. 2051 (Chorghade dep.) 193:21:–194:2 (admitting nothing in WO '498 suggests any problem with the hydrochloride salt of sitagliptin); Sur-reply 23–24.

Notwithstanding the above, assuming Petitioner's claim 3 challenge is proposing that it would have been obvious to substitute phosphoric acid for hydrochloric acid, and to run the process of Example 7 but with all the changes to it made by Dr. Chyall, and further assuming a POSA would have made such modifications, that would still not produce the claimed subject

matter.[33] That would, at best, make a 1:1 (R)-sitagliptin DHP. *Supra* Section II(D)(2); Reply 1 (citing Ex. 2225 ¶¶ 24, 48, 52).

Claim 3 is, however, to the (S)-enantiomer of 1:1 sitagliptin DHP. *See Sanofi-Synthelabo*, 550 F.3d at 1086 ("The determination of obviousness is made with respect to the subject matter as a whole, not separate pieces of the claim."). Neither WO '498 nor Bastin show any (S)-configuration nor any racemate (mixture of configurations) of any sitagliptin salt. Ex. 2051 (Chorghade dep.) 176:18–177:10 ("Q. The WO '498 does not identify the S-enantiomer – A. No, it doesn't"). And, significantly, Petitioner "does not explain why the POSA would have been motivated to specifically make the (S)-configuration." PO Resp. 38; Ex. 2103 ¶ 255 ("Dr. Chorghade has failed to explain why the POSA would have been motivated to make the (S)-configuration."); *see In re Stepan*, 868 F.3d 1342, 1345–46 n.1 (Fed. Cir. 2017) ("Whether a rejection is based on combining disclosures from multiple references, combining multiple embodiments from a single reference, or selecting from large lists of elements in a single reference, there must be a motivation to make the combination and a reasonable expectation that such a combination would be successful, otherwise a skilled artisan would not arrive at the claimed combination.").

[33] As discussed above, this strains the arguments made for claim 3 in the Petition, which provided no specific details about how Example 7 should be changed (e.g., details of the screening protocol, such as in Dr. Chyall's testing), nor any experimental proof that a 1:1 stoichiometry arises "every time." Ex. 1002 ¶ 76.

Petitioner advances no expected or even theoretical benefit to making an (S)-enantiomer of 1:1 sitagliptin DHP. Sur-reply 23 ("Mylan fails to identify any reason why the POSA would have formed a salt of (*S*)-sitagliptin."). And we find WO '498's general disclosure on diastereomers, which again appears in reference that putatively encompasses millions of potential compounds and salts, does not show a motivation to make, with a reasonable expectation of success, 1:1 (S)-sitagliptin DHP specifically as claimed—especially where the evidence (discussed herein) also shows that forming such salts is highly unpredictable. *See, e.g.*, Ex. 2042, 5 ("No predictive procedure . . . reported in the literature"); Ex. 2051, 116:22–117:3 (salt formation is an unpredictable "trial and error process").

For the above reasons, we find that Petitioner has not shown by a preponderance of the evidence that claim 3 would have been obvious.

3. Claim 4

Claim 4 recites the "salt of claim 2 characterized in being a crystalline monohydrate." Ex. 1001, 16:47–48. As noted above, Patent Owner does not argue that it reduced to practice the subject matter of claim 4 before WO '498 published. WO '498 is, thus, available as a § 102(a) reference for purposes of analyzing the alleged obviousness of claim 4.

Petitioner asserts that claim 4 would have been obvious over the combination of WO '498, Bastin, and Brittain. Pet. 59–62 (Ground 5). Petitioner also asserts that claim 4 would have been obvious over WO '498 and Brittain. Pet. 62–63 (Ground 6). WO '498 and Bastin are discussed above. We provide an overview of Brittain below, followed by our analysis.

*a) Overview of Brittain (Ex. 1005)*

Brittain is a chapter from a book titled "Polymorphism in Pharmaceutical Solids," published in 1999. Ex. 1005, 1–4; Pet. 59. Brittain teaches that "it is estimated that approximately one-third of the pharmaceutical actives are capable of forming crystalline hydrates" and, based on data, "[t]his shows the expected trend in which monohydrates are most frequently encountered, and . . . the frequency decreases almost exponentially as the hydration number increases." Ex. 1005, 6.

*b) Analysis of Alleged Obviousness*

Ground 6, obviousness over WO '498 and Brittain, relies on a "predicate finding" that claim 2 is anticipated by WO '498. Pet. 62. We disagree that claim 2 is anticipated by WO '498 as explained above. *Supra* Section II(D). Ground 6 fails for that reason, but it is also deficient for other reasons discussed below on Ground 5.

For Ground 5, Petitioner first alleges that "Claim 2's (R)-sitagliptin phosphate would have been obvious over WO '498 and Bastin." Pet. 61. Citing WO '498's disclosure that "[s]alts in the solid form may exist in more than one crystal structure, and may also be in the form of hydrates," Petitioner contends the POSA "would have expected that (R)-sitagliptin . . . exists as a crystalline hydrate." *Id.* (citing Ex. 1004, 10:32–34). Then, pointing to Brittain and Dr. Chorghade's opinion, Petitioner contends that crystalline monohydrates are "frequently encountered" with pharmaceutical substances. *Id.* (citing Ex. 1005, 6 (disclosing "approximately one-third of the pharmaceutical actives are capable of forming crystalline hydrates" and an "expected trend in which monohydrates are most frequently

encountered"); Ex. 1002 ¶ 170). Combined with WO '498's alleged teaching "that hydrates exist of the compounds disclosed therein," Petitioner argues the 1:1 (R)-sitagliptin DHP crystalline monohydrate of claim 4 "would have been obvious to a POSA." *Id.* at 61–62.

Patent Owner responds that Petitioner's "cursory treatment [of claim 4] bears almost no resemblance to the required analysis of obviousness." PO Resp. 39. According to Patent Owner, courts (and the Board) consistently uphold as nonobvious claims to specific crystal forms, including monohydrates, even where the salt is disclosed expressly in the art. *Id.*; *see also* at 41–44 (citing cases recognizing unpredictability with crystalline forms). In any event, Patent Owner argues that Petitioner must show a motivation to make the crystalline monohydrate of claim 4 with a reasonable expectation of success, which Petitioner fails to do. *Id.* at 39–59. Indeed, Patent Owner argues, "Mylan fails to articulate *any* reason why the POSA would have been motivated to pursue a crystalline monohydrate form of 1:1 sitagliptin DHP," and the evidence of record gives reasons that would have discouraged the POSA from doing so. *Id.* at 54–59 (citing known problems with hydrates, such as instability and low solubility; Ex. 1005, 4–6). Patent Owner reiterates that none of the salts shown in WO '498 are hydrates, nor is guidance provided on how to make them. *Id.* at 40–41. And, Patent Owner emphasizes, "[c]rystal formation, including the structure, properties, and way to make any hydrate forms was (and is) unpredictable." *Id.* at 41 (citing, e.g., Ex. 2101 ¶¶ 50–64, 88–91; Ex. 2047, 10). Given the state of the art, and the recognized unpredictability of crystalline salt formation, Patent Owner argues the POSA would not have reasonably

expected to obtain the crystalline monohydrate of 1:1 sitagliptin DHP. *Id.* at 44–53 (citing, e.g., testimony from Dr. Chorghade that a POSA "couldn't predict with any degree of certainty" hydrate formation (Ex. 2051, 257:18–258:11), and agreeing it "is rather difficult to predict how many molecules of water or solvent can be incorporated" (Ex. 2051, 238:8–18)).

Beyond the above, Patent Owner also argues that the unexpectedly favorable properties of claim 4's monohydrate are objective evidence of nonobviousness. *Id.* at 60–64. Such properties include thermal stability, and formulation benefits such as reduced sticking and discoloration. *Id.* at 61–64 (citing, for example, Ex. 2101 ¶¶ 189–201 (analyzing thermal stability of the claimed monohydrate versus hydrated sitagliptin HCl and tartrate)).

We find Petitioner has failed to show by a preponderance of the evidence that claim 4 would have been obvious. We explain below.

As noted by Patent Owner, the Petition provides no rationale to explain why the ordinarily skilled person would have been motivated to make the claimed crystalline monohydrate of 1:1 sitagliptin DHP. PO Resp. 54. Even a generic notion that a POSA might have screened for different polymorphs and hydrates (which Petitioner does not articulate here) would be wanting for sufficient reasoning and evidentiary support. *In re Armodafinil Patent Litig. Inc.*, 939 F. Supp. 2d 456, 500 (D. Del. 2013) (holding that "more than a general motivation to find new crystal forms" is required). Petitioner's expert, Dr. Chorghade, offered no motivation (persuasive or otherwise) in his declaration and admitted that he gave no opinion on why a POSA would have preferred a hydrate of sitagliptin. Ex. 2051, 282:18–283:4 ("I don't think I specifically categorized that they

would have preferred the hydrate."); Ex. 1002 ¶¶ 168–170. And, when Petitioner was asked at the oral hearing to identify where, in the Petition, it had given any reason for the skilled artisan to have made the monohydrate of claim 4, Petitioner was unable to do so. Tr. 32:23–34:16.

In Reply, Petitioner attempts to fill this hole by citing vaguely to pages of testimony from Merck's expert, Dr. Myerson. Reply 23 (citing Ex. 1031, 70:1–72:21). But Dr. Myerson's testimony that a POSA may generally prefer "crystalline substances . . . over amorphous forms" does not explain why the specific hydrate of claim 4 would have been pursued or preferred. Ex. 1031, 72:13–21 (testifying that crystalline forms may be preferred for stability, but amorphous forms are sometimes preferred for solubility); Ex. 2051 (Chorghade dep.), 274:14–275:17 (admitting that amorphous forms "can have advantages relative to crystalline materials"). Nor does Petitioner address the numerous downsides of hydrates that are reported in the literature and cited by Patent Owner. PO Resp. 56 ("[T]he POSA would have had a number of reasons for avoiding hydrates.").

Patent Owner cites undisputed evidence that hydrates are known to exhibit lower solubility (and consequent lower bioavailability), as well as physical instability due to dehydration, among other problems. *Id.* at 59; Ex. 2160, 6; Ex. 2162, 8–9; Ex. 2163, 6; Ex. 2101¶¶ 56–57, 128–132. Even Petitioner's relied-upon Brittain reference catalogs many "problems" and "potential issues around hydrates in the development process." Ex. 1005, 5–6 (listing "lower solubility," "variable potencies," and other "negative consequences" like "tablet capping, chemical instability, discoloration, and more"). Petitioner pinpoints Brittain's teaching that "monohydrates are [the]

most frequently encountered" of the crystalline hydrate stoichiometries, but never grapples persuasively with the problems that accompany hydrates and how that would (or would not) have impacted the POSA's motivation to make the crystalline monohydrate of 1:1 sitagliptin DHP. Pet. 63; Reply 23–24. On the other hand, Dr. Myerson, a professor of chemical engineering from MIT with over 40 years' experience, deals with these issues directly. He testifies persuasively that, considering all the evidence, including the vague disclosure about crystalline forms in WO '498 balanced against the widely-reported problems with hydrates, a POSA would have sought to avoid hydrates and would not have been motivated to make a crystalline monohydrate of 1:1 sitagliptin DHP. Ex. 2103 ¶¶ 127–138.

Petitioner's failure to provide a persuasive motivation for making the crystalline monohydrate of claim 4 would, alone, justify rejecting its obviousness challenge. That, however, is not the only problem with Petitioner's challenge. On the full trial record, Petitioner does not persuade us that the ordinarily skilled person would have made the 1:1 sitagliptin DHP crystalline monohydrate with a reasonable expectation of success.

As discussed above, the preponderance of the evidence shows that forming crystalline salts, including hydrates, was and is highly unpredictable. Dr. Myerson testifies persuasively that "it is unpredictable whether any particular compound will be able to be crystallized" and that no means existed to reasonably predict formation of hydrates—much less the specific 1:1 sitagliptin DHP crystalline monohydrate of claim 4. *See, e.g.*, Ex. 2101 ¶¶ 146–149. Petitioner's expert, Dr. Chorghade, concedes that determining whether hydrates will form is difficult and fraught with

unpredictability. *See, e.g.*, Ex. 2051, 200:1–6, 238:8–18, 245:21–246:6 (admitting it "wasn't possible to predict when materials will crystallize"), 257:18–258 (admitting he "couldn't predict with any degree of certainty" hydrate formation). And the bulk of the technical literature on this record confirms the same. *See, e.g.*, Ex. 2047, 10 ("[I]t is not yet possible to predict when materials will crystallize"); Ex. 2050, 31 n.2 ("It is well known among practising chemists that it is often difficult to crystallize a newly synthesized compound."); Ex. 2049, 2 ("[I]t is still not possible to predict with any reasonable level of confidence the crystal structure of an organic material, much less the existence of polymorphism.").[34] Against this evidence, we find unpersuasive Dr. Chorghade's conclusory opinion that the POSA "would have expected that (R)-sitagliptin phosphate . . . exists as crystalline hydrate." Ex. 1002 ¶ 169.

Petitioner's probability-based argument, relying on Brittain, is also over-stated and unpersuasive. PO Resp. 48. We agree with Patent Owner that Brittain undermines Petitioner's argument insofar as the reference discloses that only "one-third of the pharmaceutical actives [APIs] are capable of forming crystalline hydrates," and that only about half of the hydrates in a public database were monohydrates. *Id.* (quoting 1005, 6). In

[34] *See also* Ex. 2046, 18 ("Predicting the formation of solvates and hydrates . . . is complex and difficult. . . . There may be too many possibilities so that no computer programs are currently available for predicting the crystal structure of hydrates and solvates."); Ex. 2048, 3:3–5 ("The existence and physical properties of polymorphs, hydrates and solvates is unpredictable"); Ex. 2171, 7:32–37 ("There are no rules exist that allow prediction of whether a compound will exist as solvated forms of an organic solvent.").

other words, contrary to what Petitioner's argument suggests about the prevalence of monohydrates, only about *one-sixth* of APIs (active compounds that have been extensively studied) could form a monohydrate according to Brittain. *Id.*; Ex. 2101 ¶ 157. Dr. Chorghade, on cross examination, agreed with this interpretation of Brittain's data. Ex. 2051, 204:18–205:12. Petitioner's probabilistic argument, especially given that the probability is low, is problematic and unpersuasive in showing a POSA's reasonable expectation of success in forming the particular crystalline monohydrate of claim 4. *See Grunenthal GmbH v. Alkem Labs. Limited*, 919 F.3d 1333, 1341–44 (Fed. Cir. 2019) (affirming finding of no reasonable expectation of success in producing the "Form A" polymorph of tapentadol hydrochloride, despite disclosure of the "Form B" polymorph in prior art and evidence that about 30–35% of the compounds are polymorphic); *see also Lupin*, IPR2015-01030, Paper 17, 20–21 (finding similar probability argument did not show a reasonable expectation of success in formulating a hydrate of darunavir); PO Resp. 48–49; Sur-reply 17–18.

In Reply, Petitioner argues that the crystalline monohydrate can be made using an isopropanol/water solvent. Reply 24–25 (citing testimony of Dr. Matzger that use of isopropanol/water as a screening solvent is "old chemistry" (Ex. 2103 ¶ 149; Ex. 1025, 232:14–19)). Putting aside that this is a new theory based on a hypothetical use of an isopropanol solvent system that we could rightly refuse to consider in determining the alleged obviousness of claim 4 (37 C.F.R. § 42.23(b)), it does not justify a finding in Petitioner's favor. Sur-reply 18.

There are numerous solvents and reaction parameters that a POSA could choose in screening for possible crystalline salts (*see, e.g.*, Ex. 2101 ¶¶ 79, 90–91, 163–164, 166), but

> to have a reasonable expectation of success, one must be motivated to do more than merely vary all parameters or try each of numerous possible choices until one possibly arrived at a successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many choices is likely to be successful.

*Grunenthal*, 919 F.3d at 1342 (internal quotation marks omitted); *accord Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1365 (Fed. Cir. 2007). Petitioner's new focus on isopropanol/water appears to be rooted in hindsight[35] and also fails because the record shows its use, even assuming it was an obvious solvent choice, does not necessarily result in the claimed crystalline monohydrate of the 1:1 sitagliptin DHP. As discussed above, actual testing shows that reacting sitagliptin and phosphoric acid in an isopropanol/water solvent produces non-1:1 salts. *Supra* Section II(D)(2) (discussing Dr. Matzger's experiments); *see also* Ex. 2127 (Hansen Decl.) ¶ 34 (no hydrate despite use of aqueous IPA (isopropanol), citing Ex. 2131, 18)). And, if isopropanol/water was chosen, Petitioner still fails to explain persuasively why the skilled artisan would have *reasonably expected* the resulting salt to be the claimed crystalline monohydrate.

---

[35] Petitioner's focus on isopropanol/water likely arose because the '708 patent describes a preparation of the monohydrate in that solvent. Reply 24–25 (citing Ex. 1001, 8:1–13:21, and noting that "inherency" can be based on the patent). A patent's own disclosure can evidence inherency, but Petitioner's use here looks like hindsight to support the alleged obviousness.

For the above reasons, we disagree that a POSA would have reasonably expected to successfully produce the subject matter of claim 4 from the combination of WO ’498, Bastin, and Brittain.

Finally, although we need not reach the alleged unexpected properties of the claimed crystalline monohydrate, such unexpected results are further evidence undermining Petitioner’s challenge to claim 4. *See Hamilton Beach Brands, Inc. v. f’real Foods, LLC*, 908 F.3d 1328, 1343 (Fed. Cir. 2018) (holding no need to reach objective indicia of nonobviousness where petitioner had not made a showing necessary to prevail on threshold obviousness issues). Petitioner does *not* contest that Patent Owner’s relied-upon results were surprising or unexpected, and Dr. Myerson’s supporting testimony, which we credit, indicates that they were. Ex. 2101 ¶¶ 186–214. Rather, Petitioner argues, “1:1 sitagliptin DHP is disclosed in WO498 . . . and other sitagliptin phosphoric acid salts are disclosed in WO498,” which Petitioner characterizes as “the closest prior art.” Reply 25. So characterized, Petitioner argues Merck’s results are insufficient because Merck did not compare the results against the “closest” salts, and instead used “more distant salts *e.g.*, HCl, tartrate, etc.” *Id.* Petitioner also contends that “Merck only provides data tied to a single crystalline monohydrate form” of 1:1 sitagliptin DHP, and therefore the results are not “commensurate with the scope” of the claims. *Id.* at 25, 27.

We disagree with Petitioner’s above-noted criticisms of the unexpected results evidence. *Id.* at 25–27. The only salt of sitagliptin actually identified in WO ’498 is the sitagliptin hydrochloride of Example 7. Ex. 1004, 47. No phosphate salt of sitagliptin is specifically identified, and

no hydrates of any salt are described. Ex. 2101 ¶ 136. Merck's evidence, in making comparisons against, for example, *hydrated* forms of sitagliptin hydrochloride provides a more robust and persuasive comparison than it was even required to make. *Id.* ¶¶ 189–201 (analyzing stability results where water in the claimed monohydrate's lattice does not dehydrate until over 100°C versus dehydration at about 20°C for hydrated sitagliptin HCL and tartrate). "Unexpected results are shown in comparison to what was known, not what was unknown." *Millennium Pharma., Inc. v. Sandoz Inc.*, 862 F.3d 1356, 1368 (Fed. Cir. 2017) (holding patent owner, in presenting unexpected results, "was not required to create the glycerol ester, when the product had not been created in the prior art").

Moreover, even assuming a 1:1 sitagliptin DHP salt was identified in WO '498, Merck provides evidence, for example, that anhydrous forms of that salt undergo undesirable form conversion while the crystalline monohydrate of claim 4 unexpectedly does not. Ex. 2101 ¶¶ 202–207; *see also id.* ¶ 210 (unpredictable reduction in "sticking" of the monohydrate versus the anhydrous form). Inasmuch as Petitioner's position would require Merck to have further compared the claimed subject matter to itself, that is not required based on the prior art asserted here. *See Millennium*, 862 F.3d at 1368 (citing, with approval, *In re Geiger*, 815 F.2d 686, 690 (Fed. Cir. 1987) (Newman J., concurring) ("The applicant is not required to create prior art, nor prove that his invention would have been obvious if the prior art were different than it actually was.")).

We also conclude that Petitioner's criticism about Merck testing only one form of the crystalline monohydrate of 1:1 sitagliptin DHP is

unavailing. The testing must be "reasonably commensurate" to claim 4's scope, and there is no requirement to test "every embodiment." *In re Kao,* 639 F.3d 1057, 1068 (Fed. Cir. 2011). The undisputed evidence here is that, despite Merck's years of research and efforts to identify other forms, "the crystalline monohydrate in the '708 patent is the *only* monohydrate of 1:1 sitagliptin known to exist." Sur-reply 26; Ex. 2101 ¶ 205; Ex. 2122, 34; Ex. 2124 ¶¶ 9, 15. On this record, Merck's testing was reasonable and demonstrated unexpected, advantageous properties of the crystalline monohydrate of claim 4.

For the reasons above, Petitioner has not proved by a preponderance of the evidence that claim 4 would have been obvious.

## III. MOTION TO EXCLUDE

Patent Owner moves to exclude three exhibits (or portions thereof). *See generally* Paper 81. Petitioner opposes the motion. Paper 83. Patent Owner moves to exclude Exhibit 2225, the declaration of Dr. Leonard J. Chyall dated August 3, 2010, "to the extent Mylan relies on it." Paper 81, 3. Patent Owner moves to exclude Exhibit 1030, Dr. Chyall's lab notebook, in its entirety. *Id.* And lastly, Patent Owner moves to exclude portions of Exhibit 1035, Dr. Chorghade's Reply Declaration, "to the extent it addresses Exhibit 1030 or Exhibit 2225." *Id.* at 3–4. Patent Owner has the burden of proof to show that it is entitled to the requested relief. 37 C.F.R. § 42.20(c). We deny Patent Owner's motion for the reasons explained below.

*A. Exhibit 2225 (Chyall Declaration)*

Merck argues Exhibit 2225 is inadmissible for two reasons. First, Merck argues the Board should exclude portions of Exhibit 2225 cited by Mylan because they are hearsay. Paper 81, 3–6. Second, Merck argues Exhibit 2225 is inadmissible expert testimony (citing Fed. R. Evid. ("FRE") 702 and *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993) ("*Daubert*")). We disagree Exhibit 2225 should be excluded on these bases.

We overrule Merck's hearsay objection because Merck introduced this exhibit and, despite its argument to the contrary, it too relied on Dr. Chyall's testimony (in Exhibit 2225 and several other exhibits) for the truth of the matters asserted.

In its Response, Merck cited generally to "EX2225" (and other Chyall testimony from prior proceedings in Israel, such as in Exhibits 2192,[36] 2224, and 2227) without qualification, limitation, or objection. *See, e.g.*, PO Resp. 17; Paper 83, 1–4. Merck cited this testimony to support its argument that "Dr. Leonard Chyall, of Purdue University, repeatedly reproduced the same material [i.e., non-1:1 salts of sitagliptin and phosphoric acid]." *Id.* Also, Merck's expert, Dr. Matzger, cited repeatedly to Exhibit 2225, including some of the same portions relied on by Petitioner and Dr. Chorghade. For example, Dr. Matzger, pointing to Dr. Chyall's methanol-based experiments,

---

[36] Exhibit 2192 (Dr. Chyall's Second Declaration, dated March 7, 2012), for example, also appears to include some of the same details of Dr. Chyall's testimony in Exhibit 2225 on the topic of whether it is possible to prepare non-1:1 phosphoric acid salts of sitagliptin; Mylan cites and Dr. Chorghade relies on Exhibit 2192 as well, but Merck does not move for its exclusion.

writes: "Dr. Chyall, Petitioner Teva's expert in the Israeli opposition . . . used an excess of sitagliptin base in multiple of his experiments as well as tested the influence of excess acid." Ex. 2103 ¶ 126 (citing Ex. 2225 ¶¶ 23–25); *see also id.* ¶¶ 130–131 (citing details of Dr. Chyall's solubility study and those results in Exhibit 2225 ¶ 69). This was plainly reliance on Dr. Chyall's testimony for its truth, and Merck's argument that it was cited merely for non-hearsay purposes and because it allegedly motivated Dr. Matzger's own experiments is not persuasive. Paper 85, 2.[37]

Having relied on Dr. Chyall's testimony for factual details about his salt-forming experiments and the actual results of *some* of those experiments, as Merck does, it's hardly surprising Petitioner responded by citing experimental results in Merck's own exhibit that allegedly support Petitioner's argument—experiments showing formation of 1:1 phosphate salts of sitagliptin when reacted in methanol under certain conditions. Merck's argument that it "could not have foreseen" Mylan's use of Exhibit 2225 in this way is, thus, unpersuasive. Paper 85, 3. Once Merck opted to use Dr. Chyall's testimony as a sword, Petitioner was entitled to respond in kind. *Cf. Caterpillar, Inc. v. Wirtgen Am., Inc.*, IPR2018-01091, Paper 49 at 71 (PTAB Nov. 27, 2019) ("We will not endorse Patent Owner's attempt to use the transcript as a sword for its purposes, and our rules as a shield to

---

[37] For similar reasons, Patent Owner's citation to Fed. R. Evid. 105 is inapposite. Paper 85, 1. We disagree that Patent Owner's reliance on Chyall's testimony is not for its truth. Accordingly, this is not a situation where there is a permissible non-hearsay use by one party and an impermissible hearsay use by another.

prevent Petitioner from using the same transcript to rebut Patent Owner's contentions."); Paper 83, 1.

As for Merck's contention that Dr. Chyall was originally an expert of joinder petitioner Teva, that reliance on Dr. Chyall was withdrawn after joinder was granted, and that Dr. Chyall was not cross-examined in this case, we recognize that Merck sees this as unfair to it. Paper 81, 5–6. On the other hand, Merck opened the door to Petitioner citing Dr. Chyall's experiments where 1:1 salts were made when Merck cited those very experiments (without noting their results) along with other Chyall experiments where he produced non-1:1 phosphate salts. PO Resp. 17. Moreover, early in this case, Merck suggested to the Board that it may pursue Dr. Chyall's deposition. Ex. 1018, 13:15–14:2. The Board signaled it would promptly handle any disputed request for additional discovery, if raised. Paper 44, 9–10. Yet Merck apparently never requested a deposition of Dr. Chyall, nor sought the Board's further help in resolving any discovery dispute. Paper 83, 12–13. In short, Merck cannot escape that its own actions (and inactions) played a significant role in placing Merck in the position it finds itself now with respect to Exhibit 2225.

Merck also requests exclusion of Exhibit 2225 under FRE 702. Paper 81, 7–10. According to Merck, Dr. Chyall's declaration never mentions WO '498, nor did Dr. Chyall seek to reproduce any examples from that reference. Inasmuch as Dr. Chyall's declaration reflects an attempt to make 1:1, or non-1:1, salt forms of sitagliptin, Merck contends his testimony was specific to issues in the proceedings in Israel and "bears no connection to U.S. inherent anticipation law." *Id.* at 8–9. For at least those reasons, Patent

Owner contends the testimony has no scientific connection to the facts of this case and is unhelpful. *Id.* at 7–10.

We agree with Petitioner that Merck's arguments go the weight of this evidence, not admissibility. Paper 83, 13–15. To the extent there are differences between Dr. Chyall's experiments and the examples in the prior art, or other alleged shortcomings with Dr. Chyall's work, that potentially diminish the scientific connection and relevance to the particular issues here, Merck has pointed those things out. *See, e.g.*, Sur-reply 5–7. And we have considered and weighed such matters in reaching our conclusions. Similarly, to the extent Merck's expert relied on Dr. Chyall's work, but also conducted his own experiments in this proceeding to confirm formation of non-1:1 salts, whereas Dr. Chorghade relied on Dr. Chyall's experiments *without* running his own, that too goes to the weight of the respective testimony. Paper 81, 10. We, thus, overrule Patent Owner's FRE 702 and *Daubert* objection to Exhibit 2225.

### *B. Exhibit 1030 (Chyall Lab Notebook)*

Merck moves to exclude Exhibit 1030 for lack of authentication under FRE 901, violation of 37 C.F.R. § 42.65, and as hearsay. Paper 81, 11–12.

We deny Merck's motion to exclude Exhibit 1030. There is a sufficient showing that this exhibit is an authentic copy of Dr. Chyall's lab notebook, as evidenced by the declaration of Noam Blei (Ex. 1036 ¶¶ 1–3), and based on indicia on the document itself (each page titled "Notebook 4063") in combination with Dr. Chyall's declarations (e.g., Exhibits 2221 and 2225, cross-referencing to "Notebook 4063"); FRE 901(b)(3)-(4) (authentication provided by comparison of expert or trier of fact, or by

distinctive characteristics of the evidence taken together with all the circumstances). Merck did not timely object to Exhibit 1030 under Rule 42.65, so the objection was waived.[38] Paper 68, 2; 37 C.F.R. § 42.64(b)(1). Finally, even if we agreed that the notebook is hearsay, we conclude it was permissible, under FRE 703, for Dr. Chorghade to have relied upon the data therein in forming his opinions. That Patent Owner's own expert relies on similar lab notebooks from Dr. Chyall is sufficient to show that the data therein are the type that experts in this field reasonably rely on in forming technical opinions. *See, e.g.*, Ex. 2103 ¶ 131 (citing and relying on Ex. 2226 ("Chyall Lab Notebook 4031")).

### *C. Exhibit 1035 (Chorghade Reply Declaration)*

Merck moves to exclude Exhibit 1035 because "large portions . . . rely on and/or parrot the inadmissible experiments and conclusions of Dr. Chyall in Exhibits 2225 and 1030." Paper 81, 12. We disagree with Merck for reasons already explained above. Under the circumstances here, it was reasonable for Dr. Chorghade to rely on Dr. Chyall's testing and testimony. Merck's contention that the facts and data in Exhibits 2225 and 1030 are not the sort that experts in this field would reasonably rely upon is undermined by its own expert's testimony. *Id.* at 13; *see* Ex. 2103 ¶ 126 (citing and relying on Ex. 2225), ¶ 131 (citing and relying on Ex. 2225 and Ex. 2226 ("Chyall Lab Notebook 4031")). That Dr. Chorghade may lack "personal

---

[38] Even if the objection had been timely, the declarations of Drs. Chyall and Chorghade include sufficient information to explain the cited testing and comply with Rule 42.65, which does not specify that the affiant must have performed the testing first hand. 37 C.F.R. § 42.65.

knowledge" about that data because he did not generate it himself goes to the weight of his opinions, not admissibility. Paper 81, 13. And, for similar reasons to those above, we disagree that Dr. Chorghade's Reply Declaration, to the extent it relies on Dr. Chyall's allegedly "unhelpful" testing or testimony, should be excluded under FRE 702. Paper 81, 10, 14–15.

For the above reasons, Merck's Motion to Exclude is denied.

## IV. CONSTITUTIONALITY

Patent Owner states: "[T]his IPR should be dismissed as unconstitutional because administrative patent judges are principal officers requiring presidential appointment and Senate confirmation." Sur-reply 26–27. We decline to consider Patent Owner's constitutional challenge, as the issue has been addressed by intervening authority in *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320, 1335 (Fed. Cir. 2019), *cert. granted sub nom. United States v. Arthrex, Inc.*, 2020 WL 6037206 (Oct. 13, 2020).

## V. CONCLUSION

Based on the information in this record, we conclude Petitioner has not shown by a preponderance of the evidence that claims 1–4, 17, 19, and 21–23 of the '708 patent are unpatentable for anticipation or obviousness.

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–3, 17, 19, 21–23 | 102(a), (e)(2) | WO '498 | | 1–3, 17, 19, 21–23 |
| 1–3, 17, 19, 21–23 | 102(a), (e)(2) | '871 patent | | 1–3, 17, 19, 21–23 |

| | | | | |
|---|---|---|---|---|
| 3, 17, 19, 21–23 | 103 | WO ’498 | | 3, 17, 19, 21–23 |
| 1–3, 17, 19, 21–23 | 103 | WO ’498, Bastin | | 1–3, 17, 19, 21–23 |
| 4 | 103 | WO ’498, Bastin, Brittain | | 4 |
| 4 | 103 | WO ’498, Brittain | | 4 |
| **Overall Outcome** | | | | 1–4, 17, 19, 21–23 |

## VI. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner has not shown by a preponderance of the evidence that claims 1–4, 17, 19, and 21–23 are unpatentable;

FURTHER ORDERED that Patent Owner’s Motion to Exclude is *denied*; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

Jitendra Malik
Alissa Pacchioli
Heike Radeke
Christopher West
Lance Soderstrom
KATTEN MUCHIN ROSEMAN LLP
jitty.malik@katten.com
alissa.pacchioli@katten.com
heike.radeke@kattenlaw.com
christopher.west@katten.com
lance.soderstrom@kattenlaw.com

Russell W. Faegenburg
Tedd W. Van Buskirk
Michael H. Teschner
LERNER, DAVID, LITTENBERG, KRUMHOLZ & MENTLIK, LLP
rfaegenburg.ipr@ldlkm.com
tvanbuskirk@lernerdavid.com
mteschner.ipr@ldlkm.com

Jovial Wong
WINSTON & STRAWN LLP
jwong@winston.com

FOR PATENT OWNER:

Stanley E. Fisher
Jessamyn S. Berniker
Shaun P. Mahaffy
Anthony H. Sheh
WILLIAMS & CONNOLLY LLP
sfisher@wc.com
jberniker@wc.com
smahaffy@wc.com
asheh@wc.com

US007326708B2

(12) **United States Patent**
**Cypes et al.**

(10) **Patent No.: US 7,326,708 B2**
(45) **Date of Patent: Feb. 5, 2008**

(54) **PHOSPHORIC ACID SALT OF A DIPEPTIDYL PEPTIDASE-IV INHIBITOR**

(75) Inventors: **Stephen Howard Cypes**, Santa Clara, CA (US); **Alex Minhua Chen**, Metuchen, NJ (US); **Russell R. Ferlita**, Westfield, NJ (US); **Karl Hansen**, Atlantic Highlands, NJ (US); **Ivan Lee**, Piscataway, NJ (US); **Vicky K. Vydra**, Fair Lawn, NJ (US); **Robert M. Wenslow, Jr.**, East Windsor, NJ (US)

(73) Assignee: **Merck & Co., Inc.**, Rahway, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 657 days.

(21) Appl. No.: **10/874,992**

(22) Filed: **Jun. 23, 2004**

(65) **Prior Publication Data**

US 2005/0032804 A1 Feb. 10, 2005

**Related U.S. Application Data**

(60) Provisional application No. 60/482,161, filed on Jun. 24, 2003.

(51) **Int. Cl.**
***A61K 31/495*** (2006.01)
***C07D 471/04*** (2006.01)

(52) **U.S. Cl.** ....................................... **514/249**; 544/350

(58) **Field of Classification Search** ................ 514/249; 544/350

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,479,692 | B1 * | 11/2002 | Ekwuribe et al. | 558/413 |
| 6,699,871 | B2 | 3/2004 | Edmondson et al. | |
| 2003/0100563 | A1 | 5/2003 | Edmondson et al. | |
| 2006/0287528 | A1 * | 12/2006 | Wenslow et al. | 544/350 |
| 2007/0021430 | A1 * | 1/2007 | Chen et al. | 514/249 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | WO 2005/072530 | A1 | 8/2005 |
| WO | WO 2006/033848 | A1 | 3/2006 |

OTHER PUBLICATIONS

Edmondson, S.D., Drug Data Report, vol. 25, No. 3, pp. 245-246 (2003).

Database Prous DDR Online—Database Accession No. 2003: 3561.

* cited by examiner

*Primary Examiner*—James O. Wilson
*Assistant Examiner*—Ebenezer Sackey
(74) *Attorney, Agent, or Firm*—Philippe L. Durette; Catherine D. Fitch

(57) **ABSTRACT**

The dihydrogenphosphate salt of 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro [1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine is a potent inhibitor of dipeptidyl peptidase-IV and is useful for the prevention and/or treatment of non-insulin dependent diabetes mellitus, also referred to as type 2 diabetes. The invention also relates to a crystalline monohydrate of the dihydrogenphosphate salt as well as a process for its preparation, pharmaceutical compositions containing this novel form and methods of use for the treatment of diabetes, obesity, and high blood pressure.

**24 Claims, 5 Drawing Sheets**



INTENSITY (COUNTS)
2500
2000
1500
1000
500
0
5
10
15
20
25
30
35
2THETA (°)


FIG. 1




FIG. 2




FIG. 3


DELTA Y=3.3647 %
TEMPERATURE (°C)
WEIGHT %
100.2
100.0
99.5
99.0
98.5
98.0
97.5
97.0
96.5
95.9
20.16
40
60
80
100
120
140
160
183.1

FIG.4


HEAT FLOW (W/g)
0
−2
−4
−6
−8
−10
0
50
100
150
200
250
TEMPERATURE (°C)
213.23°C
209.63°C
293.6J/g
140.66°C
138.09°C
125.7J/g

FIG.5

# PHOSPHORIC ACID SALT OF A DIPEPTIDYL PEPTIDASE-IV INHIBITOR

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present invention is related to U.S. provisional application Ser. No. 60/482,161, filed Jun. 24, 2003, the contents of which are hereby incorporated by reference.

## FIELD OF THE INVENTION

The present invention relates to a particular salt of a dipeptidyl peptidase-IV inhibitor. More particularly, the invention relates to a dihydrogenphosphate salt of 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a] pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine, which is a potent inhibitor of dipeptidyl peptidase-IV. This novel salt and crystalline hydrates thereof are useful for the treatment and prevention of diseases and conditions for which an inhibitor of dipeptidyl peptidase-IV is indicated, in particular Type 2 diabetes, obesity, and high blood pressure. The invention further concerns pharmaceutical compositions comprising the dihydrogenphosphate salt and crystalline hydrates thereof useful to treat Type 2 diabetes, obesity, and high blood pressure as well as processes for preparing the dihydrogenphosphate salt and crystalline hydrates thereof and their pharmaceutical compositions.

## BACKGROUND OF THE INVENTION

Inhibition of dipeptidyl peptidase-IV (DP-IV), an enzyme that inactivates both glucose-dependent insulinotropic peptide (GIP) and glucagon-like peptide 1 (GLP-1), represents a novel approach to the treatment and prevention of Type 2 diabetes, also known as non-insulin dependent diabetes mellitus (NIDDM). The therapeutic potential of DP-IV inhibitors for the treatment of Type 2 diabetes has been reviewed: C. F. Deacon and J. J. Holst, "Dipeptidyl peptidase IV inhibition as an approach to the treatment and prevention of Type 2 diabetes: a historical perspective," *Biochem. Biophys. Res. Commun.,* 294: 1-4 (2000); K. Augustyns, et al., "Dipeptidyl peptidase IV inhibitors as new therapeutic agents for the treatment of Type 2 diabetes," *Expert. Opin. Ther. Patents,* 13: 499-510 (2003); and D. J. Drucker, "Therapeutic potential of dipeptidyl peptidase IV inhibitors for the treatment of Type 2 diabetes," *Expert Opin. Investig. Drugs,* 12: 87-100 (2003).

WO 03/004498 (published 16 Jan. 2003), assigned to Merck & Co., describes a class of beta-amino tetrahydrotriazolo[4,3-a]pyrazines, which are potent inhibitors of DP-IV and therefore useful for the treatment of Type 2 diabetes. Specifically disclosed in WO 03/004498 is 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine. Pharmaceutically acceptable salts of this compound are generically encompassed within the scope of WO 03/004498.

However, there is no specific disclosure in the above reference of the newly discovered monobasic dihydrogenphosphate salt of 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro [1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine of structural formula I below.

## SUMMARY OF THE INVENTION

The present invention is concerned with a novel dihydrogenphosphate salt of the dipeptidyl peptidase-IV (DP-IV) inhibitor 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4] triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl) butan-2-amine and crystalline hydrates thereof, in particular a crystalline monohydrate. The dihydrogenphosphate salt and crystalline hydrates of the present invention have advantages in the preparation of pharmaceutical compositions of 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine, such as ease of processing, handling, and dosing. In particular, they exhibit improved physical and chemical stability, such as stability to stress, high temperatures and humidity, as well as improved physicochemical properties, such as solubility and rate of solution, rendering them particularly suitable for the manufacture of various pharmaceutical dosage forms. The invention also concerns pharmaceutical compositions containing the novel salt and hydrates as well as methods for using them as DP-IV inhibitors, in particular for the prevention or treatment of Type 2 diabetes, obesity, and high blood pressure.



## BRIEF DESCRIPTION OF THE FIGURES

FIG. **1** is a characteristic X-ray diffraction pattern of the crystalline monohydrate of the dihydrogenphosphate salt of structural formula II.

FIG. **2** is a carbon-13 cross-polarization magic-angle spinning (CPMAS) nuclear magnetic resonance (NMR) spectrum of the crystalline monohydrate of the dihydrogenphosphate salt of structural formula II.

FIG. **3** is a fluorine-19 magic-angle spinning (MAS) nuclear magnetic resonance (NMR) spectrum of the crystalline monohydrate of the dihydrogenphosphate salt of structural formula II.

FIG. **4** is a typical thermogravimetric analysis (TGA) curve of the crystalline monohydrate dihydrogenphosphate salt of structural formula II.

FIG. **5** is a typical differential scanning calorimetry (DSC) curve of the crystalline monohydrate of the dihydrogenphosphate salt of structural formula II.

## DETAILED DESCRIPTION OF THE INVENTION

This invention provides a new monobasic dihydrogenphosphate salt of 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1 ,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl) butan-2-amine of the following structural formula I:

(I)




or a crystalline hydrate thereof. In particular, the instant invention provides a crystalline monohydrate of the dihydrogenphosphate salt of formula I.

The dihydrogenphosphate salt of the present invention has a center of asymmetry at the stereogenic carbon atom

indicated with an * and can thus occur as a racemate, racemic mixture, and single enantiomers, with all isomeric forms being included in the present invention. The separate enantiomers, substantially free of the other, are included within the scope of the invention, as well as mixtures of the two enantiomers.

One embodiment of the present invention provides the dihydrogenphosphate salt of (2R)-4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-triflorophenyl) butan-2-amine of structural formula II:

(II)




or a crystalline hydrate thereof.

A second embodiment of the present invention provides the dihydrogenphosphate salt of (2S)-4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl) butan-2-amine of structural formula III:

(III)




or a crystalline hydrate thereof.

More specifically, the dihydrogenphosphate salt of the present invention is comprised of one molar equivalent of mono-protonated 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro [1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine cation and one molar equivalent of dihydrogenphosphate (biphosphate) anion.

In a further embodiment of the present invention, the dihydrogenphosphate salt of structural formulae I-III is a crystalline hydrate. In one class of this embodiment, the crystalline hydrate is a crystalline monohydrate.

A further embodiment of the present invention provides the dihydrogenphosphate salt drug substance of structural formulae I-III that comprises the crystalline monohydrate present in a detectable amount. By "drug substance" is meant the active pharmaceutical ingredient ("API"). The amount of crystalline monohydrate in the drug substance can be quantified by the use of physical methods such as X-ray powder diffraction, solid-state fluorine-19 magic-angle spinning (MAS) nuclear magnetic resonance spectroscopy, solid-state carbon-13 cross-polarization magic-angle spinning (CPMAS) nuclear magnetic resonance spectroscopy, solid state Fourier-transform infrared spectroscopy, and Raman spectroscopy. In a class of this embodiment, about 5% to about 100% by weight of the crystalline monohydrate is present in the drug substance. In a second class of this embodiment, about 10% to about 100% by weight of the crystalline monohydrate is present in the drug substance. In a third class of this embodiment, about 25% to about 100% by weight of the crystalline monohydrate is present in the drug substance. In a fourth class of this embodiment, about 50% to about 100% by weight of the crystalline monohydrate is present in the drug substance. In a fifth class of this embodiment, about 75% to about 100% by weight of the crystalline monohydrate is present in the drug substance. In a sixth class of this embodiment, substantially all of the dihydrogenphosphate salt drug substance is the crystalline monohydrate of the present invention, i.e., the dihydrogenphosphate salt drug substance is substantially phase pure monohydrate.

The crystalline dihydrogenphosphate salt of the present invention exhibits pharmaceutic advantages over the free base and the previously disclosed hydrochloride salt (WO 03/004498) in the preparation of a pharmaceutical drug product containing the pharmacologically active ingredient. In particular, the enhanced chemical and physical stability of the crystalline dihydrogenphosphate salt monohydrate constitute advantageous properties in the preparation of solid pharmaceutical dosage forms containing the pharmacologically active ingredient.

The dihydrogenphosphate salt of the present invention, which exhibits potent DP-IV inhibitory properties, is particularly useful for the prevention or treatment of Type 2 diabetes, obesity, and high blood pressure.

Another aspect of the present invention provides a method for the prevention or treatment of clinical conditions for which an inhibitor of DP-IV is indicated, which method comprises administering to a patient in need of such prevention or treatment a prophylactically or therapeutically effective amount of the dihydrogenphosphate salt of structural formula I or a hydrate thereof, in particular the crystalline monohydrate thereof. Such clinical conditions include diabetes, in particular Type 2 diabetes, hyperglycemia, insulin resistance, and obesity.

The present invention also provides the use of the dihydrogenphosphate salt of structural formula I or a hydrate thereof, in particular the crystalline monohydrate, for the manufacture of a medicament for the prevention or treatment of clinical conditions for which an inhibitor of DP-IV is indicated.

The present invention also provides pharmaceutical compositions comprising the dihydrogenphosphate salt of structural formula I or a hydrate thereof, in particular the crystalline monohydrate, in association with one or more pharmaceutically acceptable carriers or excipients. In one embodiment the pharmaceutical composition comprise a therapeutically effective amount of the active pharmaceutical ingredient in admixture with pharmaceutically acceptable excipients wherein the active pharmaceutical ingredient comprises a detectable amount of the crystalline monohydrate of the present invention. In a second embodiment the pharmaceutical composition comprise a therapeutically effective amount of the active pharmaceutical ingredient in admixture with pharmaceutically acceptable excipients wherein the active pharmaceutical ingredient comprises about 5% to about 100% by weight of the crystalline monohydrate of the present invention. In a class of this second embodiment, the active pharmaceutical ingredient in such compositions comprises about 10% to about 100% by

weight of the crystalline monohydrate. In a second class of this embodiment, the active pharmaceutical ingredient in such compositions comprises about 25% to about 100% by weight of the crystalline monohydrate. In a third class of this embodiment, the active pharmaceutical ingredient in such compositions comprises about 50% to about 100% by weight of the crystalline monohydrate. In a fourth class of this embodiment, the active pharmaceutical ingredient in such compositions comprises about 75% to about 100% by weight of the crystalline monohydrate. In a fifth class of this embodiment, substantially all of the active pharmaceutical ingredient is the crystalline dihydrogenphosphate salt monohydrate of the present invention, i.e., the active pharmaceutical ingredient is substantially phase pure dihydrogenphosphate salt monohydrate.

The compositions in accordance with the invention are suitably in unit dosage forms such as tablets, pills, capsules, powders, granules, sterile solutions or suspensions, metered aerosol or liquid sprays, drops, ampoules, auto-injector devices or suppositories. The compositions are intended for oral, parenteral, intranasal, sublingual, or rectal administration, or for administration by inhalation or insufflation. Formulation of the compositions according to the invention can conveniently be effected by methods known from the art, for example, as described in *Remington's Pharmaceutical Sciences,* 17th ed., 1995.

The dosage regimen is selected in accordance with a variety of factors including type, species, age, weight, sex and medical condition of the patient; the severity of the condition to be treated; the route of administration; and the renal and hepatic function of the patient. An ordinarily skilled physician, veterinarian, or clinician can readily determine and prescribe the effective amount of the drug required to prevent, counter or arrest the progress of the condition.

Oral dosages of the present invention, when used for the indicated effects, will range between about 0.01 mg per kg of body weight per day (mg/kg/day) to about 100 mg/kg/day, preferably 0.01 to 10 mg/kg/day, and most preferably 0.1 to 5.0 mg/kg/day. For oral administration, the compositions are preferably provided in the form of tablets containing 0.01, 0.05, 0.1, 0.5, 1.0, 2.5, 5.0, 10.0, 15.0, 25.0, 50.0, 100, 200, and 500 milligrams of the active ingredient for the symptomatic adjustment of the dosage to the patient to be treated. A medicament typically contains from about 0.01 mg to about 500 mg of the active ingredient, preferably, from about 1 mg to about 200 mg of active ingredient. Intravenously, the most preferred doses will range from about 0.1 to about 10 mg/kg/minute during a constant rate infusion. Advantageously, the crystalline forms of the present invention may be administered in a single daily dose, or the total daily dosage may be administered in divided doses of two, three or four times daily. Furthermore, the crystalline forms of the present invention can be administered in intranasal form via topical use of suitable intranasal vehicles, or via transdermal routes, using those forms of transdermal skin patches well known to those of ordinary skill in the art. To be administered in the form of a transdermal delivery system, the dosage administration will, of course, be continuous rather than intermittent throughout the dosage regimen.

In the methods of the present invention, the dihydrogenphosphate salt and crystalline hydrates herein described in detail can form the active pharmaceutical ingredient, and are typically administered in admixture with suitable pharmaceutical diluents, excipients or carriers (collectively referred to herein as 'carrier' materials) suitably selected with respect to the intended form of administration, that is, oral tablets, capsules, elixirs, syrups and the like, and consistent with conventional pharmaceutical practices.

For instance, for oral administration in the form of a tablet or capsule, the active pharmaceutical ingredient can be combined with an oral, non-toxic, pharmaceutically acceptable, inert carrier such as lactose, starch, sucrose, glucose, methyl cellulose, magnesium stearate, dicalcium phosphate, calcium sulfate, mannitol, sorbitol and the like; for oral administration in liquid form, the active pharmaceutical ingredient can be combined with any oral, non-toxic, pharmaceutically acceptable inert carrier such as ethanol, glycerol, water and the like. Moreover, when desired or necessary, suitable binders, lubricants, disintegrating agents and coloring agents can also be incorporated into the mixture. Suitable binders include starch, gelatin, natural sugars such as glucose or beta-lactose, corn sweeteners, natural and synthetic gums such as acacia, tragacanth or sodium alginate, carboxymethylcellulose, polyethylene glycol, waxes and the like. Lubricants used in these dosage forms include sodium oleate, sodium stearate, magnesium stearate, sodium benzoate, sodium acetate, sodium chloride and the like. Disintegrators include, without limitation, starch, methyl cellulose, agar, bentonite, xanthan gum and the like.

The dihydrogenphosphate salt of structural formula I and the crystalline monohydrate have been found to possess a high solubility in water, rendering it especially amenable to the preparation of formulations, in particular intranasal and intravenous formulations, which require relatively concentrated aqueous solutions of active ingredient. The solubility of the crystalline dihydrogenphosphate salt monohydrate of formula I in water has been found to be about 72 mg/mL.

According to a further aspect, the present invention provides a process for the preparation of the dihydrogenphosphate salt of formula I, which process comprises reacting 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluoromethyl)butan-2-amine of structural formula IV below:

(IV)




with approximately one equivalent of phosphoric acid in a suitable $C_1$-$C_5$ alkanol, such as methanol, ethanol, isopropyl alcohol (IPA), and isoamyl alcohol (IAA) or aqueous $C_1$-$C_5$ alkanol. The reaction is carried out at a temperature range of about 25 ° C. to about 80 ° C. The phosphoric acid solution can be added to a solution of the amine, or the addition can be performed in the reverse direction. The crystalline dihydrogenphosphate salt monohydrate is obtained by crystallization from an aqueous $C_1$-$C_5$ alkanol solution of the dihydrogenphosphate salt as described below.

General Methods for Crystallizing the Monohydrate of the Dihydrogenphosphate Salt of Structural Formula I

(a) In Ethanol/Water System at 25° C.:

(1) crystallization from a mixture of compound I in ethanol and water, such that the water concentration is above 31 weight percent,

(2) recovering the resultant solid phase, and

(3) removing the solvent therefrom.

(b) In Isoamyl Alcohol (IAA)/Water System at 25° C.:

(1) crystallization from a mixture of compound I in IAA and water, such that the water concentration is above 2.9 weight percent;

(2) recovering the resultant solid phase; and

(3) removing the solvent therefrom.

(c) In IAA/Water System at 40° C.:

(1) crystallization from a mixture of compound I in IAA and water, such that the water concentration is above 3.6 weight percent;

(2) recovering the resultant solid phase; and

(3) removing the solvent therefrom

(d) In IAA/Water System at 60° C.:

(1) crystallization from a mixture of compound I in IAA and water, such that the water concentration is above 4.5 weight percent;

(2) recovering the resultant solid phase; and

(3) removing the solvent therefrom.

(e) In Isopropyl Alcohol (IPA)/Water System at 25° C.:

(1) crystallization from a mixture of compound I in IPA and water, such that the water concentration is above 7.0 weight percent;

(2) recovering the resultant solid phase; and

(3) removing the solvent therefrom

(f) In IPA/Water System at 40° C.:

(1) crystallization from a mixture of compound I in EPA and water, such that the water concentration is above 8.1 weight percent;

(2) recovering the resultant solid phase; and

(3) removing the solvent therefrom.

(g) In IPA/Water System at 75° C.:

(1) crystallization from a mixture of compound I in IPA and water, such that the water concentration is above about 20 weight percent;

(2) recovering the resultant solid phase; and

(3) removing the solvent therefrom.

The starting compound of structural formula IV can be prepared by the procedures detailed in Schemes 1-3 and Example 1 below.

In a still further aspect, the present invention provides a method for the treatment and/or prevention of clinical conditions for which a DP-IV inhibitor is indicated, which method comprises administering to a patient in need of such prevention or treatment a prophylactically or therapeutically effective amount of the salt of Formula I as defined above or a crystalline hydrate thereof.

The following non-limiting Examples are intended to illustrate the present invention and should not be construed as being limitations on the scope or spirit of the instant invention.

Compounds described herein may exist as tautomers such as keto-enol tautomers. The individual tautomers as well as mixtures thereof are encompassed with compounds of structural formula I.

The term "% enantiomeric excess" (abbreviated "ee") shall mean the % major enantiomer less the % minor enantiomer. Thus, a 70% enantiomeric excess corresponds to formation of 85% of one enantiomer and 15% of the other. The term "enantiomeric excess" is synonymous with the term "optical purity."

EXAMPLE




(2R)-4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine dihydrogenphosphate monohydrate

Preparation of 3-(trifluoromethyl)-5,6,7,8-tetrahydro[1,2,41]triazolo[4,3-a]pyrazine hydrochloride (1-4)

Scheme 1




Step A: Preparation of bishydrazide (1-1)

Hydrazine (20.1 g, 35 wt% in water, 0.22 mol) was mixed with 310 mL of acetonitrile. 31.5 g of ethyl trifluoroacetate (0.22 mol) was added over 60 min. The internal temperature was increased to 25° C. from 14° C. The resulting solution was aged at 22-25° C. for 60 min. The was cooled to 7° C. 17.9 g of 50 wt % aqueous NaOH (0.22 mol) and 25.3 g of chloroacetyl chloride (0.22 mol) were added simultaneously over 130 min at a temperature below 16° C. When the reaction was complete, the mixture was vacuum distilled to

remove water and ethanol at 27~30° C. and under 26 ~27 in Hg vacuum. During the distillation, 720 mL of acetonitrile was added slowly to maintain constant volume (approximately 500 mL). The slurry was filtered to remove sodium chloride. The cake was rinsed with about 100 mL of acetonitrile. Removal of the solvent afforded bis-hydrazide 1-1 (43.2 g, 96.5% yield, 94.4 area % pure by HPLC assay).

$^1$H-NMR (400 MHz, DMSO-$d_6$): δ 4.2 (s, 2H), 10.7 (s, 1H), and 11.6 (s, 1H) ppm. $^{13}$C-NMR (100 MHz, DMSO-$d_6$): δ 41.0, 116.1 (q, J=362 Hz), 155.8 (q, J=50 Hz), and 165.4 ppm.

Step B: Preparation of 5-(trifluoromethyl)-2-(chloromethyl)-1.3.4-oxadiazole (1-2)

Bishydrazide 1-1 from Step A (43.2 g, 0.21 mol) in ACN (82 mL) was cooled to 5° C. Phosphorus oxychloride (32.2 g, 0.21 mol) was added, maintaining the temperature below 10° C. The mixture was heated to 80° C. and aged at this temperature for 24 h until HPLC showed less than 2 area % of 1-1. In a separate vessel, 260 mL of IPAc and 250 mL of water were mixed and cooled to 0° C. The reaction slurry was charged to the quench keeping the internal temperature below 10° C. After the addition, the mixture was agitated vigorously for 30 min, the temperature was increased to room temperature and the aqueous layer was cut. The organic layer was then washed with 215 mL of water, 215 mL of 5 wt % aqueous sodium bicarbonate and finally 215 mL of 20 wt % aqueous brine solution. HPLC assay yield after work up was 86-92%. Volatiles were removed by distillation at 75-80 mm Hg, 55° C. to afford an oil which could be used directly in Step C without further purification. Otherwise the product can be purified by distillation to afford 1-2 in 70-80% yield.

$^1$H-NMR (400 MHz, $CDCl_3$): δ 4.8 (s, 2H) ppm. $^{13}$C-NMR (100 MHz, $CDCl_3$): δ 32.1, 115.8 (q, J=337 Hz), 156.2 (q, J=50 Hz), and 164.4 ppm.

Step C: Preparation of N-[(2Z)-piperazin-2-ylidene]trifluoroacetohydrazide (1-3)

To a solution of ethylenediamine (33.1 g, 0.55 mol) in methanol (150 mL) cooled at −20° C. was added distilled oxadiazole 1-2 from Step B (29.8 g, 0.16 mol) while keeping the internal temperature at −20° C. After the addition was complete, the resulting slurry was aged at −20° C. for 1 h. Ethanol (225 mL) was then charged and the slurry slowly warmed to −5° C. After 60 min at −5° C., the slurry was filtered and washed with ethanol (60 mL) at −5° C. Amidine 1-3 was obtained as a white solid in 72% yield (24.4 g, 99.5 area wt % pure by HPLC).

$^1$H-NMR (400 MHz, DMSO-$d_6$): δ 2.9 (t, 2H), 3.2 (t, 2H), 3.6 (s, 2H), and 8.3 (b, 1H) ppm. $^{13}$C-NMR (100 MHz, DMSO-$d_6$): δ 40.8, 42.0,43.3, 119.3 (q, J=350 Hz), 154.2, and 156.2 (q, J=38 Hz) ppm.

Step D: Preparation of 3-(trifluoromethyl)-5,6,7,8-tetrahydro[1,2,4]triazolo[4.3-a]pyrazine hydrochloride (1-4)

A suspension of amidine 1-3 (27.3 g, 0.13 mol) in 110 mL of methanol was warmed to 55° C. 37% Hydrochloric acid (11.2 mL, 0.14 mol) was added over 15 min at this temperature. During the addition, all solids dissolved resulting in a clear solution. The reaction was aged for 30 min. The solution was cooled down to 20° C. and aged at this temperature until a seed bed formed (10 min to 1 h). 300 mL of MTBE was charged at 20° C. over 1 h. The resulting slurry was cooled to 2° C., aged for 30 min and filtered. Solids were washed with 50 mL of ethanol:MTBE (1:3) and dried under vacuum at 45° C. Yield of triazole 1-4 was 26.7 g (99.5 area wt % pure by HPLC).

$^1$H-NMR (400 MHz, DMSO-$d_6$): δ 3.6 (t, 2H), 4.4 (t, 2H), 4.6 (s, 2H), and 10.6 (b, 2H) ppm; $^{13}$C-NMR (100 MHz, DMSO-$d_6$): δ: 39.4, 39.6, 41.0, 118.6 (q, J=325 Hz), 142.9 (q, J=50 Hz), and 148.8 ppm.

Scheme 2




Step A: Preparation of 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-one (2-3)

2,4,5-Trifluorophenylacetic acid (2-1 (150 g, 0.789 mol), Meldrum's acid (125 g, 0.868 mol), and 4-(dimethylamino) pyridine (DMAP) (7.7 g, 0063 mol) were charged into a 5 L three-neck flask. N,N-Dimethylacetamide (DMAc) (525 mL) was added in one portion at room temperature to

dissolve the solids. N,N-diisopropylethylamine (282 mL, 1.62 mol) was added in one portion at room temperature while maintaining the temperature below 40° C. Pivaloyl chloride (107 mL, 0.868 mol) was added dropwise over 1 to 2 h while maintaining the temperature between 0 and 5° C. The reaction mixture was aged at 5° C. for 1 h. Triazole hydrochloride 14 (180 g, 0.789 mol) was added in one portion at 40-50° C. The reaction solution was aged at 70° C. for several h. 5% Aqueous sodium hydrogencarbonate solution (625 mL) was then added dropwise at 20-45° C. The batch was seeded and aged at 20-30° C. for 1-2 h. Then an additional 525 mL of 5% aqueous sodium hydrogencarbonate solution was added dropwise over 2-3 h. After aging several h at room temperature, the slurry was cooled to 0-5° C. and aged 1 h before filtering the solid. The wet cake was displacement-washed with 20% aqueous DMAc (300 mL), followed by an additional two batches of 20% aqueous DMAc (400 mL), and finally water (400 mL). The cake was suction-dried at room temperature. The isolated yield of final product 2-3 was 89%.

Step B: Preparation of (2Z)-4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl-]-1-(2,4,5-trifluorophenyl)but-2-en-2-amine (2-4)

A 5 L round-bottom flask was charged with methanol (100 mL), the ketoamide 2-3 (200 g), and ammonium acetate (110.4 g). Methanol (180 mL) and 28% aqueous ammonium hydroxide (58.6 mL) were then added keeping the temperature below 30° C. during the addition. Additional methanol (100 mL) was added to the reaction mixture. The mixture was heated at reflux temperature and aged for 2 h. The reaction was cooled to room temperature and then to about 5° C. in an ice-bath. After 30 min, the solid was filtered and dried to afford 2-4 as a solid (180 g); m.p. 271.2° C.

Step C: Preparation of (2R)-4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1 2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine (2-5)

Into a 500 ml flask were charged chloro(1,5-cyclooctadiene)rhodium(I) dimer {[Rh(cod)Cl]$_2$}(292 mg, 1.18 mmol) and (R,S) t-butyl Josiphos (708 mg, 1.3 mmol) under a nitrogen atmosphere. Degassed MeOH was then added (200 mL) and the mixture was stirred at room temperature for 1 h. Into a 4 L hydrogenator was charged the enamine amide 2-4 (118 g, 0.29 mol) along with MeOH (1 L). The slurry was degassed. The catalyst solution was then transferred to the hydrogenator under nitrogen. After degassing three times, the enamine amide was hydrogenated under 200 psi hydrogen gas at 50° C. for 13 h. Assay yield was determined by HPLC to be 93% and optical purity to be 94% ee.

The optical purity was further enhanced in the following manner. The methanol solution from the hydrogenation reaction (18 g in 180 mL MeOH) was concentrated and switched to methyl t-butyl ether (MTBE) (45 mL). Into this solution was added aqueous $H_3PO_4$ solution (0.5 M, 95 mL). After separation of the layers, 3N NaOH (35 mL) was added to the water layer, which was then extracted with MTBE (180 mL+100 mL). The MTBE solution was concentrated and solvent switched to hot toluene (180 mL, about 75° C.). The hot toluene solution was then allowed to cool to 0° C. slowly (5-10 h). The crystals were isolated by filtration (13 g, yield 72%, 98-99% ee); m.p. 114.1-115.7° C.

$^1$H NMR (300 MHz, $CD_3CN$): δ 7.26 (m), 7.08 (m), 4.90 (s), 4.89 (s), 4.14 (m), 3.95 (m), 3.40 (m), 2.68 (m), 2.49 (m), 1.40 (bs).

Compound 2-5 exists as amide bond rotamers. Unless indicated, the major and minor rotamers are grouped together since the carbon-13 signals are not well resolved:

$^{13}$C NMR ($CD_3CN$): δ 171.8, 157.4 (ddd, $J_{CF}$=242.4, 9.2, 2.5 Hz), 152.2 (major), 151.8 (minor), 149.3 (ddd; $J_{CF}$=246.7, 14.2, 12.9 Hz), 147.4 (ddd, $J_{CF}$=241.2, 12.3, 3.7 Hz), 144.2 (q, $J_{CF}$=38.8 Hz), 124.6 (ddd, $J_{CF}$=18.5, 5.9, 4.0 Hz), 120.4 (dd, $J_{CF}$=19.1, 6.2 Hz), 119.8 (q, $J_{CF}$=268.9 Hz), 106.2(dd, $J_{CF}$=29.5, 20.9 Hz), 50.1, 44.8, 44.3 (minor), 43.2 (minor), 42.4, 41.6 (minor), 41.4, 39.6, 38.5 (minor), 36.9.

The crystalline free base can also be isolated as follows:

(a) The reaction mixture upon completion of the hydrogenation step is charged with 25 wt % of Ecosorb C-941. The mixture is stirred under nitrogen for one h and then filtered. The cake is washed with 2 L/kg of methanol. Recovery of free base is about 95% and optical purity about 95% ee.

(b) The freebase solution in methanol is concentrated to 3.5-4.0 L/kg volume (based on free base charge) and then solvent-switched into isopropanol (IPA) to final volume of 3.0 L/kg IPA.

(c) The slurry is heated to 40° C. and aged 1 h at 40° C. and then cooled to 25° C. over 2 h.

(d) Heptane (7 L/kg) is charged over 7 h and the slurry stirred for 12 h at 22-25° C. The supernatant concentration before filtering is 10-12 mg/g.

(e) The slurry is filtered and the solid washed with 30% IPA/heptane (2 L/kg).

(f) The solid is dried in a vacuum oven at 40° C.

(g) The optical purity of the free base is about 99% ee.

The following high-performance liquid chromatographic (HPLC) conditions were used to determine percent conversion to product:

Column: Waters Symmetry C18, 250 mm×4.6 mm
Eluent: Solvent A: 0.1 vol % $HClO_4/H_2O$
Solvent B: acetonitrile
Gradient: 0 min 75% A: 25% B
10 min 25% A: 75% B
12.5 min 25% A: 75% B
15 min 75% A: 25% B
Flow rate: 1 mL/min
Injection Vol.: 10 μL
UV detection: 210 nm
Column temp.: 40° C.
Retention times: compound 2-4: 9.1 min
compound 2-5: 5.4 min
tBu Josiphos: 8.7 min

The following high-performance liquid chromatographic (HPLC) conditions were used to determine optical purity:

Column: Chirapak, AD-H, 250 mm×4.6 mm
Eluent: Solvent A: 0.2 vol. % diethylamine in heptane
Solvent B: 0.1 vol % diethylamine in ethanol
Isochratic Run Time: 18 min
Flow rate: 0.7 mL/min
Injection Vol.: 7 μL
UV detection: 268 nm
Column temp.: 35° C.
Retention times: (R)-amine 2-5: 13.8 min
(S)-amine 2-5: 11.2 min

(2R)-4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,24]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine dihydrogenphosphate monohydrate

A 250 mL round bottom flask equipped with an overhead stirrer, heating mantle and thermocouple, was charged with 31.5 mL of isopropanol (IPA), 13.5 mL water, 15.0 g (36.9 mmol) of (2R)-4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,

2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl) butan-2-amine freebase and 4.25 g (36.9 mmol) of 85% aqueous phosphoric acid. The mixture was heated to 75° C. A thick white precipitate formed at lower temperatures but dissolved upon reaching 75° C. The solution was cooled to 68° C. and then held at that temperature for 2 h. A slurry bed of solids formed during this age time [the solution can be seeded with 0.5 to 5 wt % of small particle size (alpine milled) monohydrate]. The slurry was then cooled at a rate of 4° C./h to 21° C. and then held overnight. 105 mL of EPA was then added to the slurry. After 1 h the slurry was filtered and washed with 45 mL IPA (solids can also be washed with a water/IPA solution to avoid turnover to other crystal forms). The solids were dried on the frit with open to air. 18.6 g of solids were recovered. The solids were found to be greater than 99.8% pure by HPLC area percentage (HPLC conditions same as those given above). The particle size distribution analysis of the isolated solids showed a mean PSD of 80 microns with 95% less than 180 microns. The crystal form of the solids was shown to be monohydrate by X-ray powder diffraction and thermogravimetric analysis.

X-ray powder diffraction studies are widely used to characterize molecular structures, crystallinity, and polymorphism. The X-ray powder diffraction pattern of the crystalline dihydrogenphosphate monohydrate was generated on a Philips Analytical X'Pert PRO X-ray Diffraction System with PW3040/60 console. A PW3373/00 ceramic Cu LEF X-ray tube K-Alpha radiation was used as the source.

FIG. **1** shows the X-ray diffraction pattern for the crystalline monohydrate form of the dihydrogenphosphate salt of structural formula II. The monohydrate exhibited characteristic diffraction peaks corresponding to d-spacings of 7.42, 5.48, and 3.96 angstroms. The monohydrate was further characterized by the d-spacings of 6.30, 4.75, and 4.48 angstroms. The monohydrate was even further characterized by the d-spacings of 5.85, 5.21, and 3.52 angstroms.

In addition to the X-ray powder diffraction patterns described above, the crystalline monohydrate form of the dihydrogenphosphate salt of structural formula II was further characterized by its solid-state carbon-13 and fluorine-19 nuclear magnetic resonance (NMR) spectra. The solid-state carbon-13 NMR spectrum was obtained on a Bruker DSX 400WB NMR system using a Bruker 4 mm double resonance CPMAS probe. The carbon-13 NMR spectrum utilized proton/carbon-13 cross-polarization magic-angle spinning with variable-amplitude cross polarization. The sample was spun at 15.0 kHz, and a total of 2048 scans were collected with a recycle delay of 20 seconds. A line broadening of 40 Hz was applied to the spectrum before FT was performed. Chemical shifts are reported on the TMS scale using the carbonyl carbon of glycine (176.03 p.p.m.) as a secondary reference.

The solid-state fluorine-19 NMR spectrum was obtained on a Bruker DSX 400WB NMR system using a Bruker 4 mm CRAMPS probe. The NMR spectrum utilized a simple pulse-acquire pulse program. The samples were spun at 15.0 kHz, and a total of 16 scans were collected with a recycle delay of 30 seconds. A vespel endcap was utilized to minimize fluorine background. A line broadening of 100 Hz was applied to the spectrum before FT was performed. Chemical shifts are reported using poly(tetrafluoroethylene) (teflon) as an external secondary reference which was assigned a chemical shift of −122 ppm.

FIG. **2** shows the solid-state carbon-13 CPMAS NMR spectrum for the crystalline monohydrate form of the dihydrogenphosphate salt of structural formula II. The monohydrate form exhibited characteristic signals with chemical shift values of 169.1, 120.8, and 46.5 p.p.m. Further characteristic of the monohydrate form were the signals with chemical shift values of 159.0, and 150.9, and 40.7 ppm.

FIG. **3** shows the solid-state fluorine-19 MAS NM spectrum for the crystalline monohydrate form of the dihydrogenphosphate salt of structural formula II. The monohydrate form exhibited characteristic signals with chemical shift values of −64.5, −114.7, −136.3, and −146.2 p.p.m. Further characteristic of the monohydrate form were the signals with chemical shift values of −96.5, −104.4, −106.3, and −154.5 ppm.

FIG. **4** shows the characteristic thermogravimetric analysis (TGA) curve for the crystalline monohydrate form of the dihydrogenphosphate salt of structural formula II. A Perkin Elmer model TGA 7 or equivalent instrument was used. Experiments were performed under a flow of nitrogen and using a heating rate of 10° C./min to a maximum temperature of approximately 250° C. After automatically taring the balance, 5 to 20 mg of sample was added to the platinum pan, the furnace was raised, and the heating program started. Weight/temperature data were collected automatically by the instrument. Analysis of the results was carried out by selecting the Delta Y function within the instrument software and choosing the temperatures between which the weight loss was to be calculated. Weight losses are reported up to the onset of decomposition/evaporation. TGA indicated a weight loss of about 3.3647 % from ambient temperature to about 250° C.

FIG. **5** shows the characteristic DSC curve for the crystalline monohydrate form of the dihydrogenphosphate salt of structural formula II. A TA Instruments DSC 2910 or equivalent instrumentation was used. Between 2 and 6 mg sample was weighed into an open pan. This pan was then crimped and placed at the sample position in the calorimeter cell. An empty pan was placed at the reference position. The calorimeter cell was closed and a flow of nitrogen was passed through the cell. The heating program was set to heat the sample at a heating rate of 10° C./min to a temperature of approximately 250° C. The heating program was started. When the run was completed, the data were analyzed using the DSC analysis program contained in the system software. The melting endotherm was integrated between baseline temperature points that are above and below the temperature range over which the endotherm was observed. The data reported are the onset temperature, peak temperature, and enthalpy.

The crystalline dihydrogenphosphate salt monohydrate of the present invention has a phase purity of at least about 5% of the form with the above X-ray powder diffraction, fluorine-19 MAS NMR, carbon-13 CPMAS NMR, and DSC physical characteristics. In one embodiment the phase purity is at least about 10% of the form with the above solid-state physical characteristics. In a second embodiment the phase purity is at least about 25% of the form with the above solid-state physical characteristics. In a third embodiment the phase purity is at least about 50% of the form with the above solid-state physical characteristics. In a fourth embodiment the phase purity is at least about 75% of the form with the above solid-state physical characteristics. In a fifth embodiment the phase purity is at least about 90% of the form with the above solid-state physical characteristics. In a sixth embodiment the crystalline dihydrogenphosphate salt monohydrate is the substantially phase pure form with the above solid-state physical characteristics. By the term "phase purity" is meant the solid state purity of the dihydrogenphosphate salt monohydrate with regard to a particu-

lar crystalline or amorphous form of the salt as determined by the solid-state physical methods described in the present application.

The crystalline dihydrogenphosphate salt monohydrate was found to be stable under ambient condition. It was found to convert to dehydrated monohydrate if heated to above 40° C. under very dry nitrogen flow. Dehydrated monohydrate converted back to monohydrate under ambient condition.

## EXAMPLES OF PHARMACEUTICAL COMPOSITIONS

1) Direct Compression Process:

The dihydrogenphosphate salt monohydrate was formulated into a tablet by a direct compression process. A 100 mg potency tablet was composed of 128.4 mg of the active ingredient, 127.8 mg microcrystalline cellulose, 127.8 mg of mannitol (or 127.8 mg of dicalcium phosphate), 8 mg of croscarmellose sodium, 8 mg of magnesium stearate and 16 mg of Opadry white (proprietary coating material made by Colorcon, West Point, Pa.). The active ingredient, microcrystalline cellulose, mannitol (or dicalcium phosphate), and croscarmellose were first blended, and the mixture was then lubricated with magnesium stearate and pressed into tablets. The tablets were then film coated with Opadry White.

2) Roller Compaction Process:

The dihydrogenphosphate salt monohydrate was formulated into a tablet by a roller compaction process. A 100 mg potency tablet was composed of 128.4 mg of the active ingredient, 45 mg microcrystalline cellulose, 111.6 mg of dicalcium phosphate, 6 mg of croscarmellose sodium, 9 mg of magnesium stearate and 12 mg of Opadry white (proprietary coating material made by Colorcon, West Point, Pa.). The active ingredient, microcrystalline cellulose, dicalcium phosphate, and croscarmellose were first blended, and the mixture was then lubricated with one third the total amount of magnesium stearate and roller compacted into ribbons. These ribbons were then milled and then resulting granules were lubricated with the remaining amount of the magnesium stearate and pressed into tablets. The tablets were then film coated with Opadry White. 3) An intravenous (i.v.) aqueous formulation is defined as the monohydrate of dihydrogenphosphate salt of formula I in 10 mM sodium acetate/0.8% saline solution at pH 4.5±0.2. For a formulation with a concentration of 4.0 mg/mL, 800 mg of NaCl is dissolved in 80 mL of water, then 57.5 μL of glacial acetic acid is added, followed by 512 mg of the dihydrogenphosphate salt monohydrate. The pH is adjusted to 4.5±0.2 with 0.1 N NaOH solution. The final volume is adjusted to 100 mL with water. A 2.0 mg/mL solution can be made by dilution of 50.0 mL of the 4.0 mg/mL solution to 100.0 mL with placebo. A 1.0 mg/mL solution can be made by dilution of 25.0 mL of the 4.0 mg/mL solution to 100.0 mL with placebo.

What is claimed is:

**1**. A dihydrogenphosphate salt of 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine of structural formula I:

(I)




or a hydrate thereof.

**2**. The salt of claim **1** of structural formula II having the (R)-configuration at the chiral center marked with an *

(II)




**3**. The salt of claim **1** of structural formula III having the (S)-configuration at the chiral center marked with an *

(III)




**4**. The salt of claim **2** characterized in being a crystalline monohydrate.

**5**. The salt of claim **4** characterized by characteristic absorption bands obtained from the X-ray powder diffraction pattern at spectral d-spacings of 7.42, 5.48, and 3.96 angstroms.

**6**. The salt of claim **5** further characterized by characteristic absorption bands obtained from the X-ray powder diffraction pattern at spectral d-spacings of 6.30, 4.75, and 4.48 angstroms.

**7**. The salt of claim **6** further characterized by characteristic absorption bands obtained from the X-ray powder diffraction pattern at spectral d-spacings of 5.85, 5.21, and 3.52 angstroms.

**8**. The salt of claim **7** further characterized by the X-ray powder diffraction pattern of FIG. **1**.

**9**. The salt of claim **4** characterized by a solid-state carbon-13 CPMAS nuclear magnetic resonance spectrum showing signals at 169.1, 120.8, and 46.5 ppm.

**10**. The salt of claim **9** further characterized by a solid-state carbon-13 CPMAS nuclear magnetic resonance spectrum showing signals at 159.0, 150.9, and 40.7 ppm.

**11**. The salt of claim **10** further characterized by the solid-state carbon-13 CPMAS nuclear magnetic resonance spectrum of FIG. **2**.

**12**. The salt of claim **4** characterized by a solid-state fluorine-19 MAS nuclear magnetic resonance spectrum showing signals at −64.5, −114.7, −136.3, and −146.2 ppm.

**13**. The salt of claim **12** further characterized by a solid-state fluorine-19 MAS nuclear magnetic resonance spectrum showing signals at −96.5, −104.4, −106.3, and −154.5 ppm.

**14**. The salt of claim **13** further characterized by the solid-state fluorine-19 MAS nuclear magnetic resonance spectrum of FIG. **3**.

**15**. The salt of claim **4** characterized by the thermogravimetric analysis curve of FIG. **4**.

**16**. The salt of claim **4** characterized by the differential scanning calorimetric curve of FIG. **5**.

**17**. A pharmaceutical composition comprising a therapeutically effective amount of the salt according to claim **2** in association with one or more pharmaceutically acceptable carriers.

**18**. A pharmaceutical composition comprising a therapeutically effective amount of the salt according to claim **4** in association with one or more pharmaceutically acceptable carriers.

**19**. A method for the treatment of type 2 diabetes comprising administering to a patient in need of such treatment a therapeutically effective amount of the salt according to claim **2** or a hydrate thereof.

**20**. A method for the treatment of type 2 diabetes comprising administering to a patient in need of such treatment a therapeutically effective amount of the salt according to claim **4**.

**21**. A process for preparing the salt of claim **2** comprising the step of contacting one equivalent of (2R)-4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine in an organic solvent or aqueous organic solvent with about a one equivalent of phosphoric acid at a temperature in the range of about 25-100° C.

**22**. The process of claim **21** wherein said organic solvent is a $C_1$-$C_5$ linear or branched alkanol.

**23**. The phosphoric acid salt of (2R)-4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine prepared according to the process of claim **21**.

**24**. A process for preparing the crystalline monohydrate of claim **4** comprising the steps of:

(a) crystallizing the dihydrogenphosphate salt of structural formula (II):

(II)




at 25° C. from a mixture of isopropanol and water, such that the water concentration is above 6.8 weight percent;

(b) recovering the resultant solid phase; and

(c) removing the solvent therefrom.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION



PATENT NO. : 7,326,708 B2
APPLICATION NO. : 10/874992
DATED : February 5, 2008
INVENTOR(S) : Cypes et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:

The first or sole Notice should read --

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 884 days.

Signed and Sealed this
Ninth Day of February, 2016

Michelle K. Lee

Michelle K. Lee
*Director of the United States Patent and Trademark Office*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Opening Brief of Appellant complies with the word limitation of Fed. Cir. R. 32(b)(1) because it contains 12,278 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in Microsoft Word 2016 using a proportionally spaced typeface (Book Antiqua) in 14-point font.

Dated: October 18, 2021 /s/ Deepro R. Mukerjee

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a copy of the foregoing Opening Brief of Appellants to be filed on October 18, 2021, with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit using the Court's electronic filing system, which will send a notice of electronic filing to all attorneys appearing in this matter.

/s/ Deepro R. Mukerjee